USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/10/13

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HICHAM AZKOUR, | |
| *Plaintiff,* | <u>Civil Action No. 10-CIV-4132 (RJS)(KNF)</u> |
| *v.* | |
| LITTLE REST TWELVE, INC., ET AL., |  |
| *Defendants.* | |

---

## PLAINTIFF'S PRE-MOTION LETTER FOR THE ISSUANCE OF A WRIT OF ATTACHMENT

---

In accordance with this Court's Individual Rule A.2, I respectfully request that, pursuant to Fed. R. Civ. P. 64 and based upon the attached evidence, the Court allow me to file a motion seeking attachment of defendant Little Rest Twelve, Inc.'s assets to any potential judgment in my favor.

"At the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment.

But a federal statute governs to the extent it applies." Fed. R. Civ. P. 64 (a); *see Capital Ventures Int'l v. Republic of Argentina, 443 F.3d 214, 221 (2d Cir. 2006).* "Rule 64 ... authorizes a federal court to borrow relevant state law on provisional remedies. And although the federal civil rules govern the conduct of the action in federal court, state law determines when and how a provisional remedy is obtained. ... Limitations and other state law provisions about the circumstances and mariner in which provisional remedies can be used, must be honored by the federal court." *Bahrain Telecommc'ns Co. v. Discoverytel, Inc., 476 F.Supp.2d 176, 183 (D.Conn.2007)* (internal citations and quotation marks omitted). New York law allows an order of attachment when "the cause of action is based on a ... judgment which qualifies for recognition under the provisions of [N.Y.C.P.L.R. §§ 5301 *et seq.*]" N.Y.C.P.L.R. § 6201(5). "Any debt or property against which a money judgment may be enforced as provided in [N.Y.C.P.L.R. § 5201] is subject to attachment." N.Y.C.P.L.R. § 6202.

The records shows there is evidence that defendant Little Rest Twelve, Inc. has not heretofore complied with the Court Judgment dated December 28, 2012, which awarded Samuel & Stein, my former counsel, attorneys' fees in the amount of $32, 315.11.

In New York, an order of attachment may be granted in any action for money damages when:

1. The defendant is a non-domiciliary residing without the state, or is a foreign corporation not qualified to do business in state; or

2. The defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so; or

3. The defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts.

N.Y.C.P.L.R. § 6201

In the present matter, there is evidence, as demonstrated by the issuance of the Writ of Execution on March 20, 2013, that the defendant has the intention to defraud me and frustrate any judgment in my favor by assigning, disposing of, encumbering or secreting property, or removing it from the state. The defendant, considering its suspicious behavior, may be about to do any of these enumerated acts. Moreover, even though the defendant, Little Rest Twelve, Inc., is a corporation registered in the state of New York, it remains 85% owned by a foreign corporation and its assets in the United States may not satisfy any judgment.

As I have previously informed the Court and as the Court has been made aware in *Inna Gudavadze, et al., v. Joseph Kay, et al.,* 08 civ. 3363 (RJS) (hereinafter referred to as "*Gudavadze*"), Little Rest Twelve, Inc. is 85% owned by Grosvenor Trading House Ltd., a British company, which, in turn, is 100% owned by the Valmore Trust, through its trustee (currently SP Trustees Gmbh). This trust was established by Miselva Establishment, a Liechtenstein trust company. Jean-Yves Haouzi, a French citizen with no ties to this country, who is also a defendant in another related matter pending before this Court, owns the remaining 15% of Little Rest Twelve, Inc.

In an Order dated January 19, 2012, granting summary judgment as to the ownership controversy of Little Rest Twelve, Inc., the Hon. A. J. Cristol, United States Bankruptcy Judge, Southern District of Florida, Miami Division, determined that Little Rest Twelve, Inc. is part of Inna Gudavadze's assets. *Compare* EXHIBIT A and *Gudavadze* Docket Entry No. 42 at ¶ 40-50.

In adversary proceedings, the Hon. Kathleen M. Williams, United States District Judge, Southern District of Florida, Miami Division, upheld Judge Cristol's findings and decision. *See* EXHIBIT B.

Based upon the accounts of <u>EXHIBIT A</u> and <u>EXHIBIT B</u>, it is now clear to this Court the controversial assets inherited by Inna Gudavadze and her daughters were amassed by the late Arkadi ("Badri") Patarkatsishvili[1] after the fall of the Soviet Union. Despite the fact that the current owners of Little Rest Twelve, Inc. have assets valued in the billions of dollars and scattered all across the globe, they have heretofore refused to pay my attorney's fees and, as stated above and it is clear on the record, a Writ of Execution issued on March 20, 2013.

Notwithstanding my former attorney's antagonisms and shortcomings, I prevailed on all claims in the present matter. More than a year ago, this Court issued an Order to this effect on March 27, 2012. On the other hand, N.Y.C.P.L.R. § 5229 states:

> In any court, before a judgment is entered, upon motion of the party in whose favor a verdict or decision has been rendered, the trial judge may order examination of the adverse party and order him restrained with the same effect as if a restraining notice had been served upon him after judgment.

This being considered, the Court is respectfully requested to act in accordance with N.Y.C.P.L.R. § 5222, N.Y.C.P.L.R. § 5229, and issue a Writ of Attachment pursuant to Fed. R. Civ. P. 64.

Respectfully submitted on April 10, 2013.

HICHAM AZKOUR, pro se

---

[1] Patarkatsishvili, like the late Boris Berezovsky, is a Russian Oligarch. They were partners. To protect their businesses, one was involved in Russian politics, the other ran for the presidential elections in the Republic of Georgia.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **PLAINTIFF'S PRE-MOTION LETTER FOR THE ISSUANCE OF A WRIT OF ATTACHMENT** has been served upon the defendants' attorney of record on this 10th day of April 2013, VIA ECF/MAIL:

Andrew S. Hoffmann, Esq.

450 Seventh Avenue, Suite 1400

New York, New York 10123

Dated: April 10th, 2013

By:          HICHAM AZKOUR, pro se

_____

HICHAM AZKOUR
127 W. 25th Street
New York, New York 10001

Email: hicham.azkour@gmail.com

# EXHIBIT A



**ORDERED in the Southern District of Florida on January 19, 2012.**

A. Jay Cristol, Judge
United States Bankruptcy Court

---

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division**

In re:                                                                    **CASE NO.: 11-17047-AJC**

**FISHER ISLAND INVESTMENTS, INC.,**                   Chapter 11 (Involuntary)

    Alleged Debtor.

_____/

In re:                                                                    **CASE NO.: 11-17061-AJC**

**LITTLE REST TWELVE, INC.,**                                Chapter 11 (Involuntary)

    Alleged Debtor.

_____/

## MEMORANDUM OPINION GRANTING SUMMARY JUDGMENT

THIS CAUSE is before the Court pursuant to Rule 7056(f), Fed. R. Bankr. P. In its Memorandum Opinion Denying the Zeltser Alleged Debtors' Motion for Partial Summary Judgment dated December 29, 2011 the Court stated that it was inclined to determine as a matter of law that Miselva Etablissement, a Liechtenstein entity ("Miselva") and onetime trustee of the Gibraltar trust named the Valmore Trust, owns Fisher Island Limited ("FIL") and Grosvenor

Trading House Limited ("GTHL"). *See* (Case No. 11-17047-AJC, ECF No. 405; Case No. 11-17061-AJC, ECF No. 338) (the "Order"). The Court stated that before making such a determination it would permit the alleged debtors Fisher Island Investments, Inc. ("FII") and Little Rest Twelve, Inc. ("LR12") as represented by Darin DiBello, Esq. and Emanuel Zeltser, Esq. (the "Zeltser Alleged Debtors") to file a legal memorandum within twenty-one (21) days of the Order to assert any basis why the Court should not enter summary judgment as indicated. By notice filed January 5, 2012, the Zeltser Alleged Debtors advised the Court that they would not file any such memorandum and would rely on the existing record already before the Court. *See* (Case No. 11-17047-AJC ECF No. 421; Case No. 11-17061-AJC ECF No. 350).

Despite being given the opportunity to do so, the Zeltser Alleged Debtors have chosen not to raise any issues of disputed fact or otherwise point the Court to specific evidence in the record which might raise an issue of disputed fact for disposition by the Court at trial. Having reviewed the record before it and having drawn all *reasonable* inferences in favor of the Zeltser Alleged Debtors, the Court finds, as a matter of law, that FIL, GTHL and their respective subsidiaries are assets of the Valmore Trust and entry of summary judgment is therefore proper.

## BACKGROUND

The Order contains a lengthy recitation of the procedural posture of this case and the positions of the parties; accordingly, the Court will only recite the facts relevant to this ruling. Two sets of attorneys claim to represent FII and LR12: the Zeltser Alleged Debtors, and the group represented by Patricia Redmond, Esq., Joseph Rebak, Esq., and Martin Russo, Esq. (the "Redmond Alleged Debtors"). The Zeltser Alleged Debtors sought a determination by way of a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure, Rule 56, Federal Rule of Bankruptcy Procedure Rule 7056 and Federal Rule of Bankruptcy Procedure Rule 9014

2

(Case No. 11-17047-AJC ECF No. 340; Case No. 11-17061-AJC ECF No. 271) that, among other claims, an entity named JWL Entertainment Group, Inc., a Delaware corporation ("JWL") is the equitable or beneficial owner of FII and LR12, pursuant to a transaction that occurred in late 2007 (the "JWL Transaction").

