# UNITED STATES DISTRICT COURT

## FOR THE

## SOUTHERN DISTRICT OF NEW YORK

**HICHAM AZKOUR,**

*Plaintiff,*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/13/14

*v.*                                          **Civil Action No. 10-CV-4132 (RJS)(KNF)**

**LITTLE REST TWELVE, INC.**

*Defendants.*

---

**PLAINTIFF'S REQUEST FOR RELIEF FROM THE MAY 9, 2014 ORDER AND HIS REPLY TO DEFENDANT'S RESPONSE TO HIS MOTION FOR RECONSIDERATION**

---

HICHAM AZKOUR, pro se

93 Pitt Street, Apt. 3B

New York, New York 10002

Email: hicham.azkour@gmail.com

1

On April 7, 2014, **HICHAM AZKOUR**, pro se plaintiff, ("Plaintiff") submitted a memorandum of law in support of his motion respectfully requesting that the Court reconsider part of its decision in its Order dated March 26, 2014 at Docket Entry No. 187. The motion, *see* Docket Entry No. 196, seeks reconsideration of the Court's determination (1) that he is disabled; (2) that a factual dispute exists as to whether he has mitigated his damages; (3) that he is not entitled to any back pay relief since September 9, 2011; (3) that a factual dispute exists as to his back pay claim for the period between February 14, 2010 and September 9, 2011; and (4) that he is not entitled to front pay. It also seeks that the Court's reconsideration of its decision in denying Plaintiff federal liquidated damages on his retained tips claim. *See* Docket Entry No. 193.

On April 17, 2014, the Court held a status conference and denied Plaintiff's motion for reconsideration on all issues except the Court's granting of summary judgment to Defendant on back pay after September 9, 2011, and ordered that defendant Little Rest Twelve, Inc. ("Defendant") respond to Plaintiff's motion on that issue no later than May 1, 2014.

On April 25, 2014, Defendant filed a letter as a response to Plaintiff's motion for reconsideration. The Court ordered that Plaintiff reply to Defendant's response no later than May 12, 2014. However, the Court, without allowing Plaintiff to timely file a reply to Defendant's response, prematurely issued an Order dated May 9, 2014, which was electronically filed and entered on May 12, 2014 at 11:50 AM EDT. *See* Docket Entry No. 210.

Plaintiff asserts that the Court did not afford him due process by prematurely issuing, to his utmost surprise, the Order dated May 9, 2014. Plaintiff contends that the Court did not afford him the least opportunity to be heard and, in addition to its premature ruling, denied him the right to appeal under the assumption that any appeal brought by Plaintiff would be made in bad faith. By denying Plaintiff the right to appeal, the Court signifies that its Order is final. As such, Plaintiff contends that he should be relieved from the May 9, 2014 Order because of the Court's mistake, inadvertence, surprise, or excusable neglect. *See* Rule 60(b)(1) of the Federal Rules of Civil Procedure.

Plaintiff respectfully requests that the Court, under the aforementioned rule, reconsider and relieve Plaintiff from its May 9, 2014 Order. Moreover, Plaintiff respectfully requests that the Court afford Plaintiff an opportunity to be heard as per this Court Order dated April 17, 2014. Furthermore, in accordance with this Order, Plaintiff submits his reply Defendant's response and supports his reply by his declaration ("*Azkour Dec.*") and the exhibits (EXHIBIT A to EXHIBIT E) attached hereto.

## 1.  ABSENCE OF FACTUAL DISPUTES

In the April 25, 2014 letter, Docket Entry No. 206, which Defendant purports to be a response to Plaintiff's motion for reconsideration, Defendant appears to be requesting an extension of the discovery completion deadline so that it may compel disclosure of Plaintiff's medical records. As we reminded the Court in a letter dated April 30, 2014, *see* Docket Entry No. 205, the deadline expired on July 31, 2011. Therefore, Defendant failed to rebut Plaintiff's arguments and, consequently, no issue has been identified by Defendant. Indeed, based upon the submissions of both parties for the sole purpose of summary judgment (excluding the superseded submissions of Plaintiff's former counsel at Docket Entries Nos. 103, 104, and 105) and the *admissible evidence* considered and examined by the Court, Plaintiff does not believe that any issue or factual dispute exists as to his entitlement to the requested legal and equitable reliefs.

The absence or lack  of any issue is simply justified by the fact that (1) Plaintiff is not mentally incompetent[1]; (2) Plaintiff is not mentally ill[2]; (3) Plaintiff has never been admitted, whether voluntarily or involuntarily, into a psychiatric hospital or an in-patient mental health program for treatment; (4) Plaintiff is not an alcoholic and does not use alcohol[3]; (5) Plaintiff does not use narcotics, illegal substances, or illegal prescriptions; (6) Plaintiff does not use tobacco or nicotine in any form; (7) Defendant has not presented any *admissible evidence*

---

[1] *See* Docket Entry No. 86 in *Azkour v. Haouzi, et al.*, 11-CV-5780 (RJS)(KNF) ("Civil Rights Action").

[2] *Id.*

[3] "Mental disability" means mental illness, mental retardation, developmental disability, *alcoholism, substance dependence,* or *chemical dependence.*  A mentally disabled person is one who has a mental disability. See Section 1.03(3) of the New York Mental Hygiene Law ("N.Y.M.H.L.").

supporting the fact that Plaintiff has been, at all times relevant, so mentally ill as not to be able to seek employment, be employed, and maintain employment; (8) Defendant contradicts itself by falsely alleging that Plaintiff is mentally ill and, at the same time, seeks to obtain evidence from him[4]; and (9) even if Plaintiff has been, *arguendo*, mentally ill, the Court erred, both as a matter of law and a matter of fact, in denying him back pay and front pay upon the basis that he has suffered from the aforementioned condition and, thence, Defendant has not been responsible for his unemployment. See *Azkour Dec.* at ¶¶ 17-27.

Not only did the Court err, but as we have stated in previous submissions, its reference to Plaintiff's alleged mental illness as a disability is a biased and misguided decision, which blatantly violates the laws, including the American with Disabilities Act ("ADA") Amendment Act ("ADAAA") of 2008, *see* 42 U.S.C. § 12102 *et seq.* Plaintiff has demonstrated to this Court that, as a recipient of the Temporary Assistance for Needy Families, he is considered as an employee. See 42 U.S.C. § 601 *et seq.; see also United States v City of New York*, 359 F3d 83 (2d Cir. 2004), *cert. denied* 543 US 1146 (2005).

In addition, Defendant's allegations and reliance on hearsay that Plaintiff has been so mentally ill that he has never been able to seek, find, and maintain employment is not supported by any law or fact. Defendant has not so far presented any record produced by a qualified psychiatrist[5] – a record in compliance with Rule 803(6) of the Federal Rules of Evidence[6] -

---

[4] The Court is reminded that Defendant's counsel, part of the Civil Rights Action's discovery proceedings, deposed Plaintiff on November 26, 2013, notwithstanding his prior knowledge and representation to the Court that Plaintiff has been allegedly suffering from severe mental impairments which cause individuals to be disconnected from reality.

[5] As defined N.Y.M.H.L. § 9.01, a "qualified psychiatrist" means a physician licensed to practice medicine in New York state who: (a) is a diplomate of the American board of psychiatry and neurology or is eligible to be certified by that board; or (b) is certified by the American osteopathic board of neurology and psychiatry or is eligible to be certified by that board.

[6] Rule 803(6) of the Federal Rules of Evidence provides that the record of an act, event, condition, opinion, or diagnosis should not be excluded if:

    (A)    the record was made at or near the time by — or from information transmitted by — someone with knowledge;

    (B)    the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

showing that Plaintiff has been suffering from severe mental ailments, which have prevented him from engaging in any employment activity.

Regardless of Defendant's baseless contentions, this Court is well aware that even *mental health patients working in mental health institutions* have been deemed workers engaging in gainful employment activity and, thus, protected by the minimum wage requirements of the FLSA. *Weidenfeller v. Kidulis,* 380 F. Supp. 445 (E.D. Wis. 1974); *Souder v. Brennan,* 367 F. Supp. 808 (D.C.D.C. 1973). In applying the economic-reality test, the *Souder* court found that "the reality is that many of the patient-workers perform work for which they are in no way handicapped and from which the institution derives the full economic benefit." *Id.* at 813. In an effort "to prevent curtailment of opportunities for employment" that resulted from the holding in *Souder,* Congress has amended the FLSA to allow the payment of wages to handicapped workers "whose earning or productive capacity is impaired by age, physical or mental deficiency, or injury" at rates lower than the minimum wage pursuant to the grant of a special certificate. *See* 29 U.S.C. § 214(c). In addition, the Department of Labor ("DOL") has defined a worker with a disability

> as an individual whose earning or productive capacity is impaired by a physical or mental disability, including those relating to age or injury, for the work to be performed. Disabilities which may affect earning or productive capacity include blindness, mental illness, mental retardation, cerebral palsy, alcoholism, and drug addiction. The following, taken by themselves, are not considered disabilities for the purposes of this part: Vocational, social, cultural, or educational disabilities; chronic unemployment; receipt of welfare benefits; nonattendance at school; juvenile delinquency; and, correctional parole or probation. Further, a disability which may affect earning or productive capacity for one type of work may not affect such capacity for another.

*See* 29 C.F.R. § 525.3(d). DOL has also promulgated a number of other regulations governing the employment of handicapped workers. *See* 29 C.F.R § 525.1 *et seq.*

---

(C)   making the record was a regular practice of that activity;

(D)   all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)   neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Therefore, Defendant's argument that Plaintiff's alleged mental illness has prevented him from seeking, finding, and maintaining employment is not sustainable and cannot be supported either by law or fact.

## 2. DEFENDANT'S UNTIMELY REQUEST SEEKING DISCLOSURE OF PLAINTIFF'S MEDICAL RECORDS IS AN OVERT, MALICIOUS ACT OF HARASSMENT AND DELAY

The act of suddenly bringing up Plaintiff's alleged mental health condition at the center of and at this very late stage of the litigation clearly reflects that Defendant is trying to distract the Court so that it may avoid the imminent consequences of its unlawful, harassing, malicious, and injurious acts. If Plaintiff's alleged psychiatric illness had really been a medical fact, raising serious questions as to Plaintiff's credibility as a witness and his ability to seek employment and maintain it, Defendant would have requested, and the Court had then granted, to have Plaintiff examined by a qualified psychiatric pursuant to Rule 35(a) of the Federal Rules of Civil Procedure. Moreover, if Plaintiff's had manifested any signs of mental disturbance or deficiency, Plaintiff's former attorney, David Stein, Esq., would have ethically taken a reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect Plaintiff as a client and, in appropriate cases, seek the appointment of a guardian ad litem, conservator or guardian. Mr. Stein would have formally informed the Court of Plaintiff's mental health condition.

Mr. Stein did not.

The Court is aware that, out of malice and want of legitimate defense, Defendant's former counsel irresponsibly used Plaintiff's alleged mental health condition in its response to Plaintiff's motion for partial summary judgment. *See* <u>Docket Entry No. 78 at ¶¶ 22-24, page 5</u>. The baseless allegations and misguided defense that Plaintiff is a mentally perturbed individual is not a novelty. On September 19, 2010, Defendant, adding perjury to insult, supported its false, injurious, and malicious allegations with the declaration of Sergei Bezrukov, an alleged floor

6

manager of Ajna Bar. *See* <u>Docket Entry No. 83 at ¶ 9, page 2</u>. Mr. Bezrukov perjuriously and incoherently declares:

> Also, at the same time, Hicham claimed that after the separation from his wife he has been *mentally unstable* and *will do anything to get his way of life back* (emphasis added).

*Id.*

Evidence, which was provided to Plaintiff by Defendant's former counsel, points unambiguously to the fact that Plaintiff never discussed his personal, private matters with Mr. Bezrukov. Mr. Bezrukov's statement seems to be based upon information furnished to him by Defendant's former counsel. As Plaintiff's pro se complaint rather reflects, Plaintiff was constantly at odds with and complaining of Mr. Bezrukov's acts of violence, perversion, and harassment. Therefore, Plaintiff's relationship with Mr. Bezrukov's was strictly a difficult, unmanageable employment relationship. Mr. Bezrukov was not Plaintiff's confidant. Any reference to Plaintiff's marriage by Mr. Bezrukov is proof that Defendant, unauthorized, provided Plaintiff's personal information to an employee, thus invading Plaintiff's privacy.

Consequently, there is no guarantee that, if Plaintiff's medical records are released, Defendant will not them for the purpose of harming Plaintiff. Curiously, while Defendant requests that Plaintiff disclose his protected health information, Plaintiff has not obtained any satisfactory assurance from Defendant that reasonable efforts have been made to secure a qualified protective order. 45 C.F.R. § 164.512(1)(e)(ii)(b). The protective order must prohibit "using or disclosing the protected health information for any purpose other than the litigation." and "[r]equire [] the return to the [physician] or destruction of the protected health information ... at the end of the litigation or proceeding." 45 C.F.R. § 164.512(1)(e)(v).

In any event, whether during the tenure of its former managers or the recent ones, Defendant created, nourished, and raised the mental health issue each time it decided to discredit Plaintiff's testimonies and claims. If Defendant's contention that Plaintiff's alleged mental illness has indeed rendered his testimony unreliable, <u>Docket Entry No. 78 at ¶¶ 22-24</u>, and prevented him

from finding and maintaining employment, <u>Docket Entry No. 206</u>, Defendant should have requested, three years ago, that the Court Order disclosure of Plaintiff's medical records as per 45 C.F.R. § 164.512(e) and subject him to a Rule 35 psychiatric evaluation.

Clearly, Plaintiff's mental health has been in controversy since he first filed his pro se complaint on May 19, 2010, and Defendant, in its October 12, 2012 letter, <u>Docket Entry No. 139</u>, informed the Court that it would deny Plaintiff reinstatement on the grounds that he was allegedly mentally ill and allegedly presented a danger to Defendant's employees. This being said, it is undeniable that Defendant has already shown it has no good cause to support a modification of the pre-trial Scheduling Order relative to the discovery completion deadline. Defendant's request is just another tactic to maliciously harass Plaintiff, harm him by inducing the Court to deny him his legal reliefs and delay the closure of the present litigation.