## DISCUSSION

The Zeltser Alleged Debtors' argument is that FIL and GTHL, and therefore FII and LR12, were transferred from Miselva to JWL and thereafter that JWL was transferred by Fallon Invest & Trade, Inc. ("Fallon") out of the Valmore Trust to Imedinvest Partners. *See* Case No. 11-17047-AJC ECF No. 428 at Exhibit 10; Case No. 11-17061-AJC ECF No. 354 at Exhibit 10; *see also* Hr'g Tr. of 3/25/10 at pp. 22:25 – 23:15; see also Case No. 11-17047-AJC ECF No. 347, Case No. 11-17061-AJC ECF No. 287. The Zeltser Alleged Debtors urge that all aspects of the JWL Transaction must be viewed under New York Law, and that as a matter of law, this Court is without jurisdiction to review the JWL transaction.

The Redmond Alleged Debtors filed a Memorandum in Opposition to Motion for Summary Judgment ("Response") (Case No. 11-17047-AJC ECF No. 372; Case No. 11-17061-AJC ECF No. 304) as well as lengthy Appendixes to the Memorandum in Opposition (Case No. 11-17047-AJC EFF Nos. 374, 375, 376, 377, 378, 379, 380, 381, 382; Case No. 11-17061-AJC ECF Nos. 306, 307, 308, 309, 310, 311, 312, 313, 314). The Redmond Alleged Debtors asserted that the JWL Transaction was never completed and even if it was, it did not affect the Valmore Trustee's ultimate ownership of these entities.

Based on the record before the Court, the Court denied the Zeltser Alleged Debtors' Motion, and stated that it was inclined to determine as a matter of law that Miselva owns FIL and GTHL. The Court is aware that Miselva was replaced as Trustee of the Valmore Trust (*See*

3

Case No. 11-17047-AJC ECF No. 428 at Exhibit 8; Case No. 11-17061-AJC ECF No. 354 at Exhibit 8) and accordingly, the matter for determination is whether SP Trustees Gmbh, as successor to Miselva as Trustee of the Valmore Trust owns FIL and GTHL, and consequently the companies below FIL and GTHL, which include FII and LR12.

The Court, having reviewed the entire record in these proceedings and having considered the positions advanced by the parties throughout the proceedings, enters summary judgment and finds that the SP Trustees Gmbh as Trustee of the Valmore Trust wholly owns FIL and GTHL, and therefore, is the owner of 100% of FII and 85% of LR12.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Pursuant to Rule 56(f), after giving notice and a reasonable time to respond, the court may grant summary judgment for a non-movant, or consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute. A court may *sua sponte* grant summary judgment where the non-moving party has been afforded an adequate opportunity to develop the record. *Artistic Ent. Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201-02 (11th Cir. 2003). The mere existence of *some* alleged material factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 248.

Entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an

4

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* at 322. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson* at 249, *citing First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). As stated herein, the Court finds that there are no *genuine* disputes as to any material fact that would preclude summary judgment in favor of the Redmond Group.

Based upon the undisputed facts, as stated more particularly in the Court's Memorandum Opinion Denying the Zeltser Alleged Debtors' Motion for Partial Summary Judgment, the Court, pursuant to Rule 56, of the Federal Rules of Civil Procedure, enters summary judgment that FIL, GTHL and their respective subsidiaries are assets of the Valmore Trust. Accordingly, it is

**ORDERED** and **ADJUDGED** that Final Summary Judgment is entered as follows:

a.    The Valmore Trust, through its trustee (currently SP Trustees Gmbh) owns 100% of Fisher Island Limited, which owns 100% of Euro Properties Investments III, S.A., which owns 100% of Fisher Island Investments, Inc., which owns 100% of Fisher Island Holdings, LLC.

b.    The Valmore Trust, through its trustee (currently SP Trustees Gmbh) owns 100% of Grosvenor Trading House, Limited, which owns 85% of Little Rest Twelve, Inc. with Jean-Yves Haouzi owning the remaining 15% of Little Rest Twelve, Inc.

###

Copies furnished to:

Patricia Redmond, Esq., who shall serve a copy of this order upon all interested parties immediately upon receipt of same and shall thereupon file a certificate of service.

5

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-20939-Civ-WILLIAMS**

In re:

FISHER ISLAND INVESTMENTS, INC.          Bankruptcy Case No. 11-17047-AJC

and,

LITTLE REST TWELVE, INC.,                 Bankruptcy Case No. 11-17061-AJC

Alleged Debtors.

_____/

## ORDER GRANTING MOTIONS TO DISMISS

This MATTER is before the Court on motions to dismiss for lack of standing
several appeals taken from a final summary judgment order entered by the Bankruptcy
Court. For the reasons set forth below, the motions are **GRANTED**.

### I. BACKGROUND

The saga of which this case is but a chapter began in February 2008 with the
unexpected death of Arkadi ("Badri") Patarkatsisvhili, an extremely wealthy
businessman and one-time presidential candidate from the Republic of Georgia. Almost
immediately after his death, a highly contentious and bitterly-fought contest erupted
over the ownership and control of his assets, which are purportedly valued in the billions
of dollars. On one side of the dispute is Badri's immediately family, led by his widow,
Inna Gudavadze. On the other side is Joseph Kay, a distant relative and employee of
Badri, and others associated with Kay. The dispute between these factions has
produced substantial litigation around the globe—in the Republic of Georgia, the United

1

Kingdom, Liechtenstein, Gibraltar, and both federal and state courts in the United States.

This case represents the most recent salvo in the dispute, involving two of Badri's assets. The first is Fisher Island Investments, Inc. ("FII"), a Florida corporation that effectively owns the remaining developments rights to Fisher Island, an exclusive residential community off the southern tip of Miami Beach, Florida. The second asset is Little Rest Twelve, Inc. ("LR12"), a New York corporation that owns and operates a popular Asian fusion restaurant in Manhattan's Meatpacking District known as Ajna Bar (formerly known as Buddha Bar). FII and LR12 are the Alleged Debtors in the underlying bankruptcy proceedings.

As explained below, those proceedings have focused in large part on the threshold issue of what attorneys have the authority to represent FII and LR12. To resolve that issue, it became necessary to determine who owns and controls the Alleged Debtors (and thus has the authority to retain counsel). The ownership dispute has been complicated by an ever-shifting labyrinth of corporations, trusts, partnerships, holding companies, and interested individuals. As a result, and for ease of reference, the Gudavadze faction has been referred to in the bankruptcy proceedings as the Redmond Group, named after that faction's lead bankruptcy attorney; likewise, the Kay faction has been referred to as the Zeltser Group, named after that faction's lead attorney. Finally, making matters even more difficult, the courts have had to grapple with ongoing allegations of misconduct, mostly directed at the Kay faction and its attorneys, including charges of flagrant forum-shopping, abuse of the judicial system,

2

and falsification of documents, testimony, transactions—even entire corporate entities—in order to construct favorable chains of corporate ownership.

The dispute over FII and LR12 did not begin in the Bankruptcy Court. Rather, shortly after Badri's death, an action was brought in the courts of the British territory of Gibraltar. At that time, the competing factions appeared to acknowledge that FII and LR12 were assets of a Gibraltar entity called the Valmore Trust. Thus, the primary issue before the Gibraltar Court was whether Gudavadze or Kay was the beneficiary of the Valmore Trust. After a year and a half of litigation, and following a five-week trial in which Kay testified at length, the Gibraltar Court issued a 79-page opinion concluding that the vast majority of the assets in the Valmore Trust were funded by Badri and held for the benefit of his immediate family. [Bankr. No. 11-17047, D.E. 379, Exh. D].[1] The Court specifically found—and explained in detail—that Kay "was most certainly not a witness of truth" and "[took] advantage of the position of trust in which he found himself." [*Id.* at 68, 74].[2] After Kay abandoned his appeal, the Gibraltar Court determined that he had no interest in the assets of the Valmore Trust. [*See id.*, D.E. 380, Exhs. F, G].

Rather than appealing the Gibraltar Court's determination, Kay pursued a different theory of ownership in various litigations in this country, asserting that the Valmore Trust was a "sham" and that an investment entity called Imedinvest Partners, of which Kay was allegedly the managing partner, was the owner of FII and LR12. In

---

[1] This Court will generally cite to the docket entries in Bankruptcy Case No. 11-17047 (the FII proceeding), but parallel docket entry citations are available in Bankruptcy Case No. 11-17061 (the LR12 proceeding).

[2] Kay admitted during his testimony that he was the sort of person who was prepared to commit perjury in order to defraud third parties out of large sums of money. [Bankr. No. 11-17047, D.E. 379, Exh. 4 at 68]. In reviewing his testimony, the Gibraltar Court observed: "Truth for some may be malleable[;] for Kay it is vaporous." [*Id.* at 72].

New York state court, attorneys Emanuel Zeltser (of Sternik & Zeltser), Bruce D. Katz (of the Law Offices of Bruce D. Katz and Associates), and Alexander Fishkin (of A. Fishkin Attorney at Law PC) appeared on behalf of LR12 and advanced that theory. Following an 11-day evidentiary hearing, the New York Court issued a 43-page opinion rejecting it. As a result, the New York Court determined, at least provisionally, that those attorneys had no authority to represent LR12 and that the New York attorney for the Gudavadze faction, Martin Russo (of Gusrae Kaplan Bruno & Nusbaum), did have such authority. [See id., D.E. 380, Exh. H]. Like the Gibraltar Court, the New York Court found—and explained in detail—that key documents and witnesses produced by the Kay faction (including Kay's sister and son) were incredible and unworthy of belief. [See id. at 17-21, 27-31, 33-37]. Meanwhile, similar issues regarding the ownership and representation of FII were being litigated in Florida state court, with Florida attorneys Darin A. DiBello (of DiBello, Lopez & Castillo, P.A.) and Stewart M. Mirmelli (of the Mirmelli Law Firm, P.A.) representing the Kay faction and attorney Joseph Rebak (of Tew Cardenas LLP)[3] representing the Gudavadze faction.