### 3.  <u>THE EVIDENCE CONSIDERED BY THE COURT FOR SUMMARY JUDGMENT IS INADMISSIBLE AND SHOULD BE EXCLUDED</u>

This Court seems to *conveniently* rely on doubtful evidence to legitimize its bias against Plaintiff. The latter argues in his pleadings at <u>Docket Entries Nos. 193 and 201</u> that this Court relied on Plaintiff's impermissible hearsay in his declaration dated June 1, 2012, *see* <u>Docket Entry No. 104 at ¶ 28</u>[7], where he proffers, without any competent authority or knowledge, a medical expert's testimony. Plaintiff testifies that, *according to his psychiatrist and psychotherapist*[8], his alleged, serious mental impairments will last long before he may be able to

---

[7] *In the context of the summary judgment motion,* the Court considered pleadings submitted by Plaintiff's former attorney in a different context, *that of an inquest,* which Plaintiff rejected. These pleadings were superseded by Plaintiff's own pleadings. The questionable declaration at <u>Docket Entry No. 104</u> was drafted by Plaintiff's former attorney and Plaintiff, at the last minute and without being duly informed, was required to sign it. Plaintiff presumes that his former counsel provided the Court with a series of emails reflecting his opposition to the submission of the pleadings at <u>Docket Entries Nos. 103, 104, and 105.</u>

[8] Plaintiff fails to identify these practitioners or provide any admissible, reliable, and relevant testimony as to their knowledge of his impairments. No practitioner has ever submitted a sworn affidavit regarding Plaintiff's mental illness. Any medical record, which has been so far submitted to the Court, *has no judicial value* because it cannot constitute admissible evidence. *See* <u>Docket Entry No. 138</u>. Such evidence is not in conformance with Rules 601, 602, 603, 702, 703, and 705 of the Federal Rules of Evidence. This is the reason why, in the Civil Rights Action, the Honorable Kevin Nathaniel Fox, U.S.M.J., determined that Plaintiff is mentally competent. *See* Civil Rights Action <u>Docket Entry No. 86</u>. Although the Hon. Fox declines to say whether Plaintiff is able to work, he nevertheless asserts that Plaintiff is efficiently able to engage in the more complex and mentally demanding activity of litigating.

recover completely, which constitutes another impediment in finding or maintaining any suitable employment. Plaintiff, without supporting his contention with any medical evidence, adds that it is unclear when he will be able to find and maintain suitable employment in the future. Rule 602 of the Federal Rules of Evidence, however, prevents Plaintiff from testifying to the subject matter of the hearsay statement, as he has no personal knowledge of it and has no authority to provide an expert's opinion. Moreover, Rule 56(c)(4) of the Federal Rules of Civil Procedure states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

No affidavit has been executed by any declarant whose statements or opinions are reported by Plaintiff in his June 1, 2012 declaration, which, as a matter of course, was never submitted to this Court in support of Plaintiff's motion for summary judgment as to his monetary damages. In addition, the statements reported by Plaintiff in his declaration or in his friend's declaration are not contained by any medical record prepared within the regular course of business. Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for business records. "Medical records can be admissible under Federal Rule of Evidence 803(6); provided they are prepared in the regular course of business; near the time of occurrence, by a person with knowledge and are properly authenticated." *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995).

Pertinently, in *Hodges,* the court excluded the defendant's expert who examined the prisoner-plaintiff in a case alleging a "systematic pattern of harassment, intimidation and retaliation" against him by prison officials and concluded that he had an anti-social personality disorder and a history of schizophrenia. Although the court acknowledged that evidence of mental illness could be relevant to the issue of credibility, the psychiatric records were dated thirteen years prior to the trial and thus had minimal probative value to render them relevant to the plaintiff's credibility. Moreover, the court excluded as well the records under Rule 403 of the Federal Rules of Evidence, because they were replete with "negative characterizations" of the plaintiff. Finally, because the expert's opinion was itself based in large part upon a review of these negative characterizations, it was similarly inadmissible.

Anyway, in his April 25, 2014 letter, Defendant point to certain medical records and requests, *three years after the discovery completion deadline*, that the Court compel their disclosure. Even if the Court grants Defendant's unreasonable request, for which he has offered no good cause, Plaintiff objects that such records are inadmissible on the grounds that they are not certified, are incomplete, and are not authenticated. This is the reason why Plaintiff respectfully requested that both parties subpoena and examine the authors of said records during trial. *See* Docket Entry No. 205. Pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Second Circuit has explicitly stated that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *see also Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (same). "To be admissible, evidence must be authenticated - the party offering the evidence must offer proof 'sufficient to support a finding that the matter in question is what its proponent claims.'" *Gissinger v. Yung*, CV-04-0534BMCJO, 2007 WL 2228153 (E.D.N.Y. July 31, 2007) (quoting Rule 901(a) of the Federal Rules of Evidence). Even if the Court relied on any medical records to support its decision that Plaintiff had been so mentally ill that he would not have been able to find and maintain employment, there is no indication that these records are complete and accurate copies of Plaintiff's medical records.

Accordingly, these records, if considered by the Court, remain inadmissible in form and may not be considered in connection with the parties' motions for summary judgment.

### 4. **A LAYMAN'S TESTIMONY CANNOT PROVIDE A SPECIALIZED UNDERSTANDING OF PLAINTIFF'S ALLEGED MENTAL ILLNESS SO THAT IT MAY BE UNDERSTOOD AND RESOLVED BY A FACT FINDER**

To the extent that the declaration of Mr. Robert Ribbler ("*Ribbler Dec.*"), one of Plaintiff's friends, contains a statement in reference to Plaintiff's allegedly deteriorating mental health, *see Ribbler Dec.* at ¶¶ 12-14, the testimony of this friend is not admissible and, pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure, should be precluded. A review of the

submissions made by Plaintiff's former attorney indicates that this witness-friend was not timely disclosed to Defendant. Moreover, notwithstanding the fact that this friend is not an expert in mental health, his statement tends to render an expert opinion. For example, Mr. Ribbler asserts that he has "come to notice that [Plaintiff] suffers from anxiety and depression [.]", yet he is unable to support such knowledge by any symptoms that support his perception of Plaintiff's condition. *See Ribbler Dec.* at ¶ 13. Furthermore, whereas the Court asserts that Plaintiff's move-in to a mental health shelter is ample evidence to support his severe mental illness and disability, it is not convincing why the testimony of Mr. Ribbler, who was Plaintiff's co-resident in the same mental health shelter, should be deemed reliable and admissible by the Court. Mr. Ribbler asserts that Plaintiff "is a friend of [his] and [he has] known him for approximately a year." *See Ribbler Dec.* at ¶ 1. Then he adds that he has "direct knowledge that [Plaintiff] is homeless and jobless." *See Ribbler Dec.* at ¶ 2. Considering that Mr. Ribbler's declaration was executed on May 9, 2012, one may conclude that his first encounter with Plaintiff reasonably occurred on or about May 9, 2011, during which time Plaintiff was still being processed by the New York City Department of the Homeless Services ("DHS") at the Bellevue Hospital Men's Shelter. The latter is a DHS processing center and, contrary to what Defendant falsely and maliciously represents, is not an in-patient program or a psychiatric hospital for the mentally ill.

In any event, Mr. Ribbler's testimony is a layman's opinion, which is not helpful to clearly determine a fact in issue. As this Court may note, his testimony is riddled with contradictions and is not based upon scientific, technical, or other specialized knowledge. While this witness-friend describes his perception that Plaintiff's mental health was negatively affected, *see Ribbler Dec.* at ¶ 13, he nevertheless asserts, by his direct knowledge of the facts, that Plaintiff was diligently seeking employment. *See Ribbler Dec.* at ¶¶ 5-6, 8-11. He even concludes that Plaintiff's mental health was deteriorating because of "his unsuccessful and disappointing experience in the labor market." *See Ribbler Dec.* at ¶ 12. Mr. Ribbler becomes more specific when he declares that Plaintiff informed him that "his mental health issues are related to his inability to find an employment because of his former's employer's refusal to provide him with a post-employment reference letter." *See Ribbler Dec.* at ¶ 14.

Despite Mr. Ribbler's unambiguous statements, which indicate that Plaintiff was diligently seeking employment and has, thus, reasonably mitigated his damages, the Court relied in its

argument at <u>Docket Entry No. 187</u> solely and conveniently upon the declarant's reference to Plaintiff's "deteriorating" mental health. *See* <u>*Ribbler Dec.* at ¶ 12</u>. This does not appear to convincingly support the fact that the Court's decision was unbiased.

Federal Rule of Evidence 701 was amended in 2001 "to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge." *United States v. Garcia*, <u>413 F.3d 201, 215 (2d Cir. 2005)</u> (citing Rule 701(c) of the Federal Rules of Evidence). The purpose of Rule 701(c) is to "prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth" in Federal Rule of Civil Procedure 26. *Id.*; *see also Bank of China v. NBM LLC*, <u>359 F.3d 171, 181 (2d Cir. 2004)</u>. Under Rule 26(a)(2)(A) and Rule 26(a)(2)(D) of the Federal Rules of Civil Procedure, a party must "disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705," and must make such disclosures "at the times and in the sequence that the court orders."

Consequently, instead of relying upon Mr. Ribbler's testimony, which is rather a layman's *inflated* perception of Plaintiff's deteriorating mental health, it is not too late that this Court allow Plaintiff to introduce a medical expert's testimony regarding his mental health. *See* <u>Docket Entry No. 201</u>. As explained to this Court in a letter dated May 5, 2014, <u>Docket Entry No. 209</u>, Plaintiff was not expecting that Defendant would seek disclosure of his protected health information.  It appears that Plaintiff's mental health has become so determinative to his entitlement of any legal relief that his reliance on a qualified expert's testimony during trial is now crucial to his defense and, considering Defendant's late request for disclosure, there is no evidence that such testimony, if admitted by the Court, will prejudice Defendant or weaken his case. Finally, there is no evidence that Plaintiff or his former attorney did not abide by the Court's pre-trial Scheduling Order or vainly sought its modification without good cause. As such, introduction of a medical expert's testimony during trial should not be precluded on the ground that Plaintiff allegedly failed to abide by the pre-trial Scheduling Order.

A district court's decision to preclude an expert witness should be based on four balancing factors: (1) the party's explanation for its failure to follow the scheduling order; (2) the importance of the precluded witness's testimony; (3) the prejudice that would result to the other party as a result of having to prepare for the new testimony; and (4) the possibility of a continuance. *See Softel, Inc. v. Dragon Med. and Scientific Commc'n, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)).

A district court can admit expert testimony from a person "qualified as an expert by knowledge, skill, experience, training, or education," assuming that "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *See* Rule 702 of the Federal Rules of Evidence. Under Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the district court's role is to determine whether the "expert" is qualified to testify as an expert. The court conducts a two-part inquiry: (1) whether the expert used a reliable methodology; and (2) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Daubert,* 509 U.S. at 592-93, 113 S.Ct. 2786.

For instance, any testimony regarding the *incompatibility* of the six or seven mental impairments with which Plaintiff has heretofore been misdiagnosed will not consist of facts only, but it will also rely on complex theories and specialized knowledge which may be beyond the common understanding of lay jurors. As stated in the Advisory Note to the Rule 702:

> Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, *Expert Testimony*, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore §1918.

It is undeniable that in the present case, the jury will be entirely incapable of understanding the evidence before it and determining the facts in issue without a medical expert's testimony. How will the testimony of a lay person help the juror understand that it is impossible to have an

individual diagnosed with Delusional Disorder and Schizophrenia at the same time? How can an individual suffering from these severe disorders remain poised, calm, coherent, connected and testify without manifesting any disturbance in behavior, feeling, thinking, or judgment? It is commonly known that Delusional Disorder is a condition characterized by the development either of a single delusion or of a set of related delusions that are usually persistent and sometimes lifelong. The content of the delusion or delusions is very variable. Clear and persistent auditory hallucinations (voices), schizophrenic symptoms such as delusions of control and marked blunting of affect, and definite evidence of brain disease are all incompatible with this diagnosis. However, the presence of occasional or transitory auditory hallucinations, particularly in elderly patients, does not rule out this diagnosis, provided that they are not typically schizophrenic and form only a small part of the overall clinical picture. So, why Plaintiff did not exhibit any of this disorder's negative symptoms during his appearances before the Court, during his testimonies, or his interaction with the courthouse's personnel?

It is not hard to conclude that Defendant vehemently insists on introducing Plaintiff's mental health as evidence during trial because it is common knowledge that laypeople give great weight to mental health information in their credibility determinations, even in the absence of expert testimony explaining what specific link, if any, exists between a mental disorder and accurate perception, memory, and narrative.[9]

### 5.  DEFENDANT'S INSISTENCE ON INTRODUCING PSYCHIATRIC EVIDENCE BEFORE LAY JURORS IS A DELIBERATE, UNFAIR ATTACK ON PLAINTIFF'S CREDIBILITY AND CHARACTER

We are convinced that Defendant's request for the disclosure of Plaintiff's medical records is not only aimed at determining his monetary damages before a jury, but it is also a disguised request to re-litigate its liability by attacking Plaintiff's credibility and character. Indeed, there can be little doubt that presenting Plaintiff's alleged mental health condition as evidence, without

---

[9] For example, a person diagnosed with schizophrenia has not necessarily experienced delusions and hallucinations, or such symptoms may be well-controlled with medication. *See* AM. PSYCHIATRIC ASS'N, *DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS* (3d ed. rev. 1987), pp. 312-13 (setting forth diagnostic criteria for schizophrenia).

the opinion of a psychiatric expert, can have a significant impact on the fact finders' assessments of Plaintiff's credibility. The analyses in bench trial opinions where evidence of a plaintiff's mental illness—particularly when presented through testimony of a defendant's forensic expert—leads the finders to conclude that the plaintiff's account is not to be believed demonstrate the ravaging and unfair effectiveness and misuse of psychiatric evidence. The cases in which psychiatric evidence was offered ostensibly on the issue of credibility are also noteworthy because one can see the role such evidence can play in a fact finder's decision-making, not only strictly with respect to the credibility of the plaintiff's trial testimony, but also as evidence of the plaintiff's overall character.

Psychiatric evidence, if it's not presented by a qualified expert, will automatically lead lay jurors to form preconceived and biased opinions, most certainly without weighing the evidence. "Opinions of this type create a serious danger of confusing or misleading the jury, *see* Fed. R.Evid. 403, causing it to substitute the expert's credibility assessment for its own common sense determination." *See Nichols v. American Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir. 1998). The U.S. Court of Appeals for the Eighth Circuit in *Nichols* vacated the judgment for the defendant in a sexual harassment case based on precisely this concern about misuse of psychiatric evidence. The trial court had admitted the testimony of a defendant's expert forensic psychiatrist—purportedly on the issue of alternative causation of damages—that the plaintiff had a personality disorder and an "undifferentiated somatoform disorder." The psychiatrist opined that the plaintiff "lacked psychiatric credibility." The appeals court ruled that such evidence was not the proper subject of expert testimony under *Daubert* and instead addressed "the very question at the heart of the jury's task—could Nichols be believed?" The court expressed concern that such evidence could have confused or misled the jury, particularly because the psychiatrist's testimony was not limited to the damages issues in the case but suggested that the plaintiff was not accurate in her descriptions of the central events in dispute.

The key problem with the expert's testimony in *Nichols* was that the psychiatrist had "used a psychological label to offer her evaluation of the truth of Nichols's statements, the accuracy of which is a pure question of credibility." While the defense expert's use of the word "credibility" in her testimony is likely what alerted the appeals court to the jurors' potential misuse of the

15

evidence, other elements of her testimony presented the same risk. Trial courts, therefore, must limit fact finders' exposure to psychiatric evidence, which they could easily use to reach broad conclusions about the plaintiff's credibility.

Civil litigation defendants may also use evidence of a plaintiff's mental illness to suggest that such mental illness indicates that the plaintiff himself instigated or contributed to the incident at issue in the litigation. Such use is more implicit than explicit since evidence rules generally exclude such use of "character evidence" in civil litigation. Where admitted, however, psychiatric evidence presents a particularly powerful form of character evidence since it also taps directly into the stigma associated with mental illness.

The basic prohibition on character evidence in the Federal Rules of Evidence, set forth in Rule 404(a), provides that: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." The character evidence prohibition is aimed at the use of evidence about a person, distinct from the incident in question, to suggest that the incident is more likely (or not) to have happened. Character evidence thus attempts to establish "a causal connection between personality and action."