On March 17, 2011, and as the Parties anticipated key rulings in the New York and Florida litigations, involuntary Chapter 11 petitions were simultaneously filed against FII and LR12 in the Bankruptcy Court for the Southern District of Florida.[4] Represented by lead attorney Craig Pugatch (of Rice Pugatch Robinson & Schiller), six

---

[3] After the motions to dismiss presently before this Court were fully briefed, attorney John F. O'Sullivan (of Hogan Lovells US LLP) was substituted as counsel for attorney Rebak. [D.E. 56].

[4] An involuntary petition was also filed against a related third entity called Mutual Benefits Offshore Fund, Ltd ("MBOF"). [Bankr. No. 11-17051-AJC]. While all three bankruptcy proceedings were generally litigated in a parallel fashion, the summary judgment proceedings at issue here did not address MBOF.

petitioning creditors—Solby + Westbrae Partners, 19 SHC Corp., Ajna Brands, Inc., 601/1700 NBC, LLC, Axafina, Inc., and Oxana Adler ("Petitioning Creditors")—asserted claims in the aggregate of approximately $32 million. [*Id.*, D.E. 1]. Purporting to represent FII and LIR12, the Zeltser Group (through attorney DiBello) filed answers consenting to relief only a few days later. [*Id.*, D.E. 6]. Shortly thereafter, attorney Patricia Redmond (of Stearns Weaver Miller Weissler Alhadeff & Sitterson), acting as co-counsel with Gudavadze attorneys Russo and Rebak, filed emergency motions to strike the answers, arguing that they were the true authorized representatives of FII and LR12 and that the involuntary petitions were filed in order to pretermit adverse rulings in the Florida and New York litigations. [*Id.*, D.E. 11]. The Bankruptcy Court initially granted relief from the automatic stay in order to allow those actions to proceed [*id.*, D.E. 34], but the Zeltser Group, through a series of procedural maneuvers,[5] effectively

---

[5] As to LR12, the Zeltser Group (through attorney Katz) removed the New York state litigation to federal district court in New York. However, the district court there entered a 37-page order remanding the case, finding that the "grounds for removal were extraordinarily weak" and "raise[d] a strong inference of delay and forum-shopping." [Case No. 11-cv-02306-JGF, D.E. 53 at 35 (S.D.N.Y. July 20, 2011)]. Undeterred, the Zeltser Group (through attorney Zeltser) then filed a voluntary Chapter 7 petition on behalf of LR12 in the Bankruptcy Court for the Southern District of New York. [Case No. 11-13428-SHL]. Because that petition threatened the operations of LR12, the Redmond Group filed an emergency motion to transfer venue back to the Florida Bankruptcy Court. [Bankr. No. 11-17061, D.E. 124, 135].

As to FII, the Zeltser Group removed the Florida state court litigation to the Florida Bankruptcy Court, where it became an adversary proceeding. [*See* Bankr. No. 11-17047, D.E. 38]. Still pending in that adversary proceeding is the Redmond Group's motion for an order requiring the Zeltser Group to show cause as to why it should not be sanctioned for committing fraud on the court due to its purported representation of FII. [*Id.*, Adv. Case No. 11-01886, D.E. 2].

revived the bankruptcy cases, insisting that only the Florida Bankruptcy Court could resolve the ownership dispute.[6]

Drawing on his twenty-five (25) years of experience on the bench, the Bankruptcy Judge remarked from the outset that the involuntary petitions "raised a smell," pointing to the following irregularities: the timing of the involuntary petitions in relation to the state court litigations; the timing of the answers consenting to the involuntary petitions; the specter of collusion between the Petitioning Creditors and the Zeltser Group; the questionable authenticity of the debt instruments upon which the Petitioning Creditors' claims were based; and the highly unusual situation of two groups vying to represent alleged debtors. [*E.g.*, *id.* D.E. 28; *id.*, D.E. 67 at 15-16, 29]. Given these irregularities, as well as the complexity of the case, the Bankruptcy Court ordered the U.S. Trustee to appoint an Examiner to investigate, *inter alia*, the ownership composition of the Alleged Debtors.[7] [*Id.*, D.E. 55, 60, 64]. If the Redmond Group was the authorized representative, then the involuntary petitions would be contested. If the Zeltser Group was the authorized representative, then the petitions would be uncontested.

---

[6] At the very first bankruptcy hearing, Zeltser informed the Bankruptcy Court that it was the "only Court" that could resolve the ownership dispute, and that its "decision will be dispositive." [Bankr. No. 11-17047, D.E. 46 at 60-61].

[7] These irregularities also led the Bankruptcy Court to impose a bond on the Petitioning Creditors in order to indemnify the Redmond Group for reasonable attorneys' fees in the event that the Petitioning Creditors' claims proved to be without merit. This Court subsequently affirmed those Bond Orders on appeal. [Case No. 11-cv-22050-KMW, D.E. 43]. To date, the Petitioning Creditors have still not posted a bond, and litigation continues in the Bankruptcy Court regarding the appropriate resolution of that issue. [*See* Bankr. No. 11-17047, D.E. 87, 125, 589, 657, 658, 659, 676].

The Bankruptcy Court entered an Agreed Case Management and Scheduling Order [*id.*, D.E. 113], and after several months of extensive discovery in accordance with that Order, the Examiner issued his 94-page Report. [*Id.*, D.E. 338]. The Report was based on a review of 200,000 pages of documents, pleadings and testimony from other litigation, interviews with witnesses and counsel, and position papers submitted by the two groups. [*See id.* at 21-30]. Following his review, the Examiner concluded that the Valmore Trust (not Imedinvest) was the ultimate owner of both FII and LR12, and that the Redmond Group (not the Zeltser Group) was therefore authorized to represent the Alleged Debtors in the bankruptcy proceedings. [*Id.* at 7]. Just as the Gibraltar and New York Courts had concluded, the Examiner found—and explained in detail—that there were:

> multiple material inconsistencies in the facts advanced by the DiBello/Zeltser Group. The DiBello/Zeltser Group's facts were not only inconsistent with third-party extrinsic evidence, but were also often irreconcilably inconsistent with positions taken by the DiBello/Zeltser Group in this litigation and by Kay and others affiliated with the DiBello/Zeltser Group in related litigation. Many of these conflicts and inconsistencies are not just minor differences arising from alternative interpretations of a document or a lapse of memory on a critical issue by a key witness, but go to the heart of the DiBello/Zeltser Group's position in these cases. These inconsistencies came in the form of irreconcilable differences in positions, statements and documents. The DiBello/Zeltser Group also provided little or no credible extrinsic evidence to support its positions or its version of the facts. In contrast, the Redmond/Rebak's story was consistent with positions propounded in, and testimony given in other courts, was credible and was supported by third-party extrinsic evidence.

[*Id.* at 65].

Two particular problems with the Zeltser Group's offers of proof are illustrative of the Examiner's findings. First, the Examiner explained that, despite the centrality of

Imedinvest to the Zeltser Group's narrative, he "was provided with surprisingly little extrinsic evidence to prove the operation or even the existence of Imedinvest." [*Id.* at 65-66]. Second, the Examiner emphasized that Kay and his sister testified in the Gibraltar litigation that they were unfamiliar with Imedinvest, thus "beg[ging] the question, if they did not know who Imedinvest was in 2009, how can the DiBello/Zeltser Group possibly contend that Imedinvest is the true owner of each of the Alleged Debtors and that it has been since (depending on which aspect of the story is being told) 2004, 2006, or 2008?" [*Id.* at 67-69]. The Examiner further determined that certain documents submitted by the Zeltser Group were "so substantially at odds with all other evidence and testimony" that they were "intentionally designed to mislead" the Bankruptcy Court. [*Id.* at 8-9, 88-91].[8]

Notwithstanding the Examiner's Report, which it contended was comprised of inadmissible hearsay [*see id.*, D.E. 442], the Zeltser Group (through attorney DiBello) filed a motion for partial summary judgment on the ownership issue.[9] Despite the

---

[8] The Court takes note that, in one of Badri's probate proceedings, the Chancery Division of the High Court of Justice in the United Kingdom recently "pronounce[d] against the force and validity" of several documents submitted by Kay, many of which were notarized by attorney Fishkin. [D.E. 45, Exh. A ¶ 3].

[9] In light of the Examiner's Report, the Zeltser Group also filed two motions which, if granted, would have derailed the course of the bankruptcy proceedings. First, it filed a motion to withdraw the reference to the district court. [Bankr. No. 11-17047, D.E. 346]. In denying the motion, U.S. District Judge Paul C. Huck found that the "Zeltser Group made multiple affirmative representations indicating that the Bankruptcy Court was the proper court to resolve the issue of ownership," the Zeltser Group agreed to the Case Management and Scheduling Order governing the ownership dispute, and the Zeltser Group's "belated change of heart occurred only after, and as a result of, the issuance of [the] unfavorable Examiner's Report." [*Id.*, D.E. 479; Case No. 12-cv-20018-PCH, D.E. 31].

Second, the Zeltser Group filed a motion to reconsider and/or for clarification of the Bankruptcy Court's Case Management and Scheduling Order. [Bankr. No. 11-17047, D.E. 347]. In response, the Redmond Group pointed out, *inter alia*, that it was the Zeltser Group that

posture that had been taken in the Gibraltar litigation, it now argued that the Valmore Trust was a sham and invalid. Alternatively, it argued that the respective holding companies for FII and LR12—Fisher Island Limited ("FIL") and Grosvenor Trading Holding Limited ("GTHL")—were transferred within the Valmore Trust to JWL Entertainment Group, Inc. ("JWL"), a Delaware corporation, and JWL was then transferred outside of the Valmore Trust to Imedinvest. [*Id.*, D.E. 340]. Despite previously and repeatedly having expressed indifference to the ownership issue, the Petitioning Creditors filed a brief in support of the Zeltser Group's position. [*Id.*, D.E. 369]. In response, the Redmond Group argued that the Valmore Trust was valid, that the JWL transaction was either never completed or ineffective, and that the Valmore Trust remained the ultimate owner of FIL and GTHL and thus of FII and LR12.  [*Id.*, D.E. 372].