Character evidence is highly persuasive because all humans make assumptions about other individuals' likely conduct based upon their past behavior or particular attributes. We assume that one's "character"—which is not defined in the evidence rules but is generally considered to refer to one's fixed traits—is predictive of one's conduct on a particular occasion, such as an event at issue in litigation. However, such an assumption about human behavior came under sharp attack from psychologists who challenged the "trait theory" that had developed in the early twentieth century. Legal scholars cited to "situationist" psychological theories[10] in support of arguments to limit the admissibility of character evidence. As a result, contemporary evidence rules reflect concerns that fact finders will assign inappropriate weight to evidence— making a "fundamental attribution error"— that may not be highly predictive of behavior.

---

[10] These theories consist of an approach to behavior which holds that general traits do not exist (perhaps apart from intelligence). Behavior, then, is seen as being influenced by external, situational factors rather than internal traits or motivations.

Alternatively, there is concern that jurors will use character evidence to conclude that a litigant is a "bad person" or otherwise unworthy and therefore rule against him on that basis in part or in whole.

Because evidence of a person's fixed traits can be powerful, evidence rules purport to limit fact finders' access to it except under certain narrow circumstances, particularly in the civil context. Indeed, the only generally recognized exception to the admissibility of character evidence in civil litigation is reputation or, in the case of federal courts, opinion evidence on a trial witness's character for "truthfulness". However, courts admit such evidence, not as substantive evidence of "relevant conduct," but rather for purposes of impeachment only.

### 6.  PLAINTIFF HAS REASONABLY MITIGATED HIS DAMAGES AND SHOULD BE AWARDED HIS BACK PAY AND HIS FRONT PAY FOR A PERIOD EQUAL TO HIS UNEMPLOYMENT

In any event, Defendant does not appear to be responding to the motion as directed by the Court. Indeed, Defendant's letter did not address the new evidence from the New York State Office of Temporary and Disability Assistance ("OTDA"), *see* EXHIBIT A hereto attached, which was presented by Plaintiff to support his motion on the issue of his ability to work, nor did Defendant's letter rebut the evidence from the New York State Department of Labor ("NYSDOL") proving that Plaintiff has been available, able, and willing to work. *See* Docket Entries Nos. 199 and 200. The NYSDOL evidence, which the Court must not ignore and which is attached hereto, *see* EXHIBIT B, reflects that, while being the recipient of unemployment compensation during three years, Plaintiff has been diligently seeking employment and has been complying with the requirements of 20 C.F.R. § 604.3 and 12 N.Y.C.R.R. § 473.4.

In order to preserve his eligibility for unemployment compensation, Plaintiff, on a weekly basis, had to report to the NYSDOL office in the area where he resided for any action in connection with his claim, benefits, and registration for employment. *See* 12 N.Y.C.R.R. § 473.3; *see also Azkour Dec.* at ¶¶ 28-38.

So far, Defendant has not been able to contradict Plaintiff and prove that he was not complying with the NYSDOL unemployment eligibility requirements and, thus, was not diligently searching for employment. Neither has Defendant been able to contradict NYSDOL determination that Defendant has been responsible for Plaintiff's unemployment since his retaliatory termination. Defendant's arguments remain distractive, tangential, and are not based upon any competent and admissible evidence.

Moreover, even if *arguendo* Defendant and the Court are correct on the issue of Plaintiff's purported mental disability, Defendant's April 25, 2014 letter does not explain why the DOL regulations should discriminate against Plaintiff, as a purportedly mental ill individual, and deprive him of the right to seek employment and be employed. *See* Docket Entry No. 193. As stated above, the public interest protects the employment rights of workers with disabilities. *See, e.g.,* 29 U.S.C. § 214(c) and 29 C.F.R. § 525.3(d).

Despite the fact that there is no evidence which supports Defendant's contention that Plaintiff was hospitalized, Defendant, in its April 25, 2014, falsely asserts that Plaintiff was admitted to the Bellevue Hospital Center for observation, care and treatment in its comprehensive psychiatric inpatient program. Except for its blind and misguided reliance on Plaintiff's request to have the Court appoint a guardian ad litem to represent his interests in the Civil Rights Action, *see* Civil Rights Action Docket Entry No. 24, which was justly denied for the reasons set forth at Civil Rights Action Docket Entry No. 86, Defendant willfully misrepresents and mischaracterizes Plaintiff's statements in his declaration that some nurses "diagnosed" him with a multitude of disorders, *see* Docket Entry No. 194 at ¶¶ 7-8, 14. Defendant deliberately ignores that Plaintiff, for example, has never been examined by a New York State *qualified* psychiatrist. *Id.* at ¶¶ 10, 13, and 15. Defendant also ignores that the nurses who diagnosed or, rather negligently and incompetently misdiagnosed him, issued absurd reports where they do not state whether Plaintiff is able to work. *Id.* at ¶ 9; *see also Azkour Dec.* at ¶¶ 9-16.

In opposition to what Defendant falsely and fraudulently alleges, Plaintiff has never been admitted to any psychiatric hospital, whether in New York or elsewhere, whether voluntarily or involuntarily[11]. *See Azkour Dec.* at ¶¶ 6-7. Moreover, Plaintiff has never been examined by any

---

[11] See Article 9, N.Y.M.H.L.

qualified psychiatrist, and any psychiatric evaluation that has been produced, signed by a psychiatrist, and furnished to this Court is not based upon any *direct examination* of Plaintiff and, thus, does not meet the standards set by The American Board of Psychiatry and Neurology ("ABPN"). All reports and evaluations were executed based upon a consultative basis and all information was indirectly gathered by social workers or registered nurses from the Bowery Residents' Committee ("BRC") for the sole purpose of recommending to DHS, albeit negligently and fraudulently, that Plaintiff be placed in some type or category of subsidized housing. Some of these reports and evaluations contradict one another. *See Azkour Dec.* at ¶¶ 9-16. After many complaints as to the unprofessionalism of BRC's nurses and Medical Director, BRC referred Plaintiff to an uncertified psychiatrist working for the Postgraduate Center for Mental Health ("PCMH"). As a matter of fact, one of the evaluations furnished to this Court was executed by this very psychiatrist who, albeit clinically active, is not certified by ABPN and does not satisfy the Maintenance of Certification requirements. *See* EXHIBIT C. Plaintiff met this PCMH psychiatrist twice and for less than 15 minutes. Most of the time he spent at PCMH, Plaintiff was seen by a social worker.

It is now inevitably undoubtable that the mental disability defense used by Defendant is not sustainable. It is malicious, spiteful and, so far, has not helped Defendant demonstrate that Plaintiff did not reasonably mitigate his damages. On the same note, by deliberately and conveniently using inadmissible and excludable evidence, namely the testimony of Mr. Ribbler, the Court has unintentionally admitted, most likely in contrast with its March 26, 2014 and April 17, 2014 decisions, that Plaintiff reasonably and diligently mitigated his damages. As shown by EXHIBIT D, Plaintiff also seeks employment in another line of work and is highly motivated in finding employment regardless of the challenges he has been heretofore facing. *See Azkour Dec.* at ¶¶ 54-55. To satisfy the duty to mitigate, "the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position." *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). It is also reasonable and appropriate to conclude that Becerril was reasonably diligent in her search for new employment. *See Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir.1997)(citing *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1309 (7th Cir. 1984) (finding that filing applications, reading classified advertisements, and discussing employment opportunities with a friend are "more than sufficient to constitute reasonable diligence")).

19

Because Plaintiff has reasonably and diligently mitigated his damages he should be awarded back pay from the date of his unlawful discharge onward. For the same reasons set forth above and based upon more arguments as set forth below, the Court should reconsider its decision in summarily denying Plaintiff's his request for an award of front pay. Plaintiff request an award of front pay for a period equal to the period of his long term unemployment.

### 7.   PLAINTIFF IS ENTITLED TO BACK PAY AND THE COURT SHOULD NOT DEDUCT THE AMOUNT OF PLAINTIFF'S UNEMPLOYMENT COMPENSATION FROM HIS BACK PAY

Considering the fact that Defendant unlawfully terminated Plaintiff, it is not inconsistent to state that EXHIBIT B indisputably indicates that Defendant was responsible for Plaintiff's unemployment. While Plaintiff earned $33,521.00 in unemployment benefits, Docket Entry No. 200, and requested deduction of this amount from his back pay, Docket Entry No. 199, such request is not warranted as Defendant unlawfully terminated Plaintiff. *See Becerril v. East Bronx NAACP Child Development Center*, No. 08 Civ. 10283, 2009 WL 2611950, at *4 (S.D.N.Y. Aug. 18, 2009) (citing *Shannon v. Fireman's Fund Insurance Co.*, 136 F. Supp. 2d 225, 232 (S.D.N.Y. 2001)) (holding that when employer unlawfully terminates employee, unemployment benefits should not be deducted)).

The Second Circuit has explicitly stated that the decision whether or not to deduct benefits received from a collateral source, such as unemployment benefits, from an award of back pay rests in the sound discretion of the district court. *See Dailey*, 108 F.3d at 460. However, the Second Circuit has addressed the issue in dicta, noting that although collateral source payments do represent an additional benefit to the plaintiff, the Second Circuit, in another opinion, notes a sister circuit's view that "[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer." *Promisel v. First Am. Artificial Flowers, Inc.*, 943 F.2d 251, 258 (2d Cir.1991) (quoting *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 795 (3rd Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)). A majority of the

courts in the Second Circuit, including the Southern District of New York, have relied on this reasoning in not deducting unemployment benefits from back pay awards. *See, e.g., Meling v. St. Francis Coll.*, 3 F. Supp. 2d 267, 275-276 (E.D.N.Y. 1998); *Perez v. Manhattan Jeep Eagle*, No. 92 Civ. 9521, 1997 WL 76519, at *1-2 (S.D.N.Y. Feb. 24, 1997); *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 411-413 (S.D.N.Y.1996); *Azar v. TGI Friday's, Inc.*, 945 F.Supp. 485, 500-01 (E.D.N.Y.1996); *Brooks v. Fonda-Fultonville Cent. Sch. Dist.*, 938 F.Supp. 1094, 1109-10 (S.D.N.Y.1996).

Defendant cannot now argue that Plaintiff will receive a "windfall" if the Court does not offset the back pay award by the amount of unemployment benefits Plaintiff received after his termination. However, because unemployment benefits are paid by a state agency rather than, for example, by Defendant, Defendant's insurance, or any one of Defendant's funds or trusts directly, Plaintiff will receive this "windfall" no matter how the benefits are treated.[12] In short, fairness dictates that the "windfall" be awarded to the victim of the discrimination, rather than the perpetrator. *See Meling*, 3 F.Supp.2d at 275; *Iannone*, 941 F.Supp. at 412-413. Accordingly, the unemployment benefits received by Plaintiff shall not be deducted from his back pay award.

## 8. **PLAINTIFF'S FRONT PAY SHOULD BE AWARDED FOR A PERIOD EQUAL TO THE ENTIRE PERIOD OF HIS UNEMPLOYMENT**

In its Order dated March 26, 2014, this Court argues:

> "Front pay is awarded in the sound discretion of the district court." *Reed v. A. W Lawrence & Co., Inc.*, 95 F .3d 1170, 1182 (2d Cir. 1996). Because the undisputed facts show that *Defendant is not responsible for Plaintiffs unemployment* after September 7, 2011, Defendant is not liable for paying Plaintiff going forward. Moreover, it is unclear if

---

[12] Defendant may argue that because it contributes to the general unemployment insurance trust fund from which unemployment benefits are paid such benefits cannot be considered to derive from a "truly" collateral source. This argument is unavailing. *See NLRB v. Gullett Gin Co.*, 340 U.S. 361, 364, 71 S.Ct. 337, 95 L.Ed. 337 (1951) (in rejecting the argument that because the employer contributed to the state's unemployment compensation fund the unemployment compensation amounted to a direct rather than a collateral benefit, the U.S. Supreme Court noted that "payments to the employees were not made to discharge any liability or obligation of [the employer], but to carry out a policy of social betterment for the benefit of the entire state."). In both *Stratton v. Dep't for the Aging*, 922 F.Supp. 857, 866 (S.D.N.Y.1996) and *Williams v. Sec'y of Navy*, 853 F.Supp. 66, 72 (E.D.N.Y.1994), cases where the courts deducted unemployment benefits from back pay awards, the defendants, *both public agencies*, effectively paid the unemployment compensation. That is not the case here.

the restaurant where Plaintiff worked still exists *(see* Doc. No. 184 (brief submitted by Plaintiff, dated December 26, 2013, stating that the restaurant where Plaintiff worked closed "almost a year ago"), and if it does not, Plaintiff would certainly not be entitled to continue receiving wages. *See Sandlin v. Corporate Interiors Inc.,* 972 F.2d 1212, 1215 (10th Cir. 1992). Accordingly, the Court grants Defendant summary judgment on the issue of front pay (emphasis)

Defendant is directly responsible for Plaintiff's unemployment because (1) it unlawfully discharged Plaintiff; (2) Plaintiff requested to be reinstated several times, *see* Amended Complaint at Docket Entry No. 63 at ¶¶ 29-31; (3) Defendant refused to reinstate him on the *pretext* that he was allegedly mentally disturbed, unable to perform the basic functions of his job, and he allegedly presented a risk of imminent harm to Defendant's employees, *see* Defendant's October 12, 2012 letter to this Court attached at Docket Entry No. 139; (4) Defendant has been refusing since Plaintiff's retaliatory termination to provide him with an unconditional post-employment reference letter, *see, e.g., Ribbler Dec.* at ¶ 14 ; and (5) Plaintiff, despite his diligent and consistent search for employment, has not yet been hired.

Based upon these facts, the Court's aforementioned argument, as we asserted in our motion for reconsideration at Docket Entry No. 196, is unavailing because it is erroneous, flawed, partial, and constitutes a blatant abuse of discretion.

Plaintiff is well aware that front pay, which is "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement," *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001), "is not mandatory and it is within the court's discretion to award," *Whitten v. Cross Garage Corp.*, No. 00 Civ. 5333, 2003 WL 21744088, at *4 (S.D.N.Y. July 9, 2003) (internal quotation marks omitted). The purpose of front pay is to help make the discharged employee whole. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984). However, any award less than the period of Plaintiff's long-term unemployment does not adequately redress the loss that he is reasonably likely to have suffered and will suffer. As Plaintiff asserted in his motion for reconsideration, whether Plaintiff has *a reasonable* prospect of *comparable* employment at age 49 is an issue for the future. Plaintiff has been unemployed for almost four years and, therefore, there is evidently a huge uncertainty as to any prospective employer willing to hire him in the restaurant industry at a level entry position. *See Buckley v. Reynolds Metals Co.*, 690 F.Supp. 211, 215 (S.D.N.Y.1988).

Plaintiff will be required to seek employment in another line of work. To do so, he must spend additional monies, resources, and time in relevant, meaningful and rewarding education and training. This would further negatively impact his personal and family life. It would also unnecessarily delay his retirement for several years. This argument is not highly speculative as to the computation of Plaintiff's front pay.

Plaintiff is 49 years old. Assuming a retirement age of 65, it can be presumed that Plaintiff has 16 years remaining before retiring.

The number of years remaining that a plaintiff has before retirement is an important factor in considering whether front pay should be awarded and, if so, what the amount of the award should be. This factor bears consideration because of the inherently speculative nature of front pay awards covering a long period of time. Defendant may argue that it has ceased its business activity and that Plaintiff has been employed only for a short period of time, not exceeding a few months. This argument is not acceptable because Defendant's egregiously unlawful acts and its indisputable acts of fraud, embezzlement and mismanagement contributed to the cessation of its business. *See* EXHIBIT E. Absent these unacceptably acts of mismanagement, Plaintiff could have still been employed by Defendant.