The Bankruptcy Court denied the Zeltser Group's motion.  Perceiving no reason to disturb the factual findings of the Gibraltar Court, the Bankruptcy Court rejected the argument that the Valmore Trust was a sham and invalid.  The Court also found that there was evidence in the record to support the Redmond Group's assertion that the JWL transaction was abandoned, which alone was sufficient to defeat the Zeltser Group's motion. The Bankruptcy Court then went further, stating that it was inclined to find as a matter of law that the Valmore Trust owned FIL and GTHL and thus FII and LR12. Nonetheless, the Bankruptcy Court afforded the Zeltser Group twenty-one (21)

---

"suggested the trial in the first instance, and agreed to the order it now seeks reconsidered." [*Id.*, D.E. 408]. The Bankruptcy Court denied the motion, finding that any objection should have been raised contemporaneously with the scheduling order, not several months after-the-fact. [*Id.*, D.E. 514 at 19-20].

days to file a legal memorandum—based on the existing record—to persuade it not to enter summary judgment in favor of the Redmond Group. [*Id.*, D.E. 405].

Despite this invitation, the Zeltser Group (through DiBello) advised that it would not be filing any memorandum and would instead rely on the existing record. [*Id.*, D.E. 421; *id.*, D.E. 514 at 4]. As a result, the Bankruptcy Court instructed both Groups to prepare a proposed summary judgment order. [*Id.*, D.E. 514 at 20-21]. Again, despite their stated indifference, the Petitioning Creditors filed a notice of objection and motion for reconsideration (joined by the Zeltser Group) premised on a concern that the Redmond Group would attempt to unilaterally include new findings and conclusions not previously made by the Bankruptcy Court. [*Id.*, D.E. 433, 434]. The Bankruptcy Court denied the motion the same day, explaining that the basis for the Petitioning Creditors' motion was "far-fetched," "misleading," and based on "bogus" and "disingenuous" representations of the most recent hearing. [*Id.*, D.E. 436, 438].

Approximately one week later, on January 20, 2012, the Bankruptcy Court entered an Order in both proceedings granting summary judgment in favor of the Redmond Group ("Summary Judgment Order"). [*Id.*, D.E. 443]. After recapping the factual and procedural background, including the Zeltser Group's failure to submit an additional legal memorandum, the Bankruptcy Court concluded as follows: "Having reviewed the record before it and having drawn all *reasonable* inferences in favor of the Zeltser Alleged Debtors, the Court finds, as a matter of law, that FIL, GTHL and their respective subsidiaries are assets of the Valmore Trust and entry of summary judgment is therefore proper." [*Id.* at 2]. The Bankruptcy Court emphasized that it was not permitted to adopt a party's version of the facts when that version was blatantly

10

contradicted by the record; that the mere existence of some material factual dispute was insufficient to defeat summary judgment where there was no *genuine* issue of *material* fact; and that it was authorized to grant summary judgment *sua sponte* when the non-moving party had been afforded an adequate opportunity to develop the record. [*Id.* at 4-5]. The Bankruptcy Court then entered final summary judgment, finding as a matter of law that: (1) the Valmore Trust (through its trustee) owned 100% of FIL, which (through an intermediary) owned 100% of FII (which, in turn, owned 100% of the company holding the development rights to Fisher Island); and (2) the Valmore Trust (through its trustee) owned 100% of GTHL, which owned 85% of LR12 (with the remaining 15% held by an individual). [*Id.* at 5].

The Summary Judgment Order sparked a wave of appeals that are now the subject of the motions to dismiss presently before the Court. Still purporting to represent FII and LR12, the Zeltser Group (via attorneys DiBello and Zeltser) filed Notices of Appeal. [Bankr. No. 11-17047, D.E. 455; Bankr. No. 11-17061, D.E. 382]. Second, and again despite their prior assertions that the ownership dispute was not their concern, the Petitioning Creditors (via attorney Pugatch) filed Notices of Appeal, which they denominated as "cross appeals" from the DiBello/Zeltser appeal. [Bankr. No. 11-17047, D.E. 466; Bankr. No. 11-17061, D.E 393]. More surprisingly, four sets of additional Notices of Appeal were filed on behalf of entities that had not previously appeared in the bankruptcy proceedings. Despite already appealing on behalf of the Petitioning Creditors, attorney Pugatch also filed Notices of Appeal on behalf of another entity called Areal Group ("Areal"). [Bankr. No. 11-17047, D.E. 486; Bankr. No. 11-17061, D.E 413]. The remaining appeals were filed by attorneys in the Zeltser Group.

On behalf of holding companies FIL and GTHL, attorneys Mirmelli and Katz filed joint Notices of Appeal. [Bankr. No. 11-17047, D.E. 468; Bankr. No. 11-17061, D.E 395]. Claiming to represent JWL, attorney Fishkin filed Notices of Appeal. [Bankr. No. 11-17047, D.E. 490; Bankr. No. 11-17061, D.E 416]. And purporting to represent an entity called Visisys Grosvenor Holding ("Visisys"), an attorney named Moshe Popack filed Notices of Appeal. [Bankr. No. 11-17047, D.E. 488; Bankr. No. 11-17061, D.E 419].[10]

Because the Notices of Appeal were filed in each underlying bankruptcy case, a total of ten separate appeals were docketed in this Court and given ten different case numbers. Those cases were ultimately transferred to the undersigned and consolidated under one lead case number. [See D.E. 12, 28].[11] With the exception of the appeals taken by DiBello and Zeltser on behalf of FII and LR12, the Redmond Group filed motions to dismiss all of the appeals for lack of standing, and those motions have now been fully briefed. Presently before this Court are: (1) the Redmond Group's Motion to Dismiss the appeals taken by FIL and GTHL [D.E. 22], FIL and GTHL's Response [D.E. 37], and the Redmond Group's Reply [D.E. 45]; (2) the Redmond Group's Motion to Dismiss the "cross appeal" taken by the Petitioning Creditors [D.E. 23], the Petitioning Creditors' Response [D.E. 40], and the Redmond Group's Reply [D.E. 47]; (3) the Redmond Group's Motion to Dismiss the appeal taken by Visisys [D.E. 31], Visisys'

---

[10] The Bankruptcy Court initially dismissed the appeals taken by Areal, Visisys, and JWL as untimely. [Bankr. No. 11-17047, D.E. 494, 495, 496]. However, it later granted motions for reconsideration and reinstated those appeals as timely. In doing so, the Bankruptcy Court found that the Redmond Group's challenge to these appellants' standing to appeal was an issue that could only be addressed by the district court. [Id., D.E. 528, 530, 531].

[11] Before that consolidation was complete, Initial Briefs were filed by DiBello on behalf of FII and LR12, Mirmelli and Katz on behalf of FIL and GTHL, and Pugatch on behalf of the Petitioning Creditors. [D.E. 14, 15, 16]. This Court stayed the briefing pending resolution of the motions to dismiss. [D.E. 21].

Response [D.E. 43], and the Redmond Group's Reply [D.E. 46]; and (4) the Redmond Group's Motion to Dismiss the appeal taken by JWL and Areal [D.E. 32], Areal's Response [D.E. 38], JWL's Response [D.E. 42], and the Redmond Group's Replies [D.E. 45, 48]. This Court has carefully considered all of these pleadings.

## II. LEGAL STANDARDS

Determining whether an appellant has standing to appeal a bankruptcy court order is a question of fact for the district court. *In re LTV Steel Co., Inc.*, 560 F.3d 449, 452 (6th Cir. 2009); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 585 (7th Cir. 1994); *In re Dykes*, 10 F.3d 184, 188 (3d Cir. 1993); *In re El San Juan Hotel*, 809 F.2d 151, 154 n.3 (1st Cir. 1987); *In re E.C. Ernst, Inc.*, 2 B.R. 757, 760 (D.C.N.Y. 1980); 9E AM. JUR. 2D BANKRUPTCY § 3811 (2012). There are two pre-requisites to bankruptcy standing that are particularly relevant to this appeal.

First, an appellant must demonstrate that it is "aggrieved" by the underlying bankruptcy court order. The Eleventh Circuit has explained that, "[u]nlike the prior law, the Bankruptcy Reform Act of 1978 ('Bankruptcy Code') does not define who has standing to appeal an order of a bankruptcy court." *In re Westwood Cmty. Two Assn', Inc.*, 293 F.3d 1332, 1334 (11th Cir. 2002). However, the federal appellate courts, including the Eleventh Circuit, "have agreed that, although Congress did not define who has standing to appeal in the Bankruptcy Code, no evidence exists that Congress intended to alter the definition set forth in the prior law, the Bankruptcy Act of 1898." *Id.* "This prior rule, commonly known as the 'person aggrieved' doctrine, holds that only a person aggrieved has standing to appeal a bankruptcy court's order." *Id.* at 1335.

13

"Since Congress did not define who had standing to appeal an order in the Bankruptcy Reform Act of 1978, [the Eleventh Circuit] recognize[s] the person aggrieved doctrine as only a prudential prerequisite to standing." *Id.* at 1335 n.3. "[T]his prudential limitation exists to fill the need for an explicit limitation on standing to appeal in bankruptcy proceedings. This need springs from the nature of bankruptcy litigation which almost always involves the interests of persons who are not formally parties to the litigation. In the course of administration of the bankruptcy estate disputes arise in which numerous persons are to some degree interested. Efficient judicial administration requires that appellate review be limited to those persons whose interests are directly affected." *Id.* (citation omitted); *see* 9E AM. JUR. 2D BANKRUPTCY § 3811 (2012) ("The purpose of the 'person aggrieved' requirement is to ensure that the bankruptcy proceedings are not unreasonably delayed by protracted litigation, and that bankruptcy litigation is not mired in endless appeals brought by a myriad of parties who are indirectly affected.") (citations omitted).