As the court in *Rengers v. WCLR Radio Station,* 661 F.Supp. 649 (N.D.Ill.1986) explained:

> If the court awards front pay for the remainder of plaintiff's working life, it must presume the plaintiff would have remained in defendant's employ all during that time. The longer the front pay period, the more speculative the front pay award.

*Id.* at 651.

Similarly, the court in *Buckley* explained:

> Front pay awards have been considered unduly speculative in situations where the discharged employee is [only] forty years old, and where an award may encompass ten years or more during which the employee, had he not been unlawfully discharged but continued in his employment, might or might not get raises, reductions, fired or incapacitated. Thus, in *Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. [353] at 362

n. 3. [(S.D.N.Y.1986)], front pay was denied where the plaintiffs sought awards covering eleven and sixteen years, respectively, or prospective employment.

*Id.* at 216. *See also Davis v. Combustion Engineering*, 742 F.2d 916, 923 (6th Cir.1984) in which the Sixth Circuit upheld an award of front pay to a 59 year old plaintiff but noted that front pay for a 41 year old plaintiff until retirement age might be unwarranted. Other courts seem to agree that plaintiffs in their forties are too young for lifetime front pay awards. *See e.g., Bailey v. Container Corporation of America*, 660 F.Supp. 1048 (S.D.Ohio 1986); *Foit v. Suburban Bancorp*, 549 F.Supp. 264, 267 (D.Md.1982); *Monroe v. Penn-Dixie Cement Corp.*, 335 F.Supp. 231, 235 (N.D.Ga. 1971).

The purpose of an award of front pay is to make the victim of unlawful retaliation whole, *see Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 285 (2d Cir.2011), and should not "place the plaintiff in a better position than he would have occupied had he not been fired." *Thomas v. iStar Fin., Inc.*, 508 F.Supp.2d 252, 260 (S.D.N.Y.2007). In light of the arguments heretofore articulated, and absent the aforementioned unlawful acts fraud, embezzlement and mismanagement, which contributed to the cessation of Defendant's business, it is clear that Plaintiff's back pay award implicitly assumes that Plaintiff would have remained employed by Defendant for more than the four years after his termination and thus such back pay does not "goe[] a long way to making [Plaintiff] whole." *See id.*

Furthermore, Plaintiff is also aware that before being awarded front pay, "a claimant is required to 'use reasonable diligence in finding other suitable employment.'" *Padilla v. Metro-North Commuter Railroad*, 92 F.3d 117, 125 (2d Cir. 1996) (emphasis omitted). Failure to mitigate will "limit the employer's liability for front pay." *See Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 313-14 (S.D.N.Y. 2009). Without evidence of any current to find comparable work, an award of front pay would be speculative. *See Greenbaum v. Svenska Handelsbanken, N.Y.*, 979 F. Supp. 973, 988 n.5 (S.D.N.Y. 1997) (declining to award front pay in light of plaintiff securing comparable employment, even though she was compensated at lower salary); *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 878 (S.D.N.Y. 1999) (holding that it would be inequitable to award plaintiff front pay when she had demonstrated no effort to mitigate

damages). Here, Plaintiff proffered admissible evidence of past and present attempts to secure employment, even in another line of work. *See* EXHIBIT D.

Finally, when a plaintiff willfully leaves comparable employment due to a change in personal circumstances, front pay is not warranted. For example, in *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 578 (S.D.N.Y. 2010), the court held that the plaintiff was not entitled to lost wages when she voluntarily left comparable employment for personal reasons, such as spending time with her sister. Similarly, in *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998), the court held that a terminated employee who entered a training program rather than seeking comparable employment did "not fulfill his obligation to mitigate." Plaintiff has sought employment, has not been employed since his termination by Defendant, and has not been admitted to a training program. Accordingly, Plaintiff is entitled to front pay.

## 9. **PLAINTIFF IS ENTITLED TO FEDERAL LIQUIDATED DAMAGES ON HIS UNLAWFULLY RETAINED TIPS**

Unsurprisingly, Defendant's letter did not address Plaintiff's contention that he is entitled to federal liquidated damages on his unlawfully retained tips claim. Although the Court contends that the retained tips claim was *only* brought under New York law and supports its conclusion by ¶¶ 51-56 of the First Amended Complaint. *See* Docket Entry No. 63. Plaintiff, however, asserts that the Court's determination is clear error because the Court overlooked the fact that tips retention was articulated under the minimum wage provision, 29 U.S.C. § 206, and that it was alleged in the First Amended Complaint at ¶¶ 57-62. In his Report & Recommendation to this Court, *see* Docket Entry No. 91, the Honorable Kevin N. Fox, U.S.M.J., recognizes that the illegal retention of Plaintiff's tips was brought by Plaintiff under *both* New York and federal law. The Report literally states:

### II. Minimum Wage

Pursuant to FLSA and NYLL, employers are required to pay their employees a minimum wage.[3] *See* 29 U.S.C. § 206(a)(1); *see also* NYLL § 652(1). Both statutes

permit an employer to pay tipped employees less than the statutorily prescribed minimum wage. *See* 29 U.S.C. § 203(m); *see also* NYLL § 652(4). Employers are permitted to credit a portion of the tips received by an employee against the required hourly minimum wage, this allowance is referred to as a "tip credit." *See* 29 U.S.C. § 203(m).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

<u>3</u> During the relevant period, the federal minimum wage was $7.25 per hour. *See* 29 U.S.C. § 206(a)(1). During the relevant period the New York minimum wage was $7.15; however, when the federal minimum wage is higher than New York's minimum wage, New York adopts the higher minimum wage. *See* NYLL § 652(1).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

## A. Tip Credit Under FLSA

Under FLSA, two conditions must be satisfied for an employer to take advantage of the tip credit: (1) the tipped employee must be informed by the employer of the provisions of § 203(m); and (2) the employee must retain all tips he or she receives. *See* 29 U.S.C. § 203(m). "FLSA permits employers to take a tip credit up to 50% of the minimum wage except that the credit may not exceed the value of the tips actually received by the employee." *Shahriar v. Smith & Wollensky Restaurant Group, Inc.,* <u>659 F.3d 234, 240 (2d Cir. 2011)</u> (citing 29 U.S.C. § 203(m)). An employer may not take advantage of the tip credit if: (a) "it requires tipped employees to share tips with (1) employees who do not provide direct customer service or (2) managers"; or (b) it has not informed its employees of the provisions of § 203(m). *Shahriar,* <u>659 F.3d at 240</u>. Pursuant to FLSA, a "tipped employee" is one who is "engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). Employees who customarily receive tips may pool their tips. See 29 U.S.C. § 203(m).

## B. Tip Credit Under New York Law

Under New York law, employers are also permitted to take a tip credit. However, they are prohibited from requiring their tipped employees to share tips with those employees who do not perform direct customer service, or who are managers of the employer. *See* NYLL § 652(4); *see also* N.Y. Comp. Codes R. Regs. Tit. 12, § 137-1.5. In New York, tips may be shared by "a waiter with a busboy or similar employee." NYLL § 196-d. "[P]laintiffs may establish a violation of § 196-d by showing that they were required to share tips with individuals who were either 'employers, owners, or managers' or simply 'not waiters, busboys, or similar employees.'" *Shahriar,* <u>659 F.3d at 240</u> (quoting *Chan v. Triple 8 Palace, Inc.,* <u>No. 03 Civ. 6048, 2006 U.S. Dist.</u>

LEXIS 15780, 2006 WL 851749, at *16 (S.D.N.Y. Mar. 30, 2006)). New York law prohibits an employer from retaining a gratuity intended for an employee. Neither an employer nor his agent may "demand or accept, directly or indirectly, any part of the gratuities, received by an employee." NYLL § 196-d.

Zajic asserts, through her declaration, that a portion of the tips collected at the restaurant, during Azkour's shifts, were retained by LRT for the purpose of sharing them with LRT's floor and lounge supervisors, who: (a) did not receive tips directly; and (b) were not eligible to receive tips under FLSA. If an employee does not retain all his or her tips, because, for example, the employer shares those tips with ineligible employees or managers, the employer may not take advantage of the FLSA tip credit. *See Shahriar*, 659 F.3d at 240 (citation omitted). LRT has not submitted any competent evidence that contradicts Zajic's assertion respecting LRT's handling of the tips intended for Azkour, nor has LRT offered any competent evidence to dispute Azkour's claim that he was never informed of the provisions of § 203(m); therefore, Azkour is entitled to summary judgment on his FLSA minimum wage claim. Moreover, LRT's retention of any gratuity intended for Azkour violates New York law, which prohibits an employer or its agents from retaining a gratuity intended for an employee. *See* NYLL §196-d. Accordingly, summary judgment on Azkour's NYLL minimum wage claim is also appropriate.

*See Azkour v. Little Rest Twelve, Inc.*, No. 10 Civ. 4132 (RJS) (KNF), 2012 U.S. Dist. LEXIS 16039, at *16-20 (S.D.N.Y., Feb. 7, 2012).

It is undisputed that Plaintiff's hourly compensation was $4.65. *See* Docket Entry No. 91 at page 6. This compensation is below the required minimum of $7.25 per hour. Minimum wage would be paid by Defendant, absent any illegal withholding of Plaintiff's tips and violation of 29 U.S.C. §§ 206 and 207, relative to both minimum wage and overtime compensation. *See* ¶¶ 33-38 of Plaintiff's First Amended Complaint. Moreover, the FLSA does not articulate any provision of law similar to NYLL §196-d, which directly addresses gratuities received, retained, or demanded by managerial or supervisory staff. Yet, both federal law and New York law construe, in the context of tipped employees, that an illegal retainer of gratuities is often translated in violations of the minimum wage and overtime compensation. NYLL §196-d provides:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee. This provision shall not apply to the checking of hats, coats or other

apparel. Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter nor as affecting practices in connection with banquets and other special functions where a fixed percentage of the patron's bill is added for gratuities which are distributed to employees, nor to the sharing of tips by a waiter with a busboy or similar employee.

On the other hand, 29 U.S.C. § 203(m) pertinently provides:

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

(2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206 (a)(1) of this title.

The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

Considering the aforementioned definition and the fact that ¶ 59 of the First Amended Complaint unambiguously alleges that Defendant failed to pay Plaintiff his tips as required by 29 U.S.C. § 203(m)(1) and  29 U.S.C. § 203(m)(2), Defendant failed to pay Plaintiff a salary equal or greater to the required minimum wage. This is the reason why the Honorable Fox's Report construes that the illegal retainer of tips was brought under both federal and New York law and, thus, the Report addresses such unauthorized retainer as willful violations of the minimum wage provision in both the FLSA and the NYLL.

For the reasons set forth above, the Court should reconsider its decision and award Plaintiff $5,421.47 in actual damages, another $5,421.47 in federal liquidated damages, and an

additional $1,355.37 in New York liquidated damages, for a sum certain of $12, 198.31 in total damages on his illegally retained tips claim.

## 10. **CONCLUSION**

**As demonstrated above,** Plaintiff contends that there is not a genuine issue, whether of fact or law, so that the Court deny his requested reliefs. The Court should reconsider its decision. In his letter, Defendant states in his April 25, 2014 letter that no rational fact finder could dispute that Plaintiff was sufficiently mentally ill as to be precluded from active employment. Plaintiff rather believes that no rational fact finder will dispute the fact that Defendant, throughout four years, (1) has acted with malice and reckless indifference as to its knowledge that it may be acting in violation of federal law; and that (2) Defendant has clearly been engaging in egregious or outrageous acts supporting an inference of the requisite evil motive. No rational fact finder will dispute the fact that Defendant's acts are explained by an evil motive. No fact finder will fathom that Defendant dragged Plaintiff in a protracted litigation for less than $10,000 in actual retained wages and tips. Any fact finder will find that it is beyond every possible human comprehension to have an immensely affluent defendant rather expend exorbitant attorney's fees, than pay a menial worker his deserved wages and gratuities.

For some reason, both the Court and Defendant wished to create a false issue by devising that Plaintiff is mentally incompetent, ill and, therefore, he cannot seek, find, and maintain employment. However, as Plaintiff asserts with the support of competent evidence from New York state agencies, *see Azkour Dec.* at ¶¶ 49-56, he is not mentally ill and, even he *arguendo* were so, the alleged, fabricated mental illness issue cannot preclude him from seeking and maintaining employment. It is just a stratagem to avoid fully paying him his damages.

**WHEREFORE,** Plaintiff respectfully requests that this Court, pursuant to Rule 60(b)(1) reconsider and relieve him of its May 9, 2014 Order. Specifically, Plaintiff respectfully requests that the Court:

1. Deny Defendant any extension to seek disclosure of Plaintiff's medical records;
2. Cease to intimidate Plaintiff by requesting that the Court sanction Plaintiff;

3.     Grant Plaintiff his motion for summary judgment as to his back pay claim starting from February 14, 2010 onward;

4.     Grant Plaintiff his motion for summary judgment as to his front pay claim for a period equal to the length of his unemployment, which was caused by Defendant;

5.     Grant all New York and federal liquidated damages relative to Plaintiff's back pay and front pay claims;

6.     Order that all the remaining disputed issues, including punitive damages, proceed to trial;

7.     Extend the jury period from two (2) to fifteen (15) days to allow reasonable examination and cross-examination of witnesses;

8.     Order Defendant not to interfere with the appointment of a pro bon attorney;

9.     Allow Plaintiff to introduce the testimony of a medical expert; and

10.     Order that Defendant advance all the costs relative to the medical expert's fees and the service of subpoena to compel the presence and testimony of witnesses.


Respectfully submitted on this 12th day of May, 2014


By:          HICHAM AZKOUR, pro se

_____

# EXHIBIT A

**STATE OF NEW YORK**
**OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE**

**REQUEST:** April 17, 2013
**CASE #:** 00000666166E
**CENTER #:** 37
**FH #:** 6353861P

---

In the Matter of the Appeal of

Hicham Azkour

from a determination by the New York City
Department of Social Services

:
:   **DECISION**
:   **AFTER**
:   **FAIR**
:   **HEARING**
:
:

---

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on December 11, 2013, in New York City, before Titilola Ifaturoti, Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

Hicham Azkour, Appellant

For the Social Services Agency

Marilyn Mathison, Fair Hearing Representative

## ISSUE

Was the Appellant's request for a hearing concerning the Agency's determination that the Appellant was not exempt from employment requirements but was work-limited timely?

Assuming the request was timely, was the Agency's determination that the Appellant was not fully disabled but able to participate in work activities with limitations correct?

## FINDINGS OF FACT

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1.    The Appellant advised the Agency of health-related conditions which the Appellant claimed prevented participation in the employment-related activities required by the Agency in order to receive assistance.

FH# 6353861P

2.    By notice dated March 21, 2013, the Agency informed the Appellant that the Appellant had been found to be non-exempt from employment requirements but was only work-limited and therefore required to participate in the Agency's employment-related programs in order to receive assistance.

3.    The notice of March 21, 2013 which the Agency provided to the Appellant advised the Appellant that a request for a fair hearing concerning this determination must be made within ten days of the Agency's determination.

4.    On April 17, 2013, the Appellant requested this fair hearing.

## APPLICABLE LAW

Section 131.5 of the Social Services Law provides that no Public Assistance shall be given to an applicant for or recipient of Public Assistance who has failed to comply with the requirements of the Social Services Law, or has refused to accept employment in which he or she is able to engage.