For this reason, "[c]ourts have widely agreed that the person aggrieved doctrine limits standing to appeal a bankruptcy court order to those individuals who have a financial stake in the order being appealed. A person has a financial stake in the order when that order diminishes their property, increases their burdens or impairs their rights." *Westwood*, 293 F.3d at 1335 (citations omitted). Thus, the "person aggrieved doctrine restricts standing more than Article III standing, as it allows a person to appeal only when they are directly and adversely affected pecuniarily by the [bankruptcy

court's] order."[12]   *Id.* (citations omitted).   In short, under binding Eleventh Circuit

precedent, "a person may appeal a bankruptcy court's order as a person aggrieved

when that order directly, adversely, and pecuniarily affects the person," and "[a]n order

will directly, adversely, and pecuniarily affect a person if that order diminishes their

property, increases their burdens, or impairs their rights."   *Id.* at 1337-38 (footnote

omitted).

The second relevant pre-requisite for standing to appeal is attendance and

objection during the bankruptcy proceedings.   The Eleventh Circuit has noted that

satisfying the "aggrieved person" standard "is only one of many hurdles a person must

overcome to have standing to appeal.   The Bankruptcy Code also contains certain

procedural requirements, including attendance at bankruptcy hearings . . . ."   *Id.* at 1338

n.8.   Indeed, it is well-established that, "[e]ven where an entity passes muster under the

'person aggrieved' criterion for appellate standing, the entity must also, unless excused

due to lack of proper notice of the bankruptcy court's proceedings, satisfy the additional

requirement of attending the bankruptcy court hearing on the matter addressed in the

decision from which appeal is sought, and there voicing its objection to the proposed

adverse decision."   9E AM. JUR. 2D BANKRUPTCY § 3811 (2012); *accord In re Ray*, 597

F.3d 871, 874 (7th Cir. 2010); *In re Kopexa Realty Venture Co.*, 240 B.R. 63, 65 n.3

(B.A.P. 10th Cir. 1999); *In re Weston*, 18 F.3d 860, 864 (10th Cir. 1994); *Matter of

Schultz Mfg. Fabricating Co.*, 956 F.2d 686, 690 (7th Cir. 1992); *In re Commercial W.*

---

[12]   To gain standing under the "case and controversy" requirement of Article III of the
Constitution, a plaintiff's injury "need not be financial and need only be 'fairly traceable' to the
alleged illegal action."   *Travelers Ins. Co. v. H.K. Porter Co., Inc.*, 45 F.3d 737, 741 (3d Cir.
1995) (citation omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

*Fin. Corp.,* 761 F.2d 1329, 1335 (9th Cir. 1985); *In re Schwinn Bicycle Co.,* 209 B.R.

887, 892 (N.D. Ill. 1997); *In re Record Club of Am., Inc.,* 28 B.R. 996, 998 (D.C. Pa.

1983).

> The reason for attendance and objection as prerequisites for standing to
> appeal is clear. When a party to litigation receives notice that a matter will
> be heard, it is his duty to appear at the hearing and present to the court
> evidence and legal authorities which will be of aid to the court in making its
> decision. If he does not do so, the court must make its decision without the
> benefit of any evidence which such person might have made available,
> and the court must act upon the presumption that persons who are absent
> are not interested in the matter before it or will be satisfied with such
> decision as the court may make. To permit persons who did not participate
> in proceedings of which they are on notice to complain of the result of
> such proceedings would cause unlimited confusion and even disrespect of
> the courts and their authority.

*Schwinn,* 209 B.R. at 892 (quoting *In re Mifflinburg Body Co.,* 54 F. Supp. 560, 561

(D.C. Pa. 1944)).

## III. DISCUSSION

### A.    Petitioning Creditors

Unlike the other appellants, the Petitioning Creditors did appear and object in the

summary judgment proceedings in the Bankruptcy Court. However, the Court finds that

they are not "aggrieved" by the Summary Judgment Order. The only effect of that Order

on the Petitioning Creditors is that they will now have to prove their claims (vis-à-vis the

Redmond Group) rather than proceed through an uncontested involuntary bankruptcy

(vis-à-vis the Zeltser Group). The Petitioning Creditors do not dispute this in their

response [*see* D.E. 40 at 3], nor could they credibly do so. In its motion, the Redmond

Group highlights numerous instances where, confronted with the appearance of

collusion between themselves and the Zeltser Group, the Petitioning Creditors informed

16

the Bankruptcy Court that they had no interest in the ownership dispute, that they desired only to move forward on their involuntary petitions regardless of who owned or represented the Alleged Debtors, and they would be "happy" to prove their claims if the Redmond Group prevailed. [D.E. 23 at 5-11; D.E. 47 at 2].[13] Thus, the Summary Judgment Order merely requires the Petitioning Creditors to prove the claims that they told the Bankruptcy Court they are prepared to prove.

That requirement does not does not render them "aggrieved" under the case law. Indeed, it is well-established that an appellant is not aggrieved even where a bankruptcy court order subjects it to litigation. *See, e.g., In re LTV Steel Co., Inc.*, 560 F.3d 449, 453 (6th Cir. 2009) ("[W]e are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal.").[14] Here, the Summary Judgment Order does not go that far, but merely

---

[13] The Petitioning Creditors continued to express this position even after the Summary Judgment Order was entered. Indeed, only six days later, Pugatch informed the Bankruptcy Court: "Well, Judge, what I'm trying to say is that the ownership dispute is not our issue." [Bankr. No. 11-17047, Transcript of Jan. 26, 2012 Hearing (D.E. 541), at 6]. And the following day, Judge Huck summarized the Petitioning Creditors' position at the hearing on the Zeltser Group's motion to withdraw the reference: "Again, as Mr. Pugatch pointed out, I don't have a dog in that [ownership] fight except to the extent that if the Zeltser Group prevails as the owner it's uncontested. If the Redmond Group prevails, it's going to be a contested matter. And we, as Mr. Pugatch are prepared to prosecute this on the merits of that." [Case No. 12-cv-20018-PCH, Transcript of Jan. 27, 2012 Hearing (D.E. 35), at 35].

[14] *Accord In re First Cincinnati, Inc.*, 286 B.R. 49, 53 (B.A.P. 6th Cir. 2002) ("[M]ost, if not all, of the courts that have considered this question have held that a bankruptcy court's order does not produce the direct and adverse pecuniary impact necessary to bestow standing on an appellant if the order's effect on the appellant is merely to expose it to the risks of litigation."); *Travelers Ins. Co. v. H.K. Porter Co., Inc.*, 45 F.3d 737, 743 (3d Cir. 1995) ("[C]ourts have recognized that an order which simply allows a lawsuit to go forward does not necessarily 'aggrieve' the potential defendant for purposes of appellate standing.") (citations omitted); *Matter of Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983) ("hold[ing] that appellant lacks standing to bring this appeal" where the "appellant's only demonstrable interest in the order is as a potential party defendant

17

requires the Petitioning Creditors to prove their claims in a contested bankruptcy proceeding. If the burden to defend against a lawsuit is insufficient to confer appellate standing, then so too is the lesser requirement of prosecuting one's own claims. To be sure, the Petitioning Creditors have an interest in proving their claims, but the Summary Judgment Order "does not prevent [them] from doing just that . . . ." *El San Juan Hotel*, 809 F.3d at 155.[15]

The Petitioning Creditors do not seriously dispute the above conclusion, much less endeavor to explain how they are aggrieved.[16] Indeed, any such explanation would be exceedingly difficult given that they repeatedly informed the Bankruptcy Court that they had no stake in the ownership dispute and were "happy" to prove their claims if the Redmond Group prevailed. *Cf. Imperial Bowl of Miami, Inc. v. Roemelmeyer*, 368 F.2d 323, 324 (5th Cir. 1966) ("Unhappy or disappointed as each [petitioner] might be, neither is aggrieved."). In fact, the Petitioning Creditors' attempt to appeal (as well as their participation at summary judgment) only serves to give some measure of

---

in an adversary proceeding"); *In re Snyder*, 4 F.2d 627, 628 (9th Cir. 1925) ("The appellant's interest, to suffice, must be a direct and immediate pecuniary interest in the particular cause, and it is not sufficient that he is interested in the question litigated, or that, by the determination of the question litigated, he may be a party in interest to some other suit, growing out·of the decision of that question.") (citation omitted).

[15] In this regard, several months before the Summary Judgment Order was entered, the Note-holding Petitioning Creditors filed a motion for summary judgment on their claims, which remains pending. [Bankr. No. 11-17047, D.E. 272, 645, 676].

[16] Nor did they do so during the summary judgment proceedings. In the very first sentence of their "Response" to the Zeltser Group's motion for partial summary judgment—which, although labeled a response, actually advanced arguments in support of the Zeltser Group's position—the Petitioning Creditors stated that they "have no interest in who is seeking to shield their assets . . . ." [Bankr. No. 11-17047, D.E. 369 at 1]. Although they went on to assert that the ownership of the Alleged Debtors "may directly affect [their] *bona fide* claim to their debts," they did not explain or clarify that assertion. [*Id.*].

legitimacy to the suggestion of collusion with the Zeltser Group that has permeated the bankruptcy proceedings. Accordingly, their appeals are dismissed for lack of standing.[17]

### B. Areal

The suggestion of collusion between the Petitioning Creditors and the Zeltser Group also gains currency by the fact that attorney Pugatch now also represents Areal in its appeal. Areal claims to be a creditor and former partner of Imedinvest. And its corporate representative is Theodore Kretschmer, who (along with Kay) was one of Imedinvest's partners.