Section 332-b of the Social Services Law and 18 NYCRR 385.2(d) provide that upon application and recertification for Public Assistance benefits, or whenever a district has reason to believe that a physical or mental impairment may prevent the individual from fully engaging in work activities, the district must determine whether the individual has any medical condition which would limit the individual's ability to participate in work activities.

Section 332-b of the Social Services Law and 18 NYCRR 385.2(d) further provide that, after the determination of an individual's medical condition has been made, the Agency must notify the applicant or recipient in writing of such determination and of the right to request a fair hearing to contest such determination within ten days of such notification. An individual shall not have the right to a fair hearing to contest such determination if he or she requests a fair hearing after the ten day period.

## DISCUSSION

By notice dated March 21, 2013, the Agency informed the Appellant that the Appellant had been found to be non-exempt from employment requirements but was only work-limited and therefore required to participate in the Agency's employment-related programs in order to receive assistance.

The notice which the Agency provided to the Appellant advised the Appellant that a request for a fair hearing concerning this determination must be made within ten days of the Agency's determination. However, the Appellant requested the present hearing hearing to review such determination on April 17, 2013, which was more than ten days after the Agency's determination.

3

FH# 6353861P

The Appellant contended that the hearing was not requested within ten days of the Agency's notice because he did not realize that he had to request a fair hearing within a limited period of time. However, the Appellant's contention does not constitute a valid reason for failing to request this hearing in a timely manner because the Agency's notice which he signed as having been read and given to him informed him that he had a 10 day deadline within which he could request for a Fair Hearing.

In light of the above, the record of this hearing does not establish a sufficient basis for tolling the ten-day statute of limitations.

**DECISION**

As this hearing was requested more than ten days after the Agency action complained of, the Commissioner is without jurisdiction to review the Agency's determination that the Appellant is not exempt from employment requirements but is only work-limited.

DATED:  Albany, New York
        12/19/2013

                                NEW YORK STATE OFFICE OF
                                TEMPORARY AND DISABILITY ASSISTANCE

                                By

                                Commissioner's Designee

# **<u>EXHIBIT B</u>**

NYS DEPARTMENT OF LABOR
PO BOX 15130
ALBANY NY 12212-5130

**REQUEST FOR EMPLOYMENT
AND WAGE DATA**

Determination Date:   03-08-2010
Local Office:          831
Claim Effective Date:  02-08-2010

| URGENT:  RETURN TO US
WITHIN 7 DAYS |

**REPLY MAY BE FAXED TO:**
(518) 457-9378

Social Security No.:

**IF YOU FAX, DO NOT MAIL ORIGINALS.**

Employee Name:   HICHAM AZKOUR

LITTLE REST TWELVE INC
17 LITTLE WEST 12TH ST
NEW YORK NY 10014-1301

Other Name:

ENTER IF MISSING OR INCORRECT

EMPLOYER
REGISTRATION NO.     47-71400

LOCATION CODE
IF ANY

Employee's Work Location:
NEW YORK

The above named employee has filed a claim for unemployment insurance and has indicated that we do not have a record of all wages paid by you during the base period.  Please complete and return this report even if the employee did not work for you or you believe that the employee is not eligible.  If we do not receive this report within 7 days of the mail date, we will use information from the employee.  If benefits are paid erroneously based on the employee's records, you will be liable for the incorrect charges up to the time we receive the corrected information.

1. Earnings:
**For calendar quarters where some wages have already been reported for this employer account number:** The wages have already been entered in the "GROSS WAGES PAID" column below.   **If these amounts are incorrect, please cross off and enter the correct amounts.**

**For quarters where no wages have previously been reported, make the following entries:  1)** Enter the **TOTAL GROSS WAGES PAID** in each quarter.  **2)**  If the employee was not paid wages in the quarter, write **"NO WAGES PAID." 3)**  If the employee was paid wages in the quarter but wages were for work performed in excluded employment, enter the wages and write **"EXCLUDED"** after the wage entry and provide a brief explanation.  **4)**  If the employee was paid wages in the quarter but they were reported to a different state, enter the wages and write **"REPORTED TO (STATE)"** after the wage entry.  **5)** If the employee did not work for you, write **"NOT OUR EMPLOYEE."  6)**  If the employee's wages were not reported to the Employer Registration number listed above, write " **WAGES REPORTED TO (CORRECT ACCT. #)."**

| BEGINNING | ENDING | GROSS WAGES PAID |
|-----------|--------|------------------|
| 10-01-2009 | 12-31-2009 | |
| 07-01-2009 | 09-30-2009 | |
| 04-01-2009 | 06-30-2009 | |
| 01-01-2009 | 03-31-2009 | |
| 10-01-2008 | 12-31-2008 | |

2.  When did the employee work for you?  From _____     To _____
                                                    Month/Day/Year                      Month/Day/Year

3.  The employee became unemployed because:

☐ LEFT OF OWN ACCORD (Explain details)
☐ To accept other work
☐ To get married
☐ Domestic responsibilities
☐ Illness
☐ To leave area
☐ Other

☐ LACK OF WORK
☐ Indefinite (Permanent Lay-Off)
☐ Temporary Lay-Off   Recall date _____
☐ DISCHARGED
☐ Incompetence
☐ Misconduct (See Reverse)
☐ Other (Explain details)

☐ INDUSTRIAL CONTROVERSY (Explain details)
☐ RETIREMENT
☐ Voluntary
☐ Disability
☐ Compulsory under company or union rules
☐ OTHER  (Explain)

Employer Name _____     Date_____

Authorized Signature: _____     Telephone No. ( _____ ) _____

LO 12 (6-05)

NEW YORK STATE DEPARTMENT OF LABOR
PAYMENT UNIT, BUILDING 12  1099-G
PO BOX 621
ALBANY, NY 12201-0621

**Do You Qualify For An Earned Income Credit?**

You may be entitled to a Federal tax credit. The amount of the credit is based on your earned income such as wages and self-employment. This credit may be allowed even if you do not owe any Federal income tax. However, you must file a Federal income tax return to obtain the credit. See the instructions on your Federal income tax forms to determine if the amount of your income allows you to claim this credit.

H   AZKOUR
170-172 E. 107TH ST
NEW YORK      NY   10029

---

## Important Information About Form 1099-G

New York State is required to report the unemployment compensation payments of $10 or more, that you received last year, to the Internal Revenue Service, and to furnish you with Form 1099-G by January 31 of this year. Unemployment compensation includes:

- Unemployment Insurance payments
- Extended Benefits and Federal Supplemental Compensation payments
- TAA (Trade Adjustment Act) basic, retroactive, and additional training payments
- DUA (Disaster Unemployment Assistance) payments.

Please keep Form 1099-G for your records. You will need this information to complete your Federal, State and Local income tax returns. If you did not receive any unemployment compensation this year, but repaid an overpayment, this form is being sent in case it will be of help to you.

**Note: Unless you have voluntarily authorized Federal or State withholding, Federal, State and Local income taxes are not withheld on unemployment compensation.** If you expect to receive these benefits in the future, you can ask the payer to withhold Federal and State income tax from each payment. Or, you can make estimated tax payments during the year. For more information regarding how to make estimated tax payments, see instructions on the appropriate tax return, or, contact the Internal Revenue Service or the NYS Department of Taxation and Finance.

**BOX 1** Shows the total unemployment compensation paid to you this year. For tax year 2010, combine the box 1 amounts from all Forms 1099-G, and report the amount as income on the unemployment compensation line on your return. **If this 1099-G is for a year other than 2010, see the instructions on**

the appropriate tax return, or contact the Internal Revenue Service, the NYS Department of Taxation and Finance or your local taxing authority to determine the amount of taxable unemployment insurance.

**Box 2** Shows adjustments credited to you this year. Adjustments include money we received including cash (money orders and personal checks) in repayment of an overpayment. Current unemployment compensation, used to repay (offset) existing overpayments, is not included in this amount. Adjustment information may be helpful to you in filing your return.

**BOX 4** Shows total Federal income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 10% rate. Include tax withheld, if any, on your income tax return.

**BOX 5** Shows Alternative Trade Adjustment Assistance (ATAA) payments you received. This amount is not included in Box 1 amounts.

**BOX 10a** Shows the payer's state.

**BOX 10b** Shows the payer's Federal Identification Number.

**BOX 11** Shows total State income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 2.5% rate. Include tax withheld, if any, on your income tax return.

---

PAYER'S name, street address, city, state, ZIP code, Federal identification number, and telephone number

**NEW YORK STATE
DEPARTMENT OF LABOR-UNEMPLOYMENT INSURANCE
ALBANY, N.Y. 12240-0001**

PAYER'S Fed. Id. No. 27-0293117          Phone  518 485-7071

OMB No. 1545-0120

Statement for Recipients of Certain Government Payments

2010

Form **1099-G** (12/10)

| RECIPIENT'S identification number | 1. Unemployment compensation | 2. Adjustments | 3. | 4. Federal income tax withheld |
|---|---|---|---|---|
| ▉▉▉▉▉▉ | $16,449.00 | $0.00 | | $0.00 |

RECIPIENT'S name, street address, city, state and ZIP code

| | 5. ATAA Payments | 6. |
|---|---|---|
| | $0.00 | |

H   AZKOUR
170-172 E. 107TH ST
NEW YORK      NY   10029

| 7. | 8. | 9. |
|---|---|---|
| 10 a. State  NY | 10 b. State Identification No.  27-0293117 | 11. State income tax withheld  $0.00 |

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

NEW YORK STATE DEPARTMENT OF LABOR
PAYMENT UNIT, BUILDING 12  1099-G
PO BOX 621
ALBANY, NY 12201-0621

**Do You Qualify For An Earned Income Credit?**

You may be entitled to a Federal tax credit. The amount of the credit is based on your earned income such as wages and self-employment. This credit may be allowed even if you do not owe any Federal income tax. However, you must file a Federal income tax return to obtain the credit. See the instructions on your Federal income tax forms to determine if the amount of your income allows you to claim this credit.

H   AZKOUR
170 107TH STREET
NEW YORK           NY   10029

---

## Important Information About Form 1099-G

New York State is required to report the unemployment compensation payments of $10 or more, that you received last year, to the Internal Revenue Service, and to furnish you with Form 1099-G by January 31 of this year. Unemployment compensation includes:

- Unemployment Insurance payments
- Extended Benefits and Federal Supplemental Compensation payments
- TAA (Trade Adjustment Act) basic, retroactive, and additional training payments
- DUA (Disaster Unemployment Assistance) payments.

Please keep Form 1099-G for your records. You will need this information to complete your Federal, State and Local income tax returns. If you did not receive any unemployment compensation this year, but repaid an overpayment, this form is being sent in case it will be of help to you.

**Note: Unless you have voluntarily authorized Federal or State withholding, Federal, State and Local income taxes are not withheld on unemployment compensation.** If you expect to receive these benefits in the future, you can ask the payer to withhold Federal and State income tax from each payment. Or, you can make estimated tax payments during the year. For more information regarding how to make estimated tax payments, see instructions on the appropriate tax return, or, contact the Internal Revenue Service or the NYS Department of Taxation and Finance.

BOX 1 Shows the total unemployment compensation paid to you this year. For tax year 2011, combine the box 1 amounts from all Forms 1099-G, and report the amount as income on the unemployment compensation line on your return. If this 1099-G is for a year other than 2011, see the instructions on

the appropriate tax return, or contact the **Internal Revenue Service, the NYS Department of Taxation and Finance or your local taxing authority to determine the amount of taxable unemployment insurance.**

Box 2 Shows adjustments credited to you this year. Adjustments include money we received including cash (money orders and personal checks) in repayment of an overpayment. Current unemployment compensation, used to repay (offset) existing overpayments, is not included in this amount. Adjustment information may be helpful to you in filing your return.

BOX 4 Shows total Federal income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 10% rate. Include tax withheld, if any, on your income tax return.

BOX 5 Shows Alternative Trade Adjustment Assistance (ATAA) payments you received. This amount is not included in Box 1 amounts.

BOX 10a Shows the payer's state.

BOX 10b Shows the payer's Federal Identification Number.

BOX 11 Shows total State income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 2.5% rate. Include tax withheld, if any, on your income tax return.

---

| PAYER'S name, street address, city, state, ZIP code, Federal identification number, and telephone number | OMB No. 1545-0120 | | |
|---|---|---|---|
| **NEW YORK STATE DEPARTMENT OF LABOR-UNEMPLOYMENT INSURANCE** ALBANY, N.Y. 12240-0001  PAYER'S Fed. Id. No. 27-0293117   Phone 518 485-7071 | Statement for Recipients of **Certain Government Payments**  Form 1099-G (12/11) | | **2011** |

| RECIPIENT'S identification number | 1. Unemployment compensation | 2. Adjustments | 3. | 4. Federal income tax withheld |
|---|---|---|---|---|
| ████████ | $10,088.00 | $0.00 | | $0.00 |

| RECIPIENT'S name, street address, city, state and ZIP code | 5. ATAA Payments | 6. | | |
|---|---|---|---|---|
| | $0.00 | | | |

| | 7. | 8. | | 9. |
|---|---|---|---|---|
| H   AZKOUR 170 107TH STREET NEW YORK    NY   10029 | 10 a. State  NY | 10 b. State Identification No.  27-0293117 | 11. State income tax withheld  $0.00 | |

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

NEW YORK STATE DEPARTMENT OF LABOR
PAYMENT UNIT, BUILDING 12  1099-G
PO BOX 621
ALBANY, NY 12201-0621

**Do You Qualify for an Earned Income Credit?**

You may be entitled to a Federal tax credit. The amount of the credit is based on your earned income such as wages and self-employment. This credit may be allowed even if you do not owe any Federal income tax. However, you must file a Federal income tax return to obtain the credit. See the instructions on your Federal income tax forms to determine if the amount of your income allows you to claim this credit.

H   AZKOUR
127 W. 25TH STREET
NEW YORK            NY  10001

---

## Important Information About Form 1099-G

Because you received unemployment compensation payments of $10 or more in 2012, New York State is required to report those payments to the Internal Revenue Service, and give you Form 1099-G by January 31, 2013. Unemployment compensation includes:

- Unemployment Insurance payments
- Extended Benefits and Federal Supplemental Compensation payments
- TAA (Trade Adjustment Act) basic, retroactive, and additional training payments
- DUA (Disaster Unemployment Assistance) payments.

Please keep Form 1099-G for your records. You will need this information to complete your Federal, State and Local income tax returns. If you did not receive any unemployment compensation this year, but repaid an overpayment, this form is being sent in case it will be of help to you.

Note: Unless you have voluntarily authorized Federal or State withholding, Federal, State and Local income taxes are not withheld on unemployment compensation. If you expect to receive these benefits in the future, you can ask the Department to withhold Federal and State income tax from each payment. Or, you can make estimated tax payments during the year. For more information regarding how to make estimated tax payments, see instructions on the appropriate tax return, or contact the Internal Revenue Service or the NYS Department of Taxation and Finance.

BOX 1 Shows the total unemployment compensation paid to you this year. For tax year 2012, combine the box 1 amounts from all Forms 1099-G, and report the amount as income on the unemployment compensation line on your return. If this 1099-G is for a year other than 2012, see the instructions on

the appropriate tax return, or contact the Internal Revenue Service, the NYS Department of Taxation and Finance or your local taxing authority to determine the amount of taxable unemployment insurance.