In addition, and as explained further below, Areal asserts that it has "a direct ownership interest" in LR12 by virtue of a Pledge Agreement signed by Kretschmer purportedly investing $12 million in LR12. [D.E. 38 at 2]. Thus, attorney Pugatch is simultaneously representing both the Petitioning Creditors and an entity claiming ownership of one of the Alleged Debtors. Such representation raises obvious conflict-of-interest concerns.

---

[17] The Petitioning Creditors' appeals are also subject to dismissal on procedural grounds. Unlike the other appellants, the Petitioning Creditors filed "cross appeals" from the Summary Judgment Order. [Bankr. No. 11-17047, D.E. 466; Bankr. No. 11-17061, D.E. 393; D.E. 16 at 1, 7, 24]. The Redmond Group correctly explains that this was procedurally improper. [D.E. 23 at 14]. The Petitioning Creditors seek to challenge the Summary Judgment Order on similar grounds as DiBello and Zeltser, who represent the original appellants. [See D.E. 14, 16]. The Petitioning Creditors therefore cannot be considered appellees and, as a result, they were required to file separate appeals rather than cross appeals from the DiBello/Zeltser appeals. This distinction is one of consequence, because appellants—unlike cross appellants—are required to file a designation of record under Fed. R. Bankr. P. 8006. The Petitioning Creditors admittedly failed to do so [D.E. 40 at 8], and this failure constitutes an independent basis for dismissal under Local Rule 87.4(b) of this Court and Local Rule 8006-1(A) of the Bankruptcy Court.

Counsel's conflict problem is compounded by the fact that three of the Petitioning Creditors' claims derive from a \$28.5 million Promissory Note that was supposedly assigned to them by Kretschmer on behalf of the Areal Plus Group.[18]   In this respect, Pugatch is simultaneously representing three Note-holding Petitioning Creditors and a subsidiary of the entity that purportedly assigned them the Note.   Patently, these representations are fraught with conflicts, especially given the disputed authenticity of the Promissory Note and the Assignment (which the Bankruptcy Court identified from the very outset of the case).   [See, e.g., Bankr. No. 11-17047, D.E. 28; id. D.E. 68 at 32-34].

Putting aside these issues of collusion and conflicts of interest, Areal still has not satisfied the pre-requisites for standing to appeal the Summary Judgment Order.   It relies exclusively on a March 24, 2004 Pledge Agreement to demonstrate its ownership interest in LR12 and, thus, its status as an "aggrieved person." [D.E. 38, Exh. 1 at 147]. However, the Court declines to credit that exhibit for several reasons.   First, it does not appear to be a standard legal document, much less one purporting to transfer \$12 million.   Faded corporate seals beneath the signatures (one of which is upside down) belie the authenticity of the document, which is neither witnessed nor notarized. Moreover, the Pledge Agreement provides only that Areal "contemplates" investing \$12 million; notably, Areal has not submitted any evidence of an actual transfer of funds. Similarly, the Pledge Agreement refers to a "demand note" that was executed by LR12, but which has not been submitted to the Court.   The Pledge Agreement also states that

---

[18]   According to a document attached to Areal's response, Areal is a wholly owned subsidiary of Areal Plus Group.   [D.E. 38, Exh. 1 at 139].

Areal could file a "first UCC lien" at any time and a Consent Judgment in the event of a default, but no such documents have been produced, even though Areal has submitted another document reflecting that LR12 did, in fact, default. [D.E. 38, Exh. 1 at 150]. Finally, the Court has reviewed the other documents attached to Areal's response and finds that they raise more questions than answers about the Pledge Agreement. Significantly, Areal does not mention these documents in its response.

Conversely, the Redmond Group has submitted reports by not one but two forensic handwriting experts who each opine that the signatures on the Pledge Agreement were not "independent creations," but were rather transferred from another source. [D.E. 48 at 2-4; *id.*, Exh. A ¶¶ 7, 10; *id.*, Exh. B at 15-16]. The Court finds it telling that, despite the importance of the Pledge Agreement to its claim, Areal has not submitted any affidavits or declarations authenticating it. The Redmond Group, on the other hand, has submitted not only forensic reports but also a sworn Declaration from the Financial Controller of LR12 from 2006 to 2010, who states that he has never seen the Pledge Agreement before, that it was not kept in the course of LR12's ordinary business, and that he does not believe that it is authentic. [D.E. 48 at 5; *id.*, Exh. D ¶ 17].[19] In short, this Court finds on the record before it that, at the very least, the Pledge Agreement has not been sufficiently authenticated. The Court therefore declines to consider it. And because Areal relies exclusively on that document to gain standing, the Court concludes that Areal is not aggrieved by the Summary Judgment Order.

---

[19] The New York state court found this individual to be a credible witness with no personal stake in the outcome of the litigation. [Bankr. No. 11-17047, D.E. 380, Exh. H at 21- 26].

21

Areal also lacks standing to appeal because it failed to appear and object in the bankruptcy proceedings. In its motion to dismiss, the Redmond Group recounts various instances in which Areal was given notice of the bankruptcy proceedings: the Redmond Group subpoenaed Kretschmer; the Bankruptcy Court granted the Redmond Group's motion to compel when he did not appear for his deposition; the Redmond Group subpoenaed him again; and, despite the Bankruptcy Court's ruling, Kretschmer acknowledged the subpoena but still never appeared for his deposition.[20]  [D.E. 32 at 13, 15]. While Areal responds that it lacked proper notice of the bankruptcy proceedings, it utterly fails to address (much less dispute) the Redmond Group's chronology concerning its only identified corporate representative. [See D.E. 38 at 6-10].

Areal's contention regarding notice is further undermined by the fact that, despite not once appearing during the ten-month long bankruptcy proceedings, it fortuitously became aware of the Summary Judgment Order just in time to appeal it. Nowhere does Areal explain this serendipitous discovery or how it came to engage attorney Pugatch, the attorney who initiated the bankruptcy proceedings on behalf of the Petitioning Creditors.

Consequently, and given all of the surrounding circumstances, the Court finds that Areal was on notice of the bankruptcy proceedings. And "having chosen not to participate in the resolution of the disputed [issue] before the bankruptcy judge, [it] ha[s] no standing to appeal the bankruptcy court's resolution of the matter." *Weston*, 18 F.3d

---

[20] Kretschmer, however, did give a deposition in the New York litigation. [See Bankr. No. 11-17047, D.E. 596, Exh. 6].

22

at 864.  Allowing Areal to do so would only cause "confusion and even disrespect of the courts and their authority."  *Schwinn*, 209 B.R. at 892 (quotation omitted).[21]  For all of these reasons, Areal's appeals are dismissed for lack of standing.

### C.   Visisys

The circumstances surrounding Visisys and its appeal are even more disconcerting.  Approximately two weeks after the Summary Judgment Order was entered, Visisys filed a Notice of Appeal.  That document marked Visisys' first appearance not only in the underlying bankruptcy proceedings, but also in the longstanding global ownership dispute.  Indeed, the Redmond Group asserts in its motion to dismiss (and Visisys does not meaningfully contest) that, notwithstanding the voluminous records generated by worldwide litigation, Visisys has never once been mentioned in any pleading, proceeding, or court.  [D.E. 23 at 2; *see* D.E. 43].

Two weeks after filing its Notices of Appeal, Visisys filed a motion in this Court regarding the timeliness of its appeal.  Without further elaboration, Visisys asserted in passing that it had standing to appeal the Summary Judgment Order because it would "present evidence showing that since early 2006, the ownership of both Grosvenor [GTHL] and Fisher Island Limited, and all of their assets (then present and future) have been assigned to Appellant [Visisys]."  [Case No. 12-mc-20741-KMW, D.E. 5 ¶ 10].  This assertion is fundamentally irreconcilable with years of litigation around the world where, again, Visisys has never once been mentioned, let alone recognized as a possible owner of FII and LR12.  But despite its rather dramatic entrance into the

---

[21]  That is particularly true here given that Areal's corporate representative failed to abide by the Bankruptcy Court's ruling compelling him to appear for his deposition.

matter, Visisys supported its conclusory assertion of ownership with a one-sentence Declaration from its attorney, Moshe Popack, who stated only that "all facts set forth in the accompanying motion are true and correct to the best of my knowledge." [*Id.* at 7].

Popack's appearance as counsel is particularly problematic. Unlike Visisys, Popack has personally been an active participant in the underlying bankruptcy proceedings. Visisys does not dispute the Redmond Group's assertions that Popack is Joseph Kay's nephew-in-law; that he has repeatedly testified on behalf of the Zeltser Group as the corporate representative for FII and LR12; that he has claimed to be counsel for Imedinvest as well as counsel for, and a director of, FIL and GTHL; and that, not only has he never before mentioned Visisys,[22] but he has affirmatively testified that Imedinvest (not Visisys) is the owner of FII and LR12. [D.E. 31 at 4; D.E. 32 at 11-12; D.E. 46 at 2; *see* D.E. 43]. Remarkably, Popack now professes not only to represent Visisys in an appeal from the same bankruptcy proceedings where he testified as a witness, but also to advance a legal position that is fundamentally inconsistent with his own testimony. Needless to say, such behavior raises serious ethical and professional concerns.[23]

---

[22]    Visisys asserts that, despite having actual knowledge of Visisys, the Redmond Group conducted discovery (including Popack's deposition) so as to purposefully avoid learning about Visisys. [D.E. 43 at 6-7]. Visisys offers no specific evidence to support this, and the Court declines to make any such finding.