Box 2 Shows adjustments credited to you this year. Adjustments include money we received including cash (money orders and personal checks) and offsets of income tax refunds in repayment of an overpayment. Current unemployment compensation, used to repay (offset) existing overpayments, is not included in this amount. Adjustment information may be helpful to you in filing your return.

BOX 4 Shows total Federal income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 10% rate. Include tax withheld, if any, on your income tax return.

BOX 5 Shows reemployment trade adjustment assistance (RTAA) payments you received. The amounts are not included in the Box 1 total. Include on Form 1040 on the "Other income" line. See the Form 1040 instructions.

BOX 10a Shows the payer's state.

BOX 10b Shows the payer's Federal Identification Number.

BOX 11 Shows total State income tax withheld from unemployment compensation paid to you this year. If you voluntarily authorized withholding, tax has been withheld at a 2.5% rate. Include tax withheld, if any, on your income tax return.

---

PAYER'S name, street address, city, state, ZIP code, Federal identification number, and telephone number

OMB No. 1545-0120

Statement for Recipients of Certain Government Payments

2012

**NEW YORK STATE
DEPARTMENT OF LABOR-UNEMPLOYMENT INSURANCE
ALBANY, N.Y. 12240-0001**

**PAYER'S Fed. Id. No. 27-0293117**     **Phone  518 485-7071**

Form **1099-G** (12/12)

| RECIPIENT'S identification number | 1. Unemployment compensation | 2. Adjustments | 3. | 4. Federal income tax withheld |
|---|---|---|---|---|
| ████████ | $6,984.00 | $0.00 | | $0.00 |

| RECIPIENT'S name, street address, city, state and ZIP code | 5. RTAA Payments | 6. |
|---|---|---|
| | $0.00 | |

| | 7. | 8. | 9. |
|---|---|---|---|
| H   AZKOUR
127 W. 25TH STREET
NEW YORK        NY  10001 | 10 a. State  NY | 10 b. State Identification No.  27-0293117 | 11. State income tax withheld  $0.00 |

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other action may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

# **EXHIBIT C**

American Board of Psychiatry and Neurology~ verifyCERT



# verifyCERT
### Certification and Status Verification System

## ❶ Click to Close Important Information about Certification Status

**I**n order to remain certified a physician must maintain an unrestricted medical license and satisfy the Maintenance of Certification (MOC) Requirements. Some physicians certified prior to 1994 may have been awarded a lifetime certificate. Those physicians are not required to participate in MOC. To find out more about Maintenance of Certification, visit our Web page at www.abpn.com/moc.html

**Certification Status**: Physicians may be "certified" or "not certified". Certification status is dependent on passing an initial certification examination and maintaining certification. Some physicians certified prior to 1994 may have been awarded a lifetime certificate. They are not required to participate in additional MOC activities to maintain their certification.

**MOC Status**: Physicians may be required to fulfill additional requirements in order to maintain their certification. The additional requirements vary based on the type and year of certification. The MOC status indicates whether or not the physician has reported meeting those requirements.

**Clinical Status**: Physicians are also required to report their Clinical Status. A designation of "clinically active" refers to any amount of direct and/or consultative patient care that a physician has provided in the preceding 24 months. "Clinically inactive" describes a physician who has provided no direct and/or consultative patient care in the past 24 months. Information on clinical activity status is self reported by the diplomate.

## Close this window

**Name : Das , Piali Mukherjee M.D.**       **City : New York**       **State : NY**

| Specialty or Subspecialty | Certification History | Status as of 5/9/2014 |
|---|---|---|
| Psychiatry<br>Certificate No. 48816 | Certified on 09/18/2000<br>certificate valid through<br>12/31/2010 | Certification Status: Not Certified<br>MOC Status: Not Meeting MOC Requirements<br>Clinical Status: Clinically Active |

# EXHIBIT D



Hicham Azkour <hicham.azkour@gmail.com>

---

## Oracle / ADF Developer - Basking Ridge, NJ

1 message

---

**Cynthia Mita** <cmita@insys.com>                                          Fri, May 9, 2014 at 2:21 PM
To: hicham.azkour@gmail.com

05/09/14 2:14 PM
I am a Resource Specialist for INSYS Group. We I am currently looking for several Java/ Oracle
ADF Developers for a **contract with our client in Basking Ridge, NJ.** We will look at 3
party candiates, but they will need to be able to travel nationally for the client 25 to 50% of the
time. **Our client will pay for all travel, lodging and provide money for meals. If you are
interested,** please forward a current copy of your resume along with your phone number and
best time that you can be reached. I will call you to further discuss this position and your
background.

- **Java ADF developers: Candidates that have 2 years of WebCenter Suite Sites
  (Fatwire - old name) experience.**
- The candidate can be mid-level with **Oracle ADF and Java experience.**
- Designs, specifies, implements, and maintains systems. Designs, codes, tests and
  Documents software programs for systems of moderate to high complexity as per the
  requirements specifications.
- Understands customer requirements, develops and evaluates alternative systems solutions.
  Translates high-level specifications for software components into program specifications.
  Involved with resolution of complex software development issues that may arise in a
  production environment.
- Participates in the investigation of system requirements and assists in preparation of
  systems specifications including revising manuals, design of forms and computer output,
  and documenting user procedures.
- Analyzes problems, conducts root cause analysis and help in resolution of problems using
  defined problem management procedure and help in application support and maintenance of
  customer applications.
- Medium level ownership and works independently.
- **6-8 years of relevant experience or equivalent combination of education and work
  experience.**
- Consistently applies fundamental knowledge of one technical discipline / programming
  languages for design specifications.
- Applies in depth knowledge of coding, testing, and debugging simple applications.
  Substantive knowledge of coding, testing and debugging.
- Competent to work in some phases of applications programming and design.
- Knows and consistently applies the fundamental concepts, practices and procedures of
  applications programming.
- Ability to write medium complexity code based on the design.
- Strong trouble shooting and problem solving skills to resolve defects and incidents.
- General understanding of how technology supports the business.
- Possesses broad knowledge of business domain
- **3-2 years Java, PL/sql, HTML5, Javascript, CSS3**
- 2 years Experience in **Oracle Sites (fatwire)**
- Knowledge of Oracle technologies like ADF, Apex, WebCenter Suite
- Willing to work on various web technologies and applications Experience and exposure to
  code release process.

**Cindy Mita**
**Sr. Resource Specialist – INSYS Group**
**395 West Passaic Street, Rochelle Park, NJ 07662**
**cmita@insys.com**
**http://www.linkedin.com/in/cindymita  Please feel free to link in with me!**
**201 937 1123**


If you would like to unsubscribe, please click here.


Lookup Candidate



Hicham Azkour <hicham.azkour@gmail.com>

## Sr. J2EE Developer -- Solicitation R264

message

**Ron Romano** <ron.romano@axelon.com>                                   Mon, Apr 28, 2014 at 12:16 PM
To: hicham.azkour@gmail.com

04/28/14 12:15 PM
Dear Job Seeker,
     My name is Ron and I'm a recruiter at Axelon Services Corporation. Our records show that you are an experienced professional with experience in J2EE/Java Development.

## Job Description

The client has a vacancy for a Sr. J2EE Developer who will provide support of production and development environments for our city wide automated time keeping system (CITYTIME).

## Primary Responsibilities include:

Perform activities related to technical design, coding and unit testing of enhancements and defect corrections for the City's time keeping system CityTime that includes: activity and payroll processing; time sheet, roster, status, and roll-call functionality; employee profile, leave balance, work schedule and self-care service. Work will involve application, architecture and interface/integration development and maintenance. Technical skills include: J2EE, Java, Websphere, EJB, JUnit; Object Oriented Development; Object Oriented Pattern skills; UML Modeling; JavaScript; and HTML.

## Preferred Skills

7+ years of experience.
Demonstrate thorough knowledge of basic Java skills.
Demonstrate thorough knowledge of J2EE and EJBs.
Strong knowledge of MOBs and data integration between heterogeneous environments.
Strong knowledge of Toplink. **Toplink skills are required.**
Strong knowledge in MQ/JMS.
Strong knowledge in SQL and PL/SQL in Oracle.
Strong knowledge of integrating IBM TIM/TAM with Java applications.
Have the ability to determine system performance and optimization.
Have the ability to rapidly comprehend and interpret the database data structures from the business perspective.
Familiarity with WebSphere Application Server.
Familiarity with Struts, Unit testing frameworks, Selenium.
Familiarity with HA and clustered deployment topologies, integration technologies.
Have strong written, verbal, and interpersonal, communication skills.
Good Task and Time Management skills.

Note: Please allow me to reiterate that I chose to contact you either because your resume had been posted to one of the internet job sites to which we subscribe, or you had previously submitted your resume to Axelon.  I assumed that you are either looking for a new employment opportunity, or you are interested in investigating the current job market.
If you are not currently seeking employment, or if you would prefer I contact you at some later date, please indicate your date of availability so that I may honor your request. In any event, I respectfully recommend you continue to avail yourself to the employment options and job market information we provide with our e-mail notices.
Thanks again.
Ron Romano
Axelon Services Corporation
44 Wall Street 18th Floor

Fax : (212) 306-0191
ron.romano@axelon.com

For more job opportunities: www.axelon.com

If you would like to unsubscribe, please click here.

Lookup Candidate



---

## Requisition(3-858-2531A) for Oracle ADF Developer for a contract position in NYC

message

---

**Qasim Chaudhary** <qasim@ustechsolutionsinc.com>                    Thu, Apr 17, 2014 at 5:48 PM
To: hicham.azkour@gmail.com

Hi,
This is **Qasim** from **US Tech Solutions Inc.**
Please go through the below job description, and let me know if you are interested to apply for this one.
**Full Name, phone #, Current location, work authorization**, and **expected hourly rate** needed along with the resume


Job ID: 3-858-2531A
Job Title: Oracle ADF Developer
Location: Brooklyn, NY
Duration: 1+ yr
Client: NYC DoITT
Interview process: F2F interview


**SCOPE OF SERVICES**

The Data Element Exchange Program (DEEP) is a multi-agency effort to strengthen the City's oversight and coordinated regulation of various City Operations, including, but not limited to, Public Health, Public Safety, Construction, Debt Collection, Violation History, License issuance and Permit issuance.  In the summer of 2008, a City taskforce comprised of members of the Mayor's Office, Law Department, Fire Department, Department of Buildings and Department of Environmental Protection presented several recommendations in areas including, technology and data sharing, legislation, and inspection protocols.  This solicitation is for assistance with data sharing, an area where significant progress has been made during the past several years but where additional opportunities for improvement exist.


- Work closely under the direction of the Stakeholder Agency Project Manager/Director and the DEEP project manager.
- Develop applications using Oracle ADF and ADF Mobile Frameworks and tools.
- Provide comprehensive developing life cycle such as feasibility studies, designs, coding, test plans and implementation.
- Conduct application's performance tuning.
- Implement systems (data exchanges) in line with business goals, objectives and technical requirements.
- Should be able to understand and follow the technical design documents and update them, if needed, during the development phase.
- Execute development plans and revise as appropriate to meet changing needs and requirements.
- Write and maintain documentation to describe program development, logic, coding, testing changes and corrections.


**MANDATORY SKILLS/EXPERIENCE**

- At least 8 years of experience developing Java/J2EE applications.
- Experience in developing applications using Oracle ADF 11g and Oracle JDeveloper IDE
- Experience in developing applications using Oracle ADF Mobile Framework
- Experience developing applications using Oracle PL/SQL and Oracle Database
- Development of functional and technical solution design documents based upon client requirements.
- Excellent verbal/written communication skills
- Ability to work in an extremely fast-paced work environment with tight deadlines


**DESIRABLE SKILLS/EXPERIENCE:**

- Experience working with NYC Government agencies

Thank you very much for your time.

Qasim Chaudhary
USTECH Solutions, Inc.
10 Exchange Place; Suite 1820
Jersey City NJ 07302
Email: qasim@ustechsolutionsinc.com
Phone: (201) 524-9600 Ext.242
www.ustechsolutions.com

Note: You are receiving this email either because at some point in the past you contacted our firm directly or posted your resume on the one of the Internet job boards.

If you are not currently seeking employment, or if you would prefer I contact you at some later date, please indicate your date of availability so that I may honor your request. In any event, I respectfully recommend you continue to avail yourself to the employment options and job market information we provide with our e-mail notices.

Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail, delete and then destroy all copies of the original message.

If you would like to unsubscribe, please click here.

Lookup Candidate

# EXHIBIT E

## In the Matter Of:

## LITTLE REST TWELVE vs. NINA ZAJIC

CASE NO: 11-17061

## NINA ZAJIC

*December 17, 2013*

*Non-Confidential Portions*



800.211.DEPO (3376)
EsquireSolutions.com

NINA ZAJIC  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 17, 2013
1

```
1
2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
3    -----------------------------------------------X
     LITTLE REST TWELVE, INC.,
4
                         PLAINTIFF,
5
             -against-
6
     NINA ZAJIC, JOSEPH KAY, DAVID KAY, JOSEPH GILL
7    and THOMAS GIGLIO,
8                        DEFENDANT.
     -----------------------------------------------X
9
     NINA ZAJIC and DAVID KAY,
10
                 Counterclaim-Plaintiffs,
11
                 -against-
12
     LITTLE REST TWELVE, INC., INNA GUDAVADZE,
13   MISELVA ETABLISSEMENT (a/k/a VALMORE TRUST),
     ANDREW BAKER, and JEAN-YVES HAUZI,
14
                 Counterclaim-Defendants.
15   -----------------------------------------------X
16                DATE: December 17, 2013
                  TIME: 10:12 a.m.
17
18           VIDEOTAPED DEPOSITION of the
19   Defendant, NINA ZAJIC, taken by the Plaintiff,
20   pursuant to a notice, held at the office of
21   Gusrae, Kaplan, Nusbaum, PLLC, 120 Wall
22   Street, New York, New York 10005, before HELGA
23   CHRISTIANE LAVAN, a Registered Professional
24   Reporter and Notary Public of the State of New
25   York.
```



```
 1

 2    A P P E A R A N C E S:

 3

 4        GUSRAE, KAPLAN & NUSSBAUM, PLLC
              Attorneys for Plaintiff/Counterclaim
              Defendants
 5            120 Wall Street
              New York, New York 10005
 6
              BY: MARTIN RUSSO, ESQ.
 7                SARAH Y. KHURANA, ESQ.

 8

 9        STERNIK & ZELTSER, ESQS.
              Attorneys for the
10            Defendants/Counterclaim Plaintiffs
              1562 1st Avenue, #205-1817
11            New York, New York 10028

12            BY: EMANUEL ZELTSER, ESQ.

13

14        Also Present:

15            GREGORY HOLDERMAN, Videographer

16

17

18            *        *          *

19

20

21

22

23

24

25
```



S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the sealing, filing and certification of the within examination before trial be waived; that all objections except as to form are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the transcript may be signed before any Notary Public with the same force and effect as if signed before a clerk or a Judge of the court.

IT IS FURTHER STIPULATED AND AGREED that the examination before trial may be utilized for all purposes as provided by the CPLR.

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the CPLR cannot be deemed waived and the appropriate sections of the CPLR shall be controlling with respect hereto.