[23]    The Court also notes that Popack, as a member of the New York Bar, has not been admitted to practice before this Court. While Mirmelli filed a motion on his behalf to appear *pro hac vice* [D.E. 10], this Court denied that motion without prejudice because it preceded the docketing of Visisys' appeal. [D.E. 18]. Standing alone, Popack's failure to be admitted to practice before this Court is sufficient to strike Visisys' response to the motion to dismiss its appeal. *See* S.D. Fla. Local R. 4(a) ("Except when an appearance pro hac vice is permitted by the Court, only members of the bar of this Court may appear as attorneys in the Court of this District."). It was

24

In light of these (and other) irregularities, the Redmond Group asserts that the Zeltser Group "concocted" Visisys and the 2006 assignment after it was unsuccessful in the Bankruptcy Court. [D.E. 31 at 3]. Although Visisys characterizes this allegation as "scandalous," it devotes less than two pages to it in its response. Even more revealing is that it offers no details about Visisys—including its incorporation, location, business operation, or ownership—and conspicuously fails to establish its status as a legitimate entity with either documentary evidence or affidavits.[24]  Instead, Visisys counters that the Redmond Group has made similar false accusations in the past against others in the Zeltser Group. [See D.E. 43 at 14-15]. However, those matters have no bearing on the one presently before this Court, which is whether Visisys has standing to appeal the Summary Judgment Order.

The only evidence that Visisys has submitted in support of its claim are copies of two (virtually) identical one-page "Assignments" from March 1, 2006, in which FIL and GTHL purport to assign all of their assets to Visisys in exchange for £100.   The Assignments appear to be signed by Badri and Kay as "Beneficial Owner[s] and Authorized Officer[s]," and they are witnessed by an "A. Pravda." [D.E. 43, Exh. A]. These Assignments, however, are completely silent as to the circumstances surrounding the transaction, and Visisys has not sufficiently explained what those

---

not until six months later—and long after Visisys' response was filed in this Court—that a renewed *pro hac vice* motion was filed. [D.E. 60]. That motion is **DENIED AS MOOT.**

[24]  Visisys states only that it was "formed and controlled exclusively by 'trusted persons' with whom the owners of FIL and [GTHL] had longstanding personal relationships." [D.E. 43 at 2].

circumstances were.[25]  The absence of any such exposition or evidence is untenable given the claimed significance of the purported Assignments.  Moreover, the Redmond Group points to evidence in the record indicating that GTHL had not even been formed by March 1, 2006.  They further point out that Popack, now acting as Visisys' counsel, previously testified that GTHL transferred its shares in LR12 to Imedinvest as late as December 31, 2007.  [D.E. 46 at 3].  The Court also observes that the Assignments, like the Areal Pledge Agreement, do not resemble standard legal documents, and lack the indicia of legitimacy one would expect given the significance of the purported transactions.[26]  Thus, in light of the suspicious circumstances surrounding Visisys and the Assignments, the Court finds that, at the very least, these documents have not been sufficiently authenticated.  The Court therefore declines to consider them.

Finally, the Court is compelled to note the timing of Visisys' sudden appearance in this case.  The global ownership battle between the Redmond Group and Zeltser Group has been waged for several years.  Yet Visisys, the self-proclaimed owner of FII and LR12, inexplicably did not assert any claim of ownership until two weeks after the Bankruptcy Court entered summary judgment in the Redmond Group's favor.  Visisys claims that it lacked notice of the bankruptcy proceedings before that time [D.E. 43 at 5], but the Court rejects this argument.  Like Areal, nowhere has Visisys explained its fortuitous discovery of the Summary Judgment Order just in time to file these appeals.

---

[25]  Visisys states only in the most conclusory terms that the Assignments were made in order to limit the control and authority of the Valmore trustee.  [See D.E. 43 at 2-3].

[26]  Interestingly, one of the few provisions included in these documents providentially allow for "[p]hotostatic or electronic cop[ies] of this instrument [to] have the same force and effect as original."

26

Nor has it been explained how Popack can represent Visisys consistent with professional and ethical rules given his well-known affiliation with the Zeltser Group and his prior testimony that Imedinvest (not Visisys) was the rightful owner. Rather than indicating a lack of notice, these circumstances tend to support the Redmond Group's assertion that the Zeltser Group "concocted" Visisys for purposes of this appeal following the adverse ruling in the Bankruptcy Court. For these reasons, Visisys' appeals are dismissed for lack of standing.

### D.    JWL, FIL & GTHL

The appeals taken by attorney Fishkin on behalf of JWL and attorneys Mirmelli and Katz on behalf of FIL and GTHL must also be dismissed. Like Areal, JWL lacks standing because it was on notice of the bankruptcy proceedings, but failed to appear or object until after the Summary Judgment Order was entered. The Redmond Group explains that it subpoenaed JWL's corporate representative to testify in the bankruptcy proceedings; that it filed proof that the subpoena was successfully served on JWL's managing agent; and that JWL did not appear for that deposition. [D.E. 32 at 10; D.E. 45 at 7]. While JWL disputes that it was served with a subpoena or "proper" notice [D.E. 42 at 3, 11], there is a proof-of-service affidavit in the bankruptcy record that is to the contrary. [Bankr. No. 11-17047, D.E. 251].

Moreover, both sides have submitted e-mail correspondence indicating that Zlata Stepanenko, JWL's corporate secretary [D.E. 42 at 3], was informed about the bankruptcy proceeding months before the Summary Judgment Order was entered and that the Redmond Group went to great lengths to depose her (albeit without success). [See D.E. 42, Exh. A; D.E. 45, Exh. D; see also Bankr. No. 11-17047, D.E. 223 at 10-

27

11; *id.*, D.E. 254, 276]. Significantly, those e-mails also demonstrate that Stepanenko was consulting with JWL's attorney, Alexander Fishkin.   Fishkin is, of course, associated with the Zeltser Group and has known about the bankruptcy proceedings from the outset.  He was co-counsel with Zeltser in the New York litigation [D.E. 32 at 7], where his law office was listed as Imedinvest's corporate office [D.E. 37 at 26 of 81], and he has been served with pleadings from the beginning of the bankruptcy cases. [*See, e.g.*, Bankr. No. 11-17047, D.E. 6].  Yet at no time did he (or anyone else) appear on behalf of JWL in the bankruptcy proceedings.  Because JWL had actual knowledge of the bankruptcy proceedings from the outset, but waited until after the Summary Judgment Order was entered to appear or object, its appeals are dismissed for lack of standing.[27]

The appeals taken by FIL and GTHL must be dismissed for the same reason. Zeltser personally informed the Bankruptcy Court that he was "a lawyer of record for [GTHL] and ha[s] been for years and years and years." [*Id.*, D.E. 46 at 62]. In addition, Popack, who, as mentioned above, has also been an active participant in the bankruptcy proceedings, has likewise claimed to be counsel for and a director of FIL and GTHL. [D.E. 31 at 4; D.E. 32 at 11-12]. However, despite Zeltser and Popack's

---

[27] Like Popack, Fishkin is a member of the New York Bar and has not been admitted to practice before this Court. While Mirmelli filed a motion on his behalf to appear *pro hac vice* [D.E. 11], this Court denied that motion without prejudice because it preceded the docketing of JWL's appeal. [D.E. 18]. Standing alone, his failure to be admitted to practice before this Court is sufficient to strike JWL's response to the motion to dismiss its appeal. *See* S.D. Fla. Local R. 4(a) ("Except when an appearance pro hac vice is permitted by the Court, only members of the bar of this Court may appear as attorneys in the Court of this District."). It was not until six months later—and long after JWL's response was filed—that a renewed *pro hac vice* motion was filed. [D.E. 59]. And Fishkin did not sign the accompanying document certifying that he has studied the Local Rules and is a member in good standing of the New York Bar. [*Id.* at 3]. That motion is **DENIED AS MOOT**.

active participation in the bankruptcy proceedings, at no point did FIL or GTHL attempt to appear or object. Moreover, Mirmelli and Katz now purport to represent FIL and GTHL on appeal, and they too (like Popack and Fishkin) are closely associated with the Zeltser Group and have known about the bankruptcy proceedings from the outset. Mirmelli was co-counsel with DiBello in the Florida litigation, Katz was co-counsel with Zeltser in the New York litigation, and both have been served with pleadings since the beginning of the bankruptcy cases. [D.E. 22 at 6-7; D.E. 37 at 3; *see e.g.*, Bankr. No. 11-17047, D.E. 6]. Indeed, both appear to acknowledge having actual notice of the bankruptcy proceedings. [*See* D.E. 37 at 11, 16]. Nonetheless, they both waited until after the Summary Judgment Order to appear or object on behalf of FIL and GTHL. Accordingly, these appeals must be dismissed for lack of standing.[28]

### E.    Counterarguments

<u>Petitioning Creditors</u>

The Petitioning Creditors make three main arguments, all of which miss the mark. First, they emphasize, without citing legal authority, that they commenced the underlying bankruptcy litigation and are parties to it. [D.E. 40 at 1-4]. "But simply holding a claim . . . against the estate does not automatically confer appellate standing under the 'person aggrieved' doctrine." *LTV Steel*, 560 F.3d at 454. Nor does the fact the Petitioning Creditors were a party to the proceedings. *See Westwood*, 293 F.3d at

---

[28]  The Court also notes that, like Fishkin and Popack, Katz is a member of the New York Bar and has not been admitted to practice before this Court. Unlike Fishkin and Popack, however, Katz has never even filed a motion to appear *pro hac vice*, despite signing multiple pleadings filed in this Court. [D.E. 15, 37; Case No. 12-cv-20973, D.E. 6 (signed jointly by Mirmelli, Katz, and Fishkin); Case No. 12-cv-21662, D.E. 21 (signed jointly by Mirmelli and Katz); Case No. 12-cv-20968, D.E. 7 (signed jointly by Mirmelli, Katz, and Fishkin)]. Notably, the same is also true of attorney Zeltser. [*See* D.E. 6, 13; Case. No. 12-cv-20969, D.E. 6].