IT IS FURTHER STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that a copy of this examination shall be furnished, without charge, to the attorneys representing the witness testifying herein.



```
 1                    Zajic

 2           THE VIDEOGRAPHER:   Here begins

 3      videotape number 1 in the deposition of Nina

 4      Zajic in the matter of Little West Twelve,

 5      Incorporated, against Nina Zajic, David Kay,

 6      Joseph Gill and Thomas Giglio.

 7           Today's date is December 17, 2013.

 8      The time is 10:12 a.m.

 9           This deposition is being taken at the

10      offices of Gusrae, Kaplan & Nusbaum and was

11      made at the request of Martin P. Russo,

12      Esquire.

13           I'm Gregory Holderman, the

14      videographer.  The court reporter is Helga

15      Lavan from Esquire Deposition Solutions, New

16      York, New York.

17           Counsel, please identify yourselves,

18      state whom you represent and please speak

19      slowly for the court reporter.

20           MR. RUSSO:  My name is Martin P.

21      Russo of Gusrae, Kaplan & Nusbaum on behalf of

22      the plaintiff, Little Rest Twelve.

23           MS. KHURANA:  Sarah Khurana, Gusrae,

24      Kaplan & Nusbaum PLLC, on behalf of plaintiff

25      Little Rest Twelve.
```



```
 1                    Zajic
 2         MR. RUSSO:  I'm also representing
 3    third-party defendants Martin Russo, Marlen
 4    Kruzkhov and Sarah Khurana.
 5         MR. ZELTSER:  Emanuel Zeltser,
 6    Sternik and Zeltser, representing the
 7    deponent.
 8         THE VIDEOGRAPHER:  Will the court
 9    reporter please swear in the witness?
10    N I N A   Z A J I C, called as a witness,
11    having been first duly sworn by a Notary
12    Public of the State of New York, was examined
13    and testified as follows:
14    EXAMINATION BY
15    MR. RUSSO:
16         Q.  Good morning, Ms. Zajic.
17         A.  Good morning.
18         Q.  We've had a number of depositions so
19    I'm going to dispense with the instructions,
20    unless you need me to repeat them.
21         A.  No.
22         Q.  Where are you presently living?
23         A.  In Forest Hills, Queens.
24         Q.  What's the address?
25         A.  105-25 65th Avenue.
```



```
 1                          Zajic
 2        A.   It depends on the project.
 3        Q.   How much is your hourly fee when you
 4   do charge it?
 5        A.   It depends on what I'm expected to
 6   do.
 7        Q.   Have you collected unemployment in
 8   the last four years?
 9        A.   No.
10        Q.   When was the last time you were
11   employed by Little Rest Twelve?
12        A.   2010.
13        Q.   Approximately when in 2010?
14        A.   Approximately the end of March 2010.
15        Q.   When was of the last time you
16   performed services for Little Rest Twelve?
17        A.   Around the same time.
18        Q.   Since that time, March of 2010, have
19   you been director of Little Rest Twelve?
20        A.   I -- I don't understand the question.
21   I don't know what you mean by director.
22        Q.   Were you ever director of Little Rest
23   Twelve?
24        A.   I may have been.  I don't recall.
25   I've held several different positions there.
```



```
 1                         Zajic

 2   reporting to?

 3        A.  At this moment I'm telling you that I

 4   cannot remember any other names but Joseph.

 5        Q.  So as you sit here today you can't

 6   remember the name of any other person that you

 7   reported to during the four and a half years

 8   that you were at Little Rest Twelve?

 9        A.  Yes.

10           MR. ZELTSER:  Hold on.  Asked and

11   answered five times.  You can answer six

12   times, then I will tell you not to.

13           MR. RUSSO:  Mr. Zeltser, let's start

14   off right.  Your objections are limited to

15   form and that's it.

16           MR. ZELTSER:  You can answer again.

17   After that, I will tell you not to.

18           Go ahead.

19           MR. RUSSO:  If you want to instruct

20   the witness not to answer a question, you can

21   do that.  But I would ask that you not coach

22   the witness.

23           MR. ZELTSER:  Okay.

24        Q.  Who did David Kay report to when he

25   was at Little Rest Twelve prior to March 31,
```



```
 1                    Zajic
 2   anything at all?
 3       A.  I didn't receive.  I don't remember
 4   receiving anything from that sale of the
 5   house.
 6       Q.  In your divorce did you receive any
 7   assets?
 8       A.  No.
 9       Q.  When was your divorce final?
10       A.  I don't recall the date.
11       Q.  Approximately.
12       A.  About a year ago.
13       Q.  What assets do you recall having in
14   or around March of 2010?
15       A.  My house.
16       Q.  Other than your house what other
17   assets?
18       A.  No other assets.
19       Q.  Did you have bank accounts?
20       A.  I don't recall what bank accounts I
21   had.  But I did.
22       Q.  And did you have any bank accounts
23   with substantial amounts of money in them,
24   more than 25,000?
25       A.  I don't remember right now.
```



```
                              Zajic
1
2    supposed to run an outfit out of Bryant Park

3    serving a seasonal menu and we tried it one

4    season.

5            MR. ZELTSER:  Bryant?

6            THE WITNESS:  Bryant Park.

7        A.  We tried it one season.  It didn't

8    prove to be profitable so we squashed the

9    project.

10           MR. ZELTSER:  Bryant, do you know

11   where that is?

12           MR. RUSSO:  It is on 42nd Street on

13   the west side.

14           MR. ZELTSER:  New York?

15           MR. RUSSO:  In New York.

16       Q.  Did Little Rest Twelve fund that

17   project?

18       A.  Yes.

19       Q.  How did it fund it, out of

20   operations?

21       A.  I don't understand the question.

22       Q.  Did you take a loan to fund it or did

23   Little Rest Twelve take money of the

24   operations, its revenue from the restaurant

25   business?
```



```
 1                     Zajic
 2      Q.   So Joseph knew about that?
 3      A.   Yes.  Of course.
 4      Q.   What about Buddha Bar in Miami?  Did
 5  you try to open a Buddha Bar in Miami?
 6      A.   No.
 7           MR. ZELTSER:  Martin?
 8           MR. RUSSO:  Actually --
 9           MR. ZELTSER:  Five minutes for a
10  cigarette.
11           MR. RUSSO:  -- I just want to finish
12  this area.
13           Did I ask you about Buddha Lounge?
14      Q.   What's Buddha Lounge LLC?
15      A.   I don't recall.  It was a project
16  that I may have been doing in Miami at the
17  time.
18      Q.   And was that for Little Rest Twelve?
19      A.   Everything I was doing was for Little
20  Rest Twelve.
21      Q.   And what were you going to do in
22  Miami for Little Rest Twelve?
23      A.   It was going to be a lounge.
24      Q.   A lounge?  And did you use Little
25  Rest Twelve funds to fund the Buddha Lounge
```



```
 1                          Zajic
 2              Did you have all the cars at the same
 3    time or did they come in succession?
 4        A.   I don't recall if they were all at
 5    the same time.  But they were within the
 6    timeframe.
 7        Q.   There was another car that was rented
 8    for Little Rest Twelve which was a Porsche
 9    Cayenne; is that right?
10        A.   Yes.
11        Q.   Why did Little Rest Twelve need four
12    cars?
13        A.   I'm recalling three.  Two of which I
14    drove and one was driven by David.
15        Q.   So which one are you not recalling,
16    the Nissan Quest?
17        A.   Yes.
18        Q.   Let's leave that side for the moment.
19              Why did you need or why did Little
20    Rest Twelve need you to have two cars, a
21    Jaguar and a BMW?
22        A.   To travel in.
23        Q.   To travel to and from work?
24        A.   Yes.
25        Q.   And did Little Rest Twelve also pay
```



```
 1                        Zajic
 2        A.  To entertain them.
 3        Q.  Why?  What were you trying to
 4   accomplish?
 5        A.  It would depend on the situation.  I
 6   don't understand what you're asking me.
 7        Q.  Why does the restaurant need to take
 8   anyone to other restaurants?  Was there a
 9   business purpose to your entertainment?
10        A.  At times yes.  Of course.
11        Q.  Did you also use your American
12   Express card for personal expenses?
13        A.  I don't understand.  When you say
14   personal, what do you mean personal?
15        Q.  Did you buy yourself meals out in
16   Long Island?
17             MR. ZELTSER:  Buy what?
18        Q.  By yourself meals out in Long Island?
19             MR. ZELTSER:  Meals.
20        A.  I may have.  I don't recall.
21        Q.  Did you use your American Express
22   card to buy yourself clothing at Neiman
23   Marcus?
24        A.  I may have.  Yes.
25        Q.  And how did you return -- withdrawn.
```



NINA ZAJIC  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 17, 2013
120

```
 1                        Zajic

 2              After March 31, 2010, where did you

 3      set up offices for Little Rest Twelve?

 4              MR. ZELTSER:  Objection to the form.

 5         A.  I don't understand when you say

 6      offices.

 7         Q.  Let's stop for a second.

 8              Did you rent an apartment for Robbie

 9      Mingles?

10         A.  I believe -- I think we did, yes.

11         Q.  When you paid for that apartment it

12      was in Harlem, is that right?

13         A.  I don't recollect where.

14         Q.  Did you set up -- withdrawn.

15              In the days following March 31, 2010,

16      did you meet with people and -- in Robbie

17      Mingles's apartment to discuss what to do?

18         A.  I don't recollect where we met.  We

19      were meeting at restaurants near meatpacking.

20         Q.  You didn't work out of Robbie

21      Mingles's apartment?

22              MR. ZELTSER:  Objection to the form.

23         A.  I don't understand.

24         Q.  You don't understand?  What don't you

25      understand?
```



```
 1                        Zajic
 2        Q.   So why did you give it to him?
 3        A.   For him to have a place to live.
 4        Q.   Did Little Rest Twelve pay for his
 5   apartment?
 6        A.   Yes.
 7        Q.   Do you recall what the rent was?
 8        A.   No.
 9        Q.   Who else did you give an apartment
10   to?
11        A.   The chefs.
12        Q.   Was that part of their compensation
13   arrangement?
14        A.   Yes.
15        Q.   Where was the chefs' apartment?
16        A.   I don't recollect that.  It was in
17   Manhattan.
18        Q.   Did you have an apartment that was
19   paid for by Little Rest Twelve?
20        A.   There was another apartment, yes,
21   that was paid -- that I occasionally used.
22        Q.   Where was that apartment?
23        A.   On the upper west.
24        Q.   What was the address?
25        A.   I don't recollect the exact address.
```



NINA ZAJIC  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 17, 2013
190

1                         Zajic

2          MR. ZELTSER:  What do you mean where

3      they are?

4          MR. RUSSO:  Well, why would you be

5      worried about guarantees unless somebody has a

6      written document where Ms. Zajic guaranteed --

7          MR. ZELTSER:  I didn't say that

8      somebody doesn't have it.  Of course there is.

9          MR. RUSSO:  You have it?

10         MR. ZELTSER:  You have it.

11         MR. RUSSO:  You didn't produce it to

12     us.

13         MR. ZELTSER:  Of course I did.

14         MR. RUSSO:  You produced it to us?

15     Her guarantees of debts?

16         MR. ZELTSER:  I produced 8,000 pieces

17     of paper.  If it's not there --

18         MR. RUSSO:  It's not there.

19         MR. ZELTSER:  If it's not there, I

20     will look for it.

21         MR. RUSSO:  We'll keep the deposition

22     open until we get that document.

23      Q.  So did your lawyers show you this

24     piece of paper by which you guaranteed the

25     debts?



                        Zajic

1

2      Q.   While you were at Little Rest Twelve

3  did you effectuate wire transfers to yourself?

4      A.   Sometimes.   Yes.

5      Q.   For what purposes did you do that?

6      A.   I don't recollect now.   There were

7  different reasons, depending on the wire.

8      Q.   Give me an example of --

9           MR. ZELTSER:   If you recall say it.

10     Q.   Well, let me ask.

11          What are the reasons why you might do

12  that?

13     A.   I don't recall.

14     Q.   Was one of them to pay yourself?

15          MR. ZELTSER:   Do you recall or you

16  don't recall?   That's all.

17     A.   I don't recall.

18          MR. ZELTSER:   You recall, you got to

19  say it.

20     Q.   Does looking at this $10,353 figure

21  help you recall, refresh your recollection?

22          MR. ZELTSER:   Does it help you

23  recall?

24     A.   Not necessarily.

25     Q.   Take a look at the second page.   Do



## In the Matter Of:

## LITTLE REST TWELVE vs. NINA ZAJIC

CASE NO: 11-17061

## DAVID KAY

*December 16, 2013*

*Non-Confidential Portions*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1
 2     SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF NEW YORK
 3     ---------------------------------------------X
       LITTLE REST TWELVE, INC.,
 4
                           PLAINTIFF,
 5
                  -against-
 6
       NINA ZAJIC, JOSEPH KAY, DAVID KAY, JOSEPH GILL
 7     and THOMAS GIGLIO,

 8                         DEFENDANT.
       ---------------------------------------------X
 9
       NINA ZAJIC and DAVID KAY,
10
                  Counterclaim-Plaintiffs,
11
                  -against-
12
       LITTLE REST TWELVE, INC., INNA GUDAVADZE,
13     MISELVA ETABLISSEMENT (a/k/a VALMORE TRUST),
       ANDRAE BAKER, and JEAN-YVES HAUZI,
14
                  Counterclaim-Defendants.
15     ---------------------------------------------X

16                  DATE: December 16, 2013
                    TIME: 10:14 a.m.
17

18            VIDEOTAPED DEPOSITION of the

19     Defendant, DAVID KAY, taken by the Plaintiff,

20     pursuant to a notice, held at the office of

21     Gusrae, Kaplan, Nusbaum, PLLC, 120 Wall

22     Street, New York, New York 10005, before HELGA

23     CHRISTIANE LAVAN, a Registered Professional

24     Reporter and Notary Public of the State of New

25     York.
```



1

2   A P P E A R A N C E S :

3

       GUSRAE, KAPLAN & NUSSBAUM, PLLC
4              Attorneys for Plaintiff/Counterclaim
               Defendants
5              120 Wall Street
               New York, New York 10005
6
               BY: MARTIN RUSSO, ESQ.
7                   SARAH Y. KHURANA, ESQ.

8

9      STERNIK & ZELTSER, ESQS.
               Attorneys for the
10             Defendants/Counterclaim Plaintiffs
               1562 1st Avenue, #205-1817
11             New York, New York 10028

12             BY: EMANUEL ZELTSER, ESQ.

13

14     Also Present:

15         GREGORY HOLDERMAN, Videographer

16       NICOLE VARISCO, ESQ., Gusrae, Kaplan

17        INNESSA MELAMED, ESQ., Gusrae, Kaplan

18

19         *        *           *

20

21

22

23

24

25



```
 1                S T I P U L A T I O N S

 2       IT IS HEREBY STIPULATED AND AGREED by and between the

 3    attorneys for the respective parties herein that the

 4    sealing, filing and certification of the within

 5    examination before trial be waived; that all objections

 6    except as to form are reserved to the time of trial.

 7       IT IS FURTHER STIPULATED AND AGREED that the

 8    transcript may be signed before any Notary Public with

 9    the same force and effect as if signed before a clerk or

10    a Judge of the court.

11       IT IS FURTHER STIPULATED AND AGREED that the

12    examination before trial may be utilized for all

13    purposes as provided by the CPLR.

14       IT IS FURTHER STIPULATED AND AGREED that all rights

15    provided to all parties by the CPLR cannot be deemed

16    waived and the appropriate sections of the CPLR shall be

17    controlling with respect hereto.

18       IT IS FURTHER STIPULATED AND AGREED by and between

19    the attorneys for the respective parties hereto that a

20    copy of this examination shall be furnished, without

21    charge, to the attorneys representing the witness

22    testifying herein.

23

24

25
```



DAVID KAY  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 16, 2013
4

1                     D. Kay

2          MR. RUSSO:  Good morning.  It's 10:00

3   and we are on the record for the noticed

4   deposition of David Kay in the case entitled

5   Little Rest Twelve, Inc. versus Nina Zajic,

6   Joseph Kay, David Kay, Joseph Gill and Thomas

7   Giglio.  Mr. Kay was noticed for several times

8   but ultimately, by agreement for this morning

9   at 10:00 a.m., despite several communications

10  over the weekend, we did not hear from his

11  counsel.  We expected him at 10:00 a.m.  It is

12  now 10.  We will wait 15 minutes.  In the

13  interim, we will send e-mails and try to

14  contact his counsel.  Thank you.

15          Off the record.

16          (Whereupon, a discussion was held off

17  the record.)

18          THE VIDEOGRAPHER:  Here begins tape

19  number 1 in the deposition of David Kay in the

20  matter of Little West Twelve, Incorporated,

21  Nina Zajic, Joseph Kay, David Kay, Joseph Gill

22  and Thomas Giglio.  Today's date is

23  December 16, 2013.  The time is 10:14 a.m.

24          This deposition is being taken at the

25  office of Gusrae, Kaplan, Nusbaum and was made



DAVID KAY  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 16, 2013
5

```
 1                      D. Kay
 2   at the request of Martin P. Russo, Esquire.
 3              I'm Gregg Holderman, the
 4   videographer.  The court reporter is Helga
 5   Lavan from Esquire Deposition Solutions, New
 6   York, New York.
 7              Counsel, please identify yourselves,
 8   state whom you represent and please speak
 9   slowly for our court reporter.
10              MR. RUSSO:  On behalf of Little Rest
11   Twelve and Martin Russo, Sarah Khurana, and
12   Marlen Kruzkhov, Martin P. Russo.
13              MR. ZELTSER:  Emanuel Zeltser for
14   deponent.
15              THE VIDEOGRAPHER:  Would the court
16   reporter swear in the witness, please?
17   D A V I D   K A Y, called as a witness, having
18   been first duly sworn by a Notary Public of
19   the State of New York, was examined and
20   testified as follows:
21   EXAMINATION BY
22   MR. RUSSO:
23        Q.  Good morning, Mr. Kay.
24        A.  Good morning to you.
25        Q.  We've had a couple of depositions.
```

```
 1                     D. Kay
 2   I'm not going to go through the formality of
 3   giving you instructions --
 4        A.   Sure.
 5        Q.   -- unless you think you need them
 6   again.
 7        A.   If you feel like you need to give
 8   them to me, you're more than welcome to.  But
 9   I think I'm ready to go.
10        Q.   Okay.
11             Can you tell us where you're living
12   now?
13        A.   I'm actually bouncing around, to tell
14   you the truth.  I spend a lot of time in
15   Singapore and here in the states.
16        Q.   Where in Singapore are you staying?
17        A.   Right in the center.
18        Q.   Are you staying in a hotel?
19        A.   No.  With a friend.
20        Q.   What is the address?
21        A.   I don't remember the address off the
22   top of my head.
23        Q.   How long have you been living there?
24        A.   I don't technically live but when I
25   go I stay there, just spend a period of time.
```



```
 1                         D. Kay
 2        Q.  What is his name?
 3        A.  Gregory Kaplan.
 4        Q.  Does your father also live in Los
 5   Angeles?
 6        A.  No.  Not to my knowledge.
 7        Q.  Does he live in California?
 8        A.  I'm -- not to my knowledge anymore.
 9        Q.  Where does your father live?
10        A.  He bounces around.
11        Q.  So you don't know where he lives?
12        A.  I mean, he never has lived in one
13   place, to my knowledge, for a long, long time.
14        Q.  Where does he have houses --
15   withdrawn.
16        A.  I would say mostly in Georgia.
17        Q.  So he owns property in Georgia?
18        A.  I don't know what the structure --
19   how -- but I know he resides there.
20            MR. ZELTSER:  Republic of Georgia.
21        A.  Sorry.  Not the state.  The country.
22        Q.  What does your father do for a
23   living?
24        A.  You know what?  At the moment I'm not
25   sure.
```



```
 1                        D. Kay
 2    her.
 3         Q.  So when was the first time you met
 4    Olga?
 5         A.  I have no idea.  I don't remember.
 6    Around that time probably.
 7         Q.  Just to be clear, do you presently
 8    have any assets whatsoever?
 9         A.  No.
10         Q.  In March of 2010 did you have any
11    assets?
12         A.  I don't remember.  I doubt it.
13         Q.  In March of 2010 did you own any
14    houses?
15         A.  No.  That I remember, I'm pretty sure
16    I did not.
17         Q.  Did you own any apartments?
18         A.  No.  I'm answering that as both, I
19    guess.
20         Q.  Okay.
21             Did you own any property anywhere?
22         A.  Not to my recollection, no.
23         Q.  Did you have bank accounts?
24         A.  I think at that time I had a bank
25    account.  I don't remember exactly where.
```



DAVID KAY  Non-Confidential Portions
LITTLE REST TWELVE vs. NINA ZAJIC

December 16, 2013
195

```
1                    D. Kay
2   use a car for?
3       Q.  Why does Little Rest Twelve need to
4   have a car?
5       A.  First of all, we would go to pick up
6   all sorts of things around the city.  I
7   remember we had get our duck from here,
8   Chinatown.  All sorts of stuff.  You do events
9   other places.  What do you mean?  What does
10  anyone use a car for?  To get to and from
11  work.
12      Q.  To and from work?
13      A.  Yeah.  That as well.
14      Q.  Was that the primary use?
15      A.  Not the primary use.  Primary use was
16  everything.  I would pick up CDs from Records,
17  put it in the truck.  You need an SUV for
18  that.
19      Q.  Did Little Rest Twelve also pay your
20  insurance?
21      A.  Health insurance?
22      Q.  No.  Auto insurance on the Porsche?
23      A.  I don't remember.  I don't remember.
24  Perhaps.  I don't know.
25          MR. RUSSO:  Mark this as DK 10.
```



# Joseph Kay

## Vol. 1

### 03/07/2014

1

2    SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK
3    Index No. 650209/2010
     ----------------------------------------x
4    LITTLE REST TWELVE, INC.,

5                        Plaintiff,

6         - against -

7    NINA ZAJIC, JOESPH KAY, DAVID KAY,

8                        Defendants.

9    ----------------------------------------x

10
                      March 7, 2014
11                    10:22 a.m.

12

13        EXAMINATION BEFORE TRIAL of JOSEPH KAY, one

14   of the Defendants herein, taken by the

15   Plaintiffs, held at the offices of GUSRAE KAPLAN

16   NUSBAUM PLLC, located at 120 Wall Street, New

17   York, New York 10005, before Anthony Giarro, a

18   Registered Professional Reporter and a Notary

19   Public of the State of New York.

20

21

22

23

24

25

```
 1

 2      A P P E A R A N C E S :

 3


 4      GUSRAE KAPLAN NUSBAUM PLLC
          Attorneys for Plaintiffs
 5        120 Wall Street
          New York, New York 10005
 6
        BY:  MARTIN P. RUSSO, ESQ.
 7           SARAH Y. KHURANA, ESQ.

 8


 9       STERNIK & ZELTSER
           Attorneys for Defendants
10         1562 1st Avenue, #205-1817
           New York, New York 10028
11
        BY:  EMANUEL ZELTSER, ESQ.
12

13

14

15

16

17      Also Present:   Bogdan Mykhalus,
        Marc Friedman,   Videographer
18

19

20

21

22

23

24

25
```

```
 1

 2                    S T I P U L A T I O N S

 3

 4           IT IS HEREBY STIPULATED, by and between

 5      the attorneys for the respective parties hereto,

 6      that:

 7            All rights provided by the C.P.L.R., and

 8      Part 221 of the Uniform Rules for the Conduct of

 9      Depositions, including the right to object to any

10      question, except as to the form, or to move to

11      strike any testimony at this examination is

12      reserved; and in addition, the failure to object

13      to any question or to move to strike any

14      testimony at this examination shall not be a bar

15      or waiver to make such motion at, and is reserved

16      to, the trial of this action.

17            This deposition may be sworn to by the

18      witness being examined before a Notary Public

19      other than the Notary Public before whom this

20      examination was begun, but the failure to do so

21      or to return the original of this deposition to

22      counsel, shall not be deemed a waiver of the

23      rights provided by Rule 3116, C.P.L.R., and shall

24      be controlled thereby.

25            The filing of the original of this
```

1

2     deposition is waived.

3             IT IS FURTHER STIPULATED, a copy of this

4     examination shall be furnished to the attorney

5     for the witness being examined without charge.

6                     *       *       *       *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2              THE VIDEOGRAPHER:  We are

3      now on the record.  Please note that

4      microphones are sensitive and may

5      pick up whispering and private

6      conversations.  Please turn off all

7      cell phones or place them away from

8      the microphones as they can interfere

9      with deposition audio.  Recordings

10     will continue until all parties will

11     agree to go off the record.

12            My name is Marc Friedman,

13     representing Veritext New York.  The

14     date today is March 7th, 2014.  And

15     the time is approximately 10:22 a.m.

16     This deposition is being held in the

17     office of Gusrae Kaplan Nusbaum,

18     located at 120 Wall Street, New York,

19     New York and is being taken by the

20     counsel for the plaintiff.

21            The caption of this case is

22     Little Rest Twelve, Inc. versus Nina

23     Zajic, Joseph Kay and David Kay.

24     This case is filed in the Supreme

25     Court of the State of New York,

1

2    structure, you know, that lawyers or

3    somebody recommended.

4         Q      Did somebody recommend that structure?

5         A      Could be.  I'm not sure.

6    We'll have to ask Nina or David.

7         Q      You don't remember?

8         A      No.  I don't know.  I can

9    only assume because I don't know.

10        Q      Sir, do you have any bank

11   accounts in the United States?

12        A      No.

13        Q      Do you have any banking

14   accounts abroad?

15        A      No.

16        Q      Where do you keep your

17   savings?

18        A      With me under a mattress.

19        Q      How much do you keep in your

20   mattress?

21        A      Whatever I need.

22        Q      Do you have your bank

23   accounts in other people's names?

24        A      Nope.

25        Q      Are you a wealthy man,

```
 1
 2        A       I'm staying with a friend.
 3        Q       Do you own any property in
 4   New York?
 5        A       No.
 6        Q       Are you staying in Forest
 7   Hills?
 8        A       No.
 9        Q       How did you pay for your
10   plane ticket to come here?
11        A       Can't remember.
12        Q       Do you have credit cards?
13        A       Yes, I do.
14        Q       What banks have given you
15   credit cards?
16        A       American Express.  I don't
17   think it's a bank.
18        Q       Do you have any MasterCards
19   or VISAs?
20        A       I can't recall.
21        Q       How do you pay your American
22   Express bill?
23        A       With money, I guess.
24        Q       Where do you get the money
25   to pay it?
```

```
 1
 2     available to you in copy form in a
 3     litigation?
 4          A       I don't remember.
 5          Q       Which records in particular
 6     were at the Little Rest Twelve location?
 7          A       Can't...
 8          Q       You don't know?
 9          A       There's no way to know.
10          Q       How much money did you
11     personally put into Little Rest Twelve?
12          A       Don't remember that either.
13          Q       How much money did you
14     personally put into MBOF?
15          A       Don't remember.
16          Q       Did Fisher Island have a
17     plane?
18          A       I don't know.
19          Q       In the Year 2007, did you
20     cause Little Rest Twelve to pay for the
21     use of a plane for Fisher Island?
22                  MR. ZELTSER:  Objection to
23          the form.
24          A       Don't remember, don't know.
25          Q       Did you ever fly in a private plane?
```

1

2          A          Many times.

3          Q          In 2007, were you flying

4     between Florida and New York in a private

5     plane?

6          A          Don't remember.

7          Q          Did Fisher Island borrow

8     approximately 1.6 million dollars from

9     Little Rest Twelve?

10          A          Don't remember.

11          Q          Did you authorize Nina to

12     transfer 1.6 million dollars to Fisher

13     Island Holdings?

14          A          Don't know.

15          Q          Could Nina transfer

16     1.6 million dollars out of Little Rest

17     Twelve without your permission?

18          A          I guess.  I don't know.

19          Q          Well, in terms of the way

20     things operated, was she supposed to get

21     your permission first?

22          A          Supposedly, yes.

23          Q          I think I asked you this.

24                     You have an address of 5

25     Chanturia Street, Tbilisi?

```
 1
 2     accountant to file your taxes for this
 3     year?
 4          A      I can't recall.
 5          Q      Who is your accountant today
 6     with respect to U.S. accounting?
 7          A      Some lady, Lana.   I don't
 8     remember her last name.
 9          Q      Lana Koifman?
10          A      Could be, yes.
11          Q      Do you deal with Ms. Koifmam
12     directly when you do your taxes?
13          A      What does that mean
14     directly?
15          Q      Do you speak with her?
16          A      I deal -- if I have to, yes.
17     I don't remember.
18          Q      Is your tax return presently
19     a complicated thing to do?
20          A      I'm not sure.   I guess
21     you'll have to ask the accountant if it's
22     complicated or not.   I don't know.
23          Q      I'm asking.
24                 Is it a very thick document
25     or is it something that you did, two or
```

1

2      three pages?

3           A      I don't remember.

4           Q      Have you sent all of your

5      information from income last year to

6      Ms. Koifmam?

7           A      Probably.

8           Q      When did you do that?

9           A      I don't remember.

10          Q      Did you personally do that

11     or did you have someone else do it for

12     you?

13          A      Can't recall.

14          Q      What is Buddha Lounge LLC?

15          A      (No response given.)

16          Q      You don't know?

17          A      (No response given.)

18          Q      Never heard of it?

19          A      I have heard of it.

20          Q      Tell me what you remember

21     about it.

22          A      I think the name speaks for

23     itself.

24          Q      Do you know where it was?

25          A      No.

1

2    information conveyed to you?

3        A       I don't remember that

4    either.

5        Q       My question was more:   Do

6    you know what's happening at the

7    restaurant itself right now?

8        A       No, I don't.

9        Q       Sir, did you have any input

10   on whether or not Little Rest Twelve paid

11   for apartments for people like David?

12       A       David who?

13       Q       David Kay, your son.   I'm

14   sorry.

15       A       Did I have what:   Knowledge?

16       Q       Input, yes.

17               Did you direct or did you

18   participate in decisions which affected

19   whether David would receive an apartment

20   or not?

21       A       I would consider that

22   day-to-day management.   And that was

23   delegated to the managers of the

24   restaurant.

25       Q       The same thing would be with

1

2      Q     Is it fair to say that if

3  Nina authorized $322,000 to be used

4  for --

5      A     It's not fair.

6      Q     No?  Why?

7      A     Because she wouldn't do it.

8  If she did it, it would be on my order.

9      Q     Well, that was the end of

10  it, that it would have been on your

11  orders.

12           So if this money was used

13  for that purpose, it would have been on

14  your orders?

15      A     Probably.  Why would she let

16  somebody else use it?

17      Q     Understood.

18           So just to be clear, Fisher

19  Island didn't have a plane, but it was a

20  Netjet's contract and you don't know

21  whose name it was in?

22      A     Correct.  I don't know whose

23  name it was in.  But I do remember having

24  a Netjet contract, yes.

25           MR. RUSSO:  Let's take a