1336. Rather, the Petitioning Creditors must demonstrate that they were aggrieved by the Summary Judgment Order and, as explained above, they have failed to make such a showing. *See id.* at 1337.

Second, the Petitioning Creditors argue that "[t]he primary focus of the [Redmond Group's] argument is that the Petitioning Creditors have waived their standing to appeal," and the issue of standing cannot be waived. [D.E. 40 at 4].[29]   However, nowhere does the Redmond Group advance such an argument. Rather, they argue that the Petitioning Creditors' statements to the Bankruptcy Court—that the ownership dispute was not their concern—demonstrate that they are not aggrieved by the Summary Judgment Order resolving that very dispute. [D.E. 47 at 2]. In any event, the Court notes that standing under the person aggrieved doctrine may be waived by the Parties because it is a prudential (rather than a constitutional) limitation. *Ray*, 597 F.3d at 875.

Third, the Petitioning Creditors argue that, to the extent the issue can be waived, it is the Redmond Group that has waived its ability to challenge the Petitioning Creditors' standing by failing to challenge their participation in the summary judgment proceedings. [D.E. 40 at 7-8]. However, the Petitioning Creditors do not adequately develop this argument or cite any legal authority to support it. Moreover, when reinstating the appeals of Areal, Visisys, and JWL, the Bankruptcy Court correctly explained that standing to appeal was an issue that must be raised in this Court.

---

[29] Also in this section of their response, the Petitioning Creditors reiterate arguments from their Initial Brief challenging the Bankruptcy Court's summary judgment procedures. [D.E. 40 at 6-7]. The Court expresses no view on those arguments, as they are directed at the merits of the appeal, not standing to appeal it.

[Bankr. No. 11-17047, D.E. 528 at 4-6]. Thus, any attempt by the Redmond Group to challenge the Petitioning Creditors' standing to appeal in the Bankruptcy Court would have been futile. The Redmond Group therefore did not waive its challenge and duly raised it once the Petitioning Creditors' appeals were docketed in this Court. Finally, and even if the Redmond Group did somehow waive its challenge, the record is such that this Court would have nonetheless chosen to address the issue, as other courts have done. *E.g.*, *H.K. Porter*, 45 F.3d at 739, 741; *El San Juan Hotel*, 809 F.2d at 154 n.3; *Fondiller*, 707 F.2d at 442.

<u>Remaining Appellants</u>

The remaining appellants raise a number of procedural arguments, all relying on the same cases and, at times, using identical language in their responses. However, only one of these arguments is doctrinally applicable to the issue of appellate standing in the bankruptcy context. Essentially, they argue that their failure to attend or object during the bankruptcy proceedings should be excused because they did not receive "proper" notice of the proceedings.[30] *See In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1335 (9th Cir. 1985). This is so, they contend, because the Redmond Group was required to initiate an adversary proceeding—with the attendant filing and service of a complaint and summons on those with an ownership interest in the Alleged Debtors—at the outset of the bankruptcy case. *See* Fed. R. Bankr. P. 7004.

---

[30] Even if this argument had merit, it would not salvage the appeals taken by Areal or Visisys, because the Court has found that these entities also lack standing as "aggrieved persons." Thus, the Court's analysis focuses largely on JWL, FIL, and GTHL.

The Court rejects this argument for several reasons. First, it has not been properly preserved. Attorneys DiBello and Zeltser vigorously represented the interests of Imedinvest and its claimed subsidiaries (including JWL, FIL, and GTHL) in the bankruptcy proceedings, and the Court finds that Fishkin, Mirmelli, and Katz all approved (at least tacitly) of their co-counsel's representation there. Indeed, there can be no serious dispute that DiBello and Zeltser acted as virtual representatives for JWL, FIL, and GTHL in the bankruptcy proceedings. *See E.E.O.C. v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1286-90 (11th Cir. 2004).[31]

However, the Zeltser Group did not raise this adversary-proceeding argument until its unsuccessful motion for reconsideration of the Bankruptcy Court's Case Management and Scheduling Order. [Bankr. No. 11-17047, D.E. 347]. That motion, along with its motion to withdraw the reference, was filed on November 30, 2011 in a transparent attempt to redirect the ownership dispute following the unfavorable Report issued by the Examiner on November 18, 2011. In this regard, it must be emphasized that the Zeltser Group went to great lengths to position the ownership dispute in the Bankruptcy Court in the first place. It also agreed to the Case Management and Scheduling Order when it was entered a few months into those proceedings, and it proceeded accordingly for the following six months without objection. It was only after

---

[31] In this regard, the Court acknowledges that "[a] judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." *Martin v. Wilks*, 490 U.S. 755, 762 (1989). However, JWL, FIL, and GTHL cannot be considered "strangers" to the bankruptcy proceedings, and there is an exception to this general rule where, as here, "a person, although not a party, has his interests adequately represented by someone with the same interests who is a party." *Id.* at 762 n.2. "Additionally, where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy . . . , legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process." *Id.*

the issuance of the Examiner's Report (and a looming trial date [see *id.*, D.E. 403]) that the Zeltser Group suddenly argued that the ownership issue could not proceed because the Redmond Group filed a motion to strike instead of an adversary proceeding. Given this history, the Bankruptcy Court essentially found that the Zeltser Group had waived its adversary-proceeding argument by not raising it sooner. [*Id.*, D.E. 514 at 19-20]. This Court, too, finds that allowing the Zeltser Group's proxies to make that argument here would contravene the "cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1279 n.15 (11th Cir. 2012).

Second, and in any event, the Court has carefully reviewed all of the cases cited by appellants and has found no authority to support their argument that the Redmond Group was required to file an adversary proceeding. Again, the underlying bankruptcy cases presented the highly unusual situation of two groups of attorneys purporting to represent the Alleged Debtors. The Zeltser Group filed answers consenting to relief; the Redmond Group responded with a motion to strike the answers and contested the petitions. Thus, before addressing the merits of the petitions, the Bankruptcy Court was required to determine which group was authorized to represent the Alleged Debtors. The appellants have not cited, and this Court has not found, any case involving similar circumstances, let alone one requiring the Redmond Group to file an adversary proceeding instead of a motion to strike. *See In re Charter Co.*, 876 F.2d 866, 874 n.12 (11th Cir. 1989).[32] If anything, threshold proceedings to determine the authorized

---

[32] The appellants rely on *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135 (11th Cir. 1999). However, in that case the Court held that a creditor was required to file an adversary proceeding to avoid

representative of an alleged debtor are best characterized as a contested matter not specifically governed by the Federal Rules of Bankruptcy Proceeding, thereby falling under Rule 9014, which provides that relief in such proceedings "shall be requested by motion." Fed. R. Bankr. P. 9014(a).[33]

Finally, even if the Redmond Group was required to file an adversary proceeding, its failure to do so would not excuse the would-be appellants' failure to appear or object during the bankruptcy proceedings. This is so because the Court finds that the would-be appellants strategically monitored the bankruptcy proceedings and deliberately waited to appear and object until after the adverse Summary Judgment Order was entered.[34] Allowing these appellants to gain standing based on a lack of "proper" notice would not only encourage litigation by ambush, but it would reward conduct that the

---

an allegedly fraudulent transfer by the debtor creating a tenancy-by-the-entireties because, in the absence of a such a proceeding, the debtor's wife (whose property interests were at stake) would not be afforded due process. *See id.* at 1139-40; *see also* Fed. R. Bankr. P. 7001 advisory committee's note ("[Adversary] [p]roceedings to which the rules in Part VII apply directly include those brought to avoid transfers . . . ."). Not only are the facts of this case plainly distinguishable, but the Zeltser Group was acting as the virtual representative for JWL, FIL, and GTHL (which, again, knew about the bankruptcy proceedings, but deliberately failed to appear or object until after the Summary Judgment Order was entered), and it was afforded abundant process.

[33] Under that Rule, "reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought," but the joinder requirements of Rule 7019 are not applicable. Fed. R. Bankr. P. 9014(a), (c); *see also* Fed. R. Bankr. P. 1018 (exempting the joinder requirements of Rule 7019 from proceedings contesting an involuntary petition).

[34] In this regard, this Court is hard-pressed to conceive of any proper purpose or good-faith basis for the appeals taken by the would-be appellants. Given the totality of the circumstances, the Court is forced to consider the unfortunate possibility that, once the Summary Judgment Order was entered, the Zeltser Group made the strategic yet vexatious decision to derail the proceedings at the appellate level by: dramatically increasing the number of pages and arguments available to its clients, overwhelming the Redmond Group by sheer volume and quantity of filings, delaying the already-protracted litigation on the ownership issue, and needlessly draining the limited resources of this Court. The Court, however, need not and does not resolve this troubling issue in this Order.

Redmond Group has compellingly argued is, at best, an attempt to game the system and, at worst, a coordinated effort to perpetrate a fraud on this Court.

## IV. CONCLUSION

For the foregoing reasons, the Redmond Group's motions to dismiss [D.E. 22, 23, 31, 32] are **GRANTED**. Accordingly, the appeals taken on behalf of the Petitioning Creditors, Areal, Visisys, JWL, FIL, and GTHL are hereby **DISMISSED**. The hearing previously set for November 1, 2012 [D.E. 57] is **CANCELED**. The Initial Briefs filed on behalf of FIL and GTHL [D.E. 15] and the Petitioning Creditors [D.E. 16] are **STRICKEN**. The Redmond Group shall respond to the Initial Brief filed by DiBello on behalf of FII and LR12 [D.E. 14] by no later than **5:00 p.m., November** 16th**, 2012**.

DONE AND ORDERED in Chambers, at Miami, Florida, this 23rd day of October, 2012.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE