# UNITED STATES DISTRICT COURT

## FOR THE

## SOUTHERN DISTRICT OF NEW YORK

---

**HICHAM AZKOUR,**

    *Plaintiff,*

       *v.*                     <u>**Civil Action No. 10-CV-4132 (RJS)(KNF)**</u>

**LITTLE REST TWELVE, INC.**

    *Defendants.*

---

## PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE

---

HICHAM AZKOUR, pro se

93 Pitt Street, Apt. 3B

New York, New York 10002

Email: hicham.azkour@gmail.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5 23 14

1

On May 14, 2014, the Court issued the Order at <u>Docket Entry No. 219</u> requesting that Plaintiff show cause why he should not be sanctioned for some allegedly inappropriate statements made to allegedly offend Defendant's counsel. Plaintiff hereby denies that the alleged statements were allegedly made with the intention to offend counsel or demean him. Counsel seems to be inclined to interpret any attempt to question his misguided actions and judgments, as an attorney, to be personal, *ad hominem* attacks against him. In fact, we believe - and this has inescapably become a pattern – that counsel, whenever he cannot defend or feels frustrated by some ruling or Plaintiff's submissions, frivolously requests that the Court sanction Plaintiff.

This Court, with all due respect, does not appear to miss a single opportunity to join counsel in his foul play, with the hope that Plaintiff will be intimidated by the threat of sanctions and cease from asserting his claims. Not only does Plaintiff question counsel's judgment, but he also questions this Court's as well. And there is nothing offensive in questioning a court's rulings, judgments, motives, prejudices, biases, and intentions. This is the reason why the U.S. Courts of Appeals and the U.S. Supreme Court exist. *See* 28 U.S.C. §§ 1-6 and 41-49.

In any event, during the course of his defense, Plaintiff legitimately made those statements to support his contention that counsel to Defendants is asserting a personal opinion of Plaintiff' mental health and, hence, his credibility and character, without the support of any *admissible evidence,* as prescribed by the Federal Rules of Evidence and the Federal Rules of Civil Procedure. Counsel has been arbitrarily advancing arguments, without any analysis of the evidence, which does not exist anyway, to nefariously assert a position or reach an arbitrary conclusion with respect to Plaintiff's mental health. Moreover, any questions, such as Plaintiff's alleged mental impairments or misdiagnoses, which counsel has every reasonable basis to believe are irrelevant to the instant matter, are maliciously brought by him with the intention to

degrade Plaintiff, discourage him, intimidate him, and harass him so that he may abandon his legitimate claims.

The Court is aware that, for the first time, almost three years ago, Defendant began using maliciously Plaintiff's alleged mental impairments in its response to Plaintiff's motion for partial summary judgment. *See* Docket Entry No. 78 at ¶¶ 22-24, page 5[1]. Therefore, the baseless allegations and misguided defense that Plaintiff is a mentally perturbed individual is not a novelty. On September 19, 2010, Defendant, already adding perjury to insult, supported its false, injurious, and malicious allegations with the doubtful declaration of a doubtful witness. *See* Docket Entry No. 83 at ¶ 9, page 2.

On numerous occasions, Plaintiff complained to this Court and respectfully requested that both Defendant and its attorneys cease offending, demeaning, and degrading him by referring to his alleged mental impairments and his alleged admission into an in-patient mental health program or psychiatric hospital. Plaintiff also requested that Defendant present *admissible evidence*, if any, to support their representations that Plaintiff is mentally deficient.

The Court never directed Defendant and its counsel to cease from using Plaintiff's alleged mental impairments without the *support of admissible evidence*. In fact, without questioning counsel's false allegations, this Court received a letter dated October 12, 2012 and another one dated April 27, 2012 where counsel maliciously reported to this Court Plaintiff's allegedly violent tendencies and where he manipulatively expressed his fear for his safety and life. In another letter dated October 23, 2012, he referred to Plaintiff as a person who is engaging

---

[1] During the July 11, 2011 settlement conference, Plaintiff, in the presence of his former counsel, complained to the Honorable Kevin N. Fox, U.S.M.J., that Defendant's egregious acts unfairly caused Plaintiff to be homeless and be assigned to a mental health shelter by the New York City Department of Homeless Services ("DHS"). Since then, Defendant's counsel capitalized on this statement and began making false allegations as to Plaintiff's mental health.

in the "extraordinarily unpleasant and creepy" acts of speaking of his children. On April 27, 2012, he referred to Plaintiff as a violent "Koran-quoting lunatic." Nonetheless, a year later, counsel inexplicably dissipated his fears and expressed the sudden need to extract evidence from a "Koran-quoting lunatic" and a devious, dangerous, and violent individual.

The Court was not moved.

To put an end to Defendant's malicious acts of mischaracterizing him as a mentally incapacitated individual, Plaintiff, on January 19, 2012, made a motion for the appointment of a guardian ad litem, knowing beforehand that it would be denied. The Court was taken by surprise and was not sure how to entertain such motion. Again, on May 23, 2012, Plaintiff renewed his motion. On August 23, 2012, the Honorable Fox issued a Memorandum & Order in the related matter *Azkour v. Haouzi, et al.*, <u>11-CV-5780 (RJS)(KNF)</u> ("Civil Rights Action") denying Plaintiff's said motion. *See* Civil Rights Action <u>Docket Entry No. 86</u>. Nothing in the medical reports submitted to the Honorable Fox in the Civil Rights Action or this Court suggest that Plaintiff is incompetent or mentally ill. In fact, despite the issuance of some questionable psychiatric and psychosocial reports, no health practitioner has even accepted to submit an affidavit certifying that Plaintiff's psychiatric evaluations are accurate and that he is competently and correctly diagnosed with a mental illness. *See* the exchange of emails between Plaintiff and the BRC staff at <u>EXHIBIT A</u>. The Court may note that Dr. Angela Kedzior[2], the BRC Medical Director, ignored Plaintiff's emails for the simple reason that she never examined him and she has no knowledge as whether the ailments reported in her nurses' evaluations were identifiable and correctly diagnosed.

---

[2] Dr. Angela Kedzior is a defendant in the unrelated matter *Azkour v. Bowery Residents' Committee, Inc., et al.*, <u>13-CV-5878-TPG</u>.

Despite the facts and the Honorable Fox's findings, counsel to Defendant and this Court continue to question Plaintiff's mental stability. The Court, in a controversial ruling at <u>Docket Entry No. 187</u>, appears to be acting as the Social Security Administration Commissioner and, without the support of any admissible evidence[3], decides that Plaintiff has been so mentally ill that he was not able to seek and maintain any employment at all. Since March 26, 2014, this Court has issued rulings in violation of the laws of the United States and the State of New York. In these rulings, the Court, *inter alia*, deliberately disregarded and violated the following statutes, regulations, rules, and legal authorities: 42 U.S.C. § 12102 *et seq.,* 42 U.S.C. § 601 *et seq.,* 29 U.S.C. § 214(c), Rule 56(c)(4) of the Federal Rules of Civil Procedure, Rule 803(6) of the Federal Rules of Evidence, 29 C.F.R § 525.1 *et seq., United States v City of New York,* <u>359 F3d 83 (2d Cir. 2004)</u>, *cert. denied* <u>543 US 1146 (2005)</u>, *Weidenfeller v. Kidulis,* <u>380 F. Supp. 445 (E.D. Wis. 1974),</u> and *Souder v. Brennan,* <u>367 F. Supp. 808 (D.C.D.C. 1973)</u>. The Court issued its decision based upon the fact that Plaintiff was assigned by DHS to a mental health shelter. In its <u>Order at Docket Entry No. 210</u>, the Court states:

> Although Plaintiff did not provide this evidence until after the Court's decision, the Court has reviewed the record and determined that *there is scant evidence* supporting the Court's conclusion that the assignment to the mental health shelter was indicative of the [4] severity of Plaintiff's mental illness. As such, the Court's conclusion must be reconsidered (emphasis added).

The Court even admits that Defendant articulates a "position". However, the Court does not state upon which sort of evidence Defendant supports its position:

> Given that Defendant's position is that Plaintiff has been sufficiently mentally ill to relieve them of [liability] since the retaliatory firing, and that Plaintiff's position will

---

[3] The Court seems to have decided the outcome of this case before reviewing the evidence for the purpose of its ruling on the cross-motions for summary judgment as to Plaintiff's monetary damages.

[4] One may note that the language used by the Court reveals that it has already made a judgment, albeit without the support of any admissible evidence that Plaintiff suffers from mental illness to a certain degree in severity.

> likely be that he was never sufficiently mentally ill, reconsidering the cut-off-date holding will have no effect on the issue to be tried and will have minimal effect on the evidence to be presented.

Evidently, this explains Plaintiff's contention that the Court ruled on his motion for summary judgment based upon hearsay evidence only. In fact, by illegitimately introducing Plaintiff's alleged mental impairments, this Court tried an issue of fact, instead of determining whether there are issues to be tried. As far as Plaintiff's mental health is concerned, there are no issues to be tried at all. The reason simply resides in the fact that Plaintiff, at all times relevant, has never been mentally ill or incompetent. In addition, there is not a scintilla of admissible evidence, in the entire record before this Court, which points to the allegation that Plaintiff has been suffering from any mental deficiency. Somehow erratically, the Court appears to justify its improprieties by contradicting itself and illogically ruling that lay jurors - *not medical experts* - may be permitted to decide if Plaintiff is mentally ill:

> Accordingly, the Court holds that a jury will be permitted to decide whether Plaintiff was sufficiently mentally ill or not for the entire period from Plaintiff's firing to the present.

*Id.* Although the Court admits that *there is scant evidence* (there is none, in fact) supporting its conclusion that the assignment of Plaintiff by DHS to a mental health shelter was indicative of the severity of his mental illness, it selectively and conveniently reconsidered its Order at Docket Entry No. 187 by deciding to direct the examination of this "scant evidence" to lay jurors. And curiously, the Court's act of reconsideration was at the detriment of Plaintiff's right to due process. Indeed, while Plaintiff was still editing his reply to Defendant's opposition to his motion for reconsideration, *see* Docket Entry No. 216, and as if the Court were avoiding that Plaintiff submit additional evidence and more convincing arguments to support his position, the Court denied Plaintiff the right to submit his reply by May 12, 2014. The Court is not naïve and is unequivocally aware that there is *no indicium of evidence* in the record, suggesting that Plaintiff

is mentally ill. The medical records received by the Court or the testimony of a lay witness regarding Plaintiff's mental health are, in the context of a motion for summary judgment, *irrelevant* and *inadmissible* as per Rule 402 of the Federal Rules of Evidence. So, why mental illness has suddenly become an issue?

The decision to refer this artificial issue to lay jurors is not a coincidence and is not supported by any law in the Second Circuit or any other circuit. The Court declined to rule on the admissible evidence because, considering the fact that Defendant has already failed to support its contention that Plaintiff is mentally ill, would result in a "windfall" for Plaintiff, which the Court, for personal reasons, arbitrarily find undeserved[5]. In adherence to its prejudices towards Plaintiff, the Court made the decision to refer the illegitimate mental health issue to a jury because, based upon its experience as a former criminal prosecutor, the Court is fully aware that lay jurors will not view[6] Plaintiff as a credible witness. Jurors will reject his testimony as unreliable because he will be painted by Defendant as a severely mentally ill patient, as some hobo who has lived his entire life in homeless shelters, and as a lazy, welfare recipient who will not be persuasive in convincing them that he was able to seek employment, let alone maintain such employment. In other words, this Court, in an act of deliberate, overt bias, decided to allow Defendant to present inadmissible, prejudicial evidence to the jurors, while denying Plaintiff his reliance on admissible expert testimony to rebut Defendants' false allegations. The court in *O'Brien v. Chaparro*, No. 05-80342-CIV, 2005 WL 6011248, at *2 (S.D. Fla. Dec. 8, 2005) noted that "the remaining stigma in our society of mental illness makes admission of such evidence in this case

---

[5] In fact, the Court made some inappropriate statements, during the April 17, 2014 conference, signifying that Plaintiff will not be found credible by a fact finder as to the mitigation of his damages. In fact, the Court meant that Plaintiff, during the four years of this litigation, has been waiting for the "windfall" to come.

[6] This is the reason why the Court, during the April 17, 2014 conference, made the inappropriate statement that no fact finder would issue a verdict in Plaintiff's favor.

to be substantially more prejudicial than probative[.]" Clearly, any evidence presented by Defendant to the jurors, be it through its medical expert or otherwise, would be inadmissible pursuant to Rule 403. Federal courts demonstrate reluctance to admit such evidence in the civil context, particularly where the primary evidence of such mental illness came through an expert forensic psychiatrist retained by the defendant rather than from current clinical treatment records of the plaintiff. In the instant matter, clinical records, if they truly are so, are inaccurate and cannot be authenticated. Unfortunately, as stated and demonstrated in Plaintiff's submission at Docket Entry No. 216, the Court has been engaging in these acts of bias and prejudice since the dismissal of Plaintiff's former attorney. It is not an assumption to say that the Court is irrelevantly and biasedly questioning Plaintiff's character because of his disagreement with his former counsel, who, as a matter of fact and law, never questioned Plaintiff's mental health or competence and reported[7] it to this Court as required by his profession's ethics. Moreover, the Court's bias has been exposed because it made inappropriate comments about Plaintiff's mental health and based its comments and biased conclusions *on the inexistence of admissible evidence*. In addition to excludable lay witnesses' affidavits, the Court appeared to have relied on some records which are not certified to be authentic, accurate, produced, and kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit. This Court relied on "scant evidence" or records that it cannot ascertain they are from a reliable source or that their preparation indicates no lack of trustworthiness. *See* Rule 803(6) of the Federal Rules of Evidence.

Plaintiff does not believe that he will further sustain this bias and hostility from the Court and, with due respect, will refer his grievances to the U.S. Court of Appeals for the Second Circuit and its Chief Judge.

---

[7] *See* Rule 1.14 of the New York Rules of Professional Conduct.

As we have repeatedly stated to this Court in previous affidavits, the transfer from a DHS assessment facility to another shelter, which may be a mental health shelter or not, does not indicate that the transferee is necessarily mentally ill or drug addicted. *See* 18 NYCRR §§ 900.8 and 900.6; *see also* EXHIBIT B. A string of cases dating back to 1979 establishes a general right to shelter in New York, rooted in the New York State's Constitution. *See Callahan v. Carey,* 307 A.D.2d 150, 762 N.Y.S.2d 349, 351 (1st Dept.2003). However, the right to shelter is not a "boundless ... entitlement" and may be subject to eligibility requirements and other limitations. *Callahan,* 762 N.Y.S.2d at 351. *The implementing directive promulgated by the New York State Office of Temporary and Disability Assistance makes it clear that broad discretion is given to local authorities in assigning the homeless to shelters.* 94 ADM-20(V)(D)(3)[8]. The directive explicitly states, "Homeless persons do not have the right to choose their own temporary placements." *Id.* Additionally, as we explained to the Court on numerous occasions, there are abuses by the homeless shelter's medical staff when they deliberately misdiagnose their non-mentally ill residents and compel non-drug addicted individuals to attend substance abuse programs, most of the time for financial gain and to abuse the Medicaid and the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA).

It is now undebatable that Plaintiff's allegedly offensive statements impartially report facts and ethical violations that have occurred before and on November 26, 2013. One is afraid they are still ongoing. These facts are verifiable because they were recorded. Plaintiff did not *personally* attack Defendant's counsel by questioning his *professional* judgment. Yet, upon numerous occasions, Defendant and its counsel questioned Plaintiff's *sanity and mental stability,*

---

[8] http://otda.ny.gov/policy/directives/1994/ADM/94_ADM_20_updated96.pdf

most of the time by attacking him *personally,* without the least shred of evidence as to his

alleged mental impairments. Rather, Plaintiff's allegedly offensive and inappropriate statements

question counsel's *professional* judgment because while he has been falsely representing to this

Court that Plaintiff is mentally ill, to the extent that he may be dangerous to himself and others,

he nevertheless lengthily examined him during the November 26, 2013 deposition proceeding,

where he sat next to him in a closed space. This does not reflect that Defendant has been truthful

to the Court or exercised a sound *professional* judgment when he chose to sit next to Plaintiff,

shout into the ear of an alleged mentally ill individual, and aggressively examine him.

As communicated to this Court, Plaintiff possesses evidence that Defendant's counsel

engaged in aggressive, offensive, and an inappropriate conduct such as shouting, yelling,

addressing Plaintiff in a threatening tone, grunting in frustration, and repeatedly asking the same

question with the intention to sow fear and confusion in Plaintiff's mind, and when Plaintiff

truthfully provided counsel with the same answer to the same question, counsel would just show

more anger and irascibility to the extent that Plaintiff was questioning his ability to complete the

deposition. This is not a conduct which is usually attributable to a person devoid of

"disturbance[s] in behavior, feeling, thinking, or judgment." In fact, this is the very conduct

attributable to a mentally ill individual. A person who shouts at another person sitting next to

him gives rise to serious questions about the shouter. The Court must review the audio recording

to fairly determine the gravity of the misconduct herein reported. To any reasonable, rational,

mentally stable person, this is not a normal conduct. This conduct or, rather, misconduct, within

the above-mentioned circumstances and setting, is contradicted by any statements or

misrepresentations made by counsel to this Court that he has knowledge that Plaintiff is mentally

ill and that he may be harmful to himself or others. No reasonable fact finder will be unable to

ultimately reach the conclusion that an individual who lengthily examines an allegedly delusional, depressed, schizophrenic individual for about two hours must be (a) either a mental health specialist; or (b) a person suffering from the same mental ailments as his interlocutor. An attorney who extracts and admits the testimony of a severely mentally ill witness, which he knows to be in such a deplorable condition, and then discredits his testimony, has truly and factually exercised a questionable *professional* judgment. More than that, he has committed an ethical violation of <u>Rule 3.4 of the New York Rules of Professional Conduct.</u>

Finally, "[i]mposition of [financial] sanctions under a court's inherent powers requires a specific finding that [a party] acted in bad faith." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage,* <u>564 F.3d 110, 114 (2d Cir. 2009).</u> "Moreover, inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Id.* "A finding of bad faith, and a finding that conduct is without color or for an improper purpose, must be supported by a high degree of specificity in the factual findings." *Id.* Additionally, "when a court [imposes financial sanctions], it must take into account the financial circumstances of the plaintiff." *See Sassower v. Field,* 973 F.2d 75, 81 (2d Cir. 1992). Here, this Court did not make a specific finding of bad faith. Moreover, although the Court states that Plaintiff received a warning because of an alleged history of making inappropriate statements directed to Defendant's counsel, it neither *explicitly* found that Plaintiff's alleged statements had been made outside the course of his legitimate submissions, or uttered for any improper purpose nor identified the "clear evidence" of such a purpose. Furthermore, this Court did not consider, as it should, Plaintiff's financial circumstances when showing its desire to impose sanctions upon him. *Id.*

Plaintiff believes that any sanctions imposed upon him by this Court will constitute a furtherance of its bias and abuse of discretion.

**WHEREFORE**, Plaintiff respectfully requests that this Court afford him due process by scheduling an *open court hearing* where he may produce evidence, which consists of an audio recording of the aforementioned November 26, 2013 proceedings, *see* EXHIBIT C, and demonstrate that counsel to Defendant engaged in misconduct and that Plaintiff's questioning his judgment thereafter was not dictated by bad faith or evil motive.

Plaintiff's requests such open court hearing to demonstrate to the Court, by the preponderance of the evidence, that counsel' repetitive complaints are not made in good faith, but are rather deliberate attempts to derail this litigation off its predictable track and create further false mental health issues to avoid liability and satisfaction of judgments against its client.

Respectfully submitted on May 23, 2014

By:     HICHAM AZKOUR, pro se

12

# **EXHIBIT A**



Hicham Azkour <hicham.azkour@gmail.com>

## Psychiatric Evaluation & Declaration of Dr. Kedzior

7 messages

**HICHAM AZKOUR** <hicham.azkour@gmail.com>                    Fri, Sep 7, 2012 at 4:23 PM
To: tmiller@brc.org, akedzior@brc.org
Cc: temanuel@brc.org

Dear Ms. Miller:

Following our conversation today, I hereby request in writing that BRC provide me with my recent psychiatric evaluation and a declaration of Dr. Angela Kedzior supporting said evaluation.

These documents will be used in a pending litigation against my former employer who caused my homelessness REDACTED by retaliating against me and unlawfully terminating my employment. See attached Court Order.

During my last evaluation by Ms. Mary Gray, I set forth the facts surrounding this litigation REDACTED

REDACTED

If it is required to meet with with Dr. Kedzior to explain my case, I would like you to schedule an appointment as soon as possible.

If you deny my request because of policy issues, please let me know if subpoena is required.

Hicham Azkour

---

**HICHAM AZKOUR** <hicham.azkour@gmail.com>                    Mon, Sep 10, 2012 at 2:03 PM
To: Tereen Miller <TMiller@brc.org>, Angela Kedzior <AKedzior@brc.org>
Cc: Taheerah Emanuel <TEmanuel@brc.org>

Ms. Miller:

Have you reached any decision as to my request?

Hicham Azkour

---

**From:** Tereen Miller <TMiller@brc.org>
**Date:** Sat, 8 Sep 2012 17:04:58 +0000
**To:** "hicham.azkour@gmail.com" <hicham.azkour@gmail.com>, Angela Kedzior <AKedzior@brc.org>
**Cc:** Taheerah Emanuel <TEmanuel@brc.org>
**Subject:** RE: Psychiatric Evaluation & Declaration of Dr. Kedzior

Hello Mr. Azkour,

I have received your email and we are currently going through our internal process regarding this request. We will
have a response for you early next week.

Thanks,

Tereen Llewelyn-Miller
Assistant Director
BRC's Jack Ryan Residence
131 W 25th Street, Floors 6-9
New York, NY 10001
Phone: 212-293-6709 ext. 8671
Fax: 212-293-6706 or 6704

---

**From:** HICHAM AZKOUR [hicham.azkour@gmail.com]
**Sent:** Friday, September 07, 2012 4:23 PM
**To:** Tereen Miller; Angela Kedzior
**Cc:** Taheerah Emanuel

---

**Tereen Miller** <TMiller@brc.org>                                  Tue, Sep 11, 2012 at 2:30 PM
To: HICHAM AZKOUR <hicham.azkour@gmail.com>
Cc: Taheerah Emanuel <TEmanuel@brc.org>, Laura Beckloff <lbeckloff@brc.org>

Let's set up a time for you, Taheerah, and I to meet.  I will speak with Taheerah.  Does Thursday at 2:30pm
work? If not, then let me know a few times you may be available.


Thanks


Tereen Llewelyn-Miller

Assistant Director

BRC's Jack Ryan Residence

131 W 25th Street, Floors 6-9

New York, NY 10001

Phone: 212-293-6709 ext. 8671

Fax: 212-293-6706 or 6704

---

**From:** HICHAM AZKOUR [mailto:hicham.azkour@gmail.com]
**Sent:** Monday, September 10, 2012 2:03 PM
**To:** Tereen Miller; Angela Kedzior
**Cc:** Taheerah Emanuel
**Subject:** Re: Psychiatric Evaluation & Declaration of Dr. Kedzior

Ms. Miller:

Have you reached any decision as to my request?

Hicham Azkour

---

**From:** Tereen Miller <TMiller@brc.org>
**Date:** Sat, 8 Sep 2012 17:04:58 +0000
**To:** "hicham.azkour@gmail.com" <hicham.azkour@gmail.com>, Angela Kedzior <AKedzior@brc.org>
**Cc:** Taheerah Emanuel <TEmanuel@brc.org>
**Subject:** RE: Psychiatric Evaluation & Declaration of Dr. Kedzior

Hello Mr. Azkour,

I have received your email and we are currently going through our internal process regarding this request. We will
have a response for you early next week.

Thanks,

Tereen Llewelyn-Miller
Assistant Director
BRC's Jack Ryan Residence

# EXHIBIT B



NY Department of
State-Division of
Administrative Rules

Home   Search   Help   ©

# Welcome to the online source for the
# New York Codes, Rules and Regulations

## 18 CRR-NY 900.6

18 CRR-NY 900.6

18 CRR-NY 900.6

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK
TITLE 18. DEPARTMENT OF SOCIAL SERVICES
CHAPTER II. REGULATIONS OF THE DEPARTMENT OF SOCIAL SERVICES
SUBCHAPTER L. HOMELESS HOUSING AND ASSISTANCE PROGRAM
PART 900. SHELTER FOR FAMILIES

Current through April 15, 2014

\* Section 900.6.\* Admissions.

(a) Any homeless family which applies to a social services district may be considered for referral to a tier I or tier II facility. Any homeless pregnant woman, 16 years of age or older, who applies to a social services district, may be considered for referral to a congregate shelter for homeless pregnant women.

(b) Local social services districts will not be reimbursed for the costs of providing shelter care and services to families referred to a facility which does not have an approved operational plan.

(c) To the extent possible, referrals must be made to facilities whose location will minimize the dislocation of the family from the family's community and schools.

(d) Social services districts may not refer a family which includes a pregnant woman or an infant under six months of age to a tier I shelter.

(e) Social services districts may not refer to a tier I shelter a family which includes a member having a medical, physical or other special need which cannot be adequately served in the facility.

(f) A district may not refer to a family shelter any family containing a member who:

(1) has a mental or physical condition that makes such placement inappropriate or otherwise may cause danger to him/herself or others;

(2) is likely to substantially interfere with the health, safety, welfare or care of other residents;

(3) is in need of a level of medical, mental health, nursing care or other assistance that cannot be rendered safely and effectively by the facility, or that cannot be reasonably provided by the facility through the assistance of other community resources; or

(4) has a generalized systemic communicable disease or a readily communicable local infection which cannot be properly isolated and quarantined in the facility.

(g) When a family cannot be referred to a facility for any of the reasons set forth in subdivision (f) of this section, the local social services district must ensure that action is taken which is appropriate to the health, safety and needs of the family member and the family. Such action may include referral to appropriate medical services, child welfare agency, adult protective or law enforcement agency, or similar entity. All reasonable efforts must be made to keep the family intact. No such alternate referral may be made unless the family has been advised of the reasons and informed of its placement options for remaining together as a family.

(h)

(1) All applicants for admission to a facility must have a preliminary health examination completed preferably at or before the time of intake but in no case later than 24 hours after admission to the facility. Such examination must be performed by qualified medical personnel to ascertain the general health of the family and/or the presence of communicable diseases, and to verify pregnancy. In no event may a person exhibiting symptoms of a generalized systemic communicable disease or a readily communicable local infection be admitted, unless the person can be properly isolated and quarantined in the facility.

(2) Notwithstanding paragraph (1) of this subdivision, a new preliminary health examination is not required when a family moves from one temporary housing placement to another temporary housing placement while staying in the social services district's emergency housing system, if the original

preliminary health examination is less than one year old and the preliminary health examination and relevant health and medical information is sent to the receiving facility at or prior to the family's arrival. Sending facilities or social services districts are required to send relevant health and medical information to receiving facilities, including any recommendation for additional health screening due to a family member's medical condition, promptly upon the family's arrival, but in no instance later than 72 hours after the family's arrival.

(3) Additional screening and referral for physical examination, laboratory and tuberculin tests, inoculations and other appropriate treatment must be provided at the request of the medical personnel performing the preliminary health examination or at the request of the family.


CROSS REFERENCES:
Responsibility for public assistance and care, Social Services Law § 62.


RESEARCH REFERENCES AND PRACTICE AIDS:
18 NY Jur 2d, Cemetaries and Dead Bodies § 72.
88 NY Jur 2d, Public Welfare and Old Age Assistance §§ 31, 42, 43, 48.
107 NY Jur 2d, Veterans § 17.
79 Am Jur 2d, Welfare Laws §§ 49, 51---54.

**18 CRR-NY 900.6**
**18 CRR-NY 900.6**
**2011 WL 74158335**
**18 CRR-NY 900.6**

**END OF DOCUMENT**


© 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.
Adobe Reader is required to view PDF images.



---

**Westlaw, part of Thomson Reuters**
© 2014 West | Privacy | Accessibility







NY Department of
State-Division of
Administrative Rules

**Home   Search   Help   ©**

# Welcome to the online source for the New York Codes, Rules and Regulations

## 18 CRR-NY 900.8

18 CRR-NY 900.8

18 CRR-NY 900.8

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK
TITLE 18. DEPARTMENT OF SOCIAL SERVICES
CHAPTER II. REGULATIONS OF THE DEPARTMENT OF SOCIAL SERVICES
SUBCHAPTER L. HOMELESS HOUSING AND ASSISTANCE PROGRAM
PART 900. SHELTER FOR FAMILIES

Current through April 15, 2014

\* Section 900.8.\* Transfer and discharge from shelters for families.

(a) Involuntary discharge.
(1) Upon entry to a facility, each family must be advised in writing of the rules of the facility and residents' rights and obligations while residing in the facility. Each family must be advised in writing of the consequences of failing to comply with the rules of the facility, including discharge from the facility and, in certain circumstances, discontinuance of temporary housing assistance.
(2) A facility operator may discharge a family or family member involuntarily from a tier I or tier II facility when the family or family member engages in the following types of conduct or activities:
(i) acts which endanger the health or safety of such person or others;
(ii) acts which substantially and repeatedly interfere with the orderly operation of the facility, including violations of the facility rules;
(iii) unreasonably fails to actively seek or follow up on referrals to housing other than temporary housing;
(iv) unreasonably fails to cooperate in developing, carrying out and completing a service or an independent living plan as required by the social services district;
(v) possesses or sells drugs illegally;
(vi) fails to apply for public assistance benefits within two working days of admission to the facility or to reapply for public assistance benefits within two working days if the family's or family member's case is closed while residing in the facility;
(vii) fails to pay the shelter provider the family's share of the cost of temporary housing in the amount determined by the social services district;
(viii) fails to constitute a family as defined in section 900.2 of this Part and cannot reasonably be expected to constitute a family within 30 days of the date it is determined the resident(s) does not constitute a family;
(ix) is absent from the facility for more than 48 hours without having complied with the facility's rules concerning absences;
(x) fails to comply with public assistance requirements, including, but not limited to, those set forth in section 352.35(e) of this Title, where the failure to comply results in discontinuance of public assistance benefits;
(xi) steals or deliberately destroys property belonging to another resident, staff, shelter visitors, or deliberately destroys shelter property; or
(xii) is no longer medically appropriate to reside in the facility.
(3) Notwithstanding paragraph (2) of this subdivision, in instances where a family's or family member's temporary housing assistance has been discontinued pursuant to section 352.35 of this Title, the facility operator must discharge the family or family member as directed by the social services district.
(4) If the family or family member is currently residing in a tier I or tier II facility, and the family's or family member's temporary housing assistance has not been discontinued pursuant to section 352.35 of this Title, the family or family member may be involuntarily discharged to another tier II facility or

similar facility, a tier I facility as appropriate or, if family shelter care is no longer appropriate, to other housing.

(5) A decision to discharge a family or family member involuntarily may be challenged in a pre-discharge hearing conducted by the social services district, or its designee, in accordance with procedures contained in the operational plan approved by the office, unless the family's or family member's temporary housing assistance has been discontinued pursuant to section 352.35 of this Title. If the social services district does not directly operate the tier II facility, it may designate the operator of the facility to conduct such discharge hearings. Where the social services district so designates the operator, it is the operator's responsibility to ensure that such hearings are conducted by an impartial adjudicator. The adjudicator may not be staff or an employee of the facility in which the family or family member resided when the notice of discharge was issued. The adjudicator must not have been a party to the decision to discharge the family or family member, or be subordinate to the person(s) who made the decision. The social services district must monitor hearings conducted by adjudicators pursuant to procedures which have been submitted to, and approved by, the office. If a pre-discharge hearing is requested, and the family's or family member's temporary housing assistance has not been discontinued pursuant to section 352.35 of this Title, the family or family member must be allowed to remain in a tier II facility pending the issuance of the decision after hearing. All decisions must be in writing on a form prescribed by the office.

(6) Unless the family's or family member's temporary housing assistance has been discontinued pursuant to section 352.35 of this Title, no family or family member may be involuntarily discharged until the following procedures are observed:

(i) for families residing in tier II facilities, the family has been given written notice on a form prescribed by the office of the discharge decision and of the reasons therefor; such notice must include a statement that the family or family member has a right to a pre- discharge hearing conducted by the social services district, or the social services district's designee. If any such hearing is requested, such notice must include a statement that the family or family member has the right to remain in the facility pending the issuance of the decision after hearing. Such notice must include a statement that if the family or family member participates in such a hearing and receives an adverse hearing decision, that the family or family member must leave the facility, but may request a fair hearing held under Part 358 of this Title to challenge the discharge decision and a statement describing how such a fair hearing may be obtained;

(ii) the family's need for protective services for adults, preventive services or protective services for children, or for other social services has been evaluated and an appropriate referral has been made if necessary; and

(iii) if criminal activity may have occurred, the appropriate law enforcement agency has been contacted;

(iv) if the family member to be involuntarily discharged is a minor child or the sole parent or caretaker relative of a child under the age of 18, provision for care, services, and support for the minor child and the family has been made consistent with the needs of the child and family; such care, services, and support must be provided in a manner consistent with current statute and regulation, including but not limited to sections 430.9 (appropriate provision of mandated preventive services) and 430.10 (necessity of placement) of this Title.

(7) A family or family member who has been involuntarily discharged from a tier II facility and who has requested and participated in a hearing as described in paragraph (6) of this subdivision may, after such discharge, request a fair hearing from the office under Part 358 of this Title to review the decision to discharge, unless the family's or family member's temporary housing assistance has been discontinued pursuant to section 352.35 of this Title. If the family or family member's temporary housing assistance has been discontinued pursuant to section 352.35 of this Title, such family or family member may request a fair hearing in accordance with section 352.35(h) of this Title.

(8) A family or family member who has requested a fair hearing as described in paragraph (7) of this subdivision and who is found by the fair hearing decision to have been wrongfully discharged from the facility must be offered an opportunity to return to the tier II facility from which the family or family member was discharged as soon as an appropriate vacancy becomes available. No such opportunity may be offered if the family or family member no longer meets the requirements for residency in a tier II facility as set forth in section 900.6(f) of this Part or if the family or family member has obtained permanent housing.

(9) A family or family member may be involuntarily discharged from a tier II facility without being provided a hearing as described in paragraphs (6) and (7) of this subdivision to review the discharge if the basis for the discharge is that the family or family member is no longer medically appropriate to reside in the facility, as determined by qualified medical personnel, the family or family member's temporary housing assistance has been discontinued pursuant to the provisions of section 352.35 of this Title or, the family or family member has been absent from the facility for more than 48 hours without having complied with the facility's rules concerning absence and has not been readmitted to the facility. The 48-hour period begins at the start of the period of the unauthorized absence. A written record of all unauthorized absences must be maintained by the facility: A family or family

member who is being discharged without being provided a hearing pursuant to paragraph (6) of this subdivision must be provided, in writing, with the reason for discharge.

(10) After receiving notification from the social services district of its intention to discontinue temporary housing assistance pursuant to the provisions of section 352.35 of this Title, a family or family member may not be involuntarily discharged pursuant to the provisions of this subdivision without the approval of the social services district.

(b) Transfers from tier II facilities.

(1) A family or family member residing in a tier II facility may be transferred to another tier II facility or to a hotel or motel regulated in accordance with section 352.3(e) through (h) of this Title only if one of the following conditions exists:

(i) the family has requested such a transfer and provided a reason and justification for their request, and appropriate space is available for the family. Such transfer is at the discretion of the local social services district;

(ii) a family member has a systemic communicable disease, illness, or readily communicable local infection which cannot be properly isolated or quarantined in the family's current tier II residence which necessitates a transfer to a facility which has been designed in whole or in part to serve such conditions; or

(iii) a family member has a medical, physical, or other special need which cannot be adequately served in the family's current tier II facility.

(2) Except as provided in this section, families may not be transferred from a tier II facility except to a permanent housing arrangement.

(c)

(1) Whenever a family member is to be transferred or discharged, the social services district must ensure that the action to be taken is appropriate to the health, safety, and needs of that family member and the family. Such action may include referral to appropriate medical services, child welfare agency, adult protective or law enforcement agency, or similar entity. All reasonable efforts must be made to keep the family intact.

(2) Prior to any transfer or discharge of a family member pursuant to subdivision (a) or (b) of this section other than a discharge based upon a discontinuance of temporary housing assistance as provided for in section 352.35 of this Title, social services district staff must advise the remaining family members of all housing options available to them. Such options may include:

(i) transfer of all or part of the family along with the family member;

(ii) continued housing of the remaining family members in their current facility, provided that the remaining family members constitute a family as defined in this Part; or

(iii) placement in other types of facilities.

(d) If, as a result of the transfer or discharge of a family member from a facility, the family members remaining in the facility no longer constitute a family as defined in this Part, the local social services district must make appropriate arrangements for those persons to be housed elsewhere in accordance with subdivision (c) of this section and with all other applicable provisions of this Title, unless such discharge is based on a discontinuance of temporary housing assistance pursuant to section 352.35 of the Title.

(e) Involuntary discharge from congregate shelters for homeless pregnant women.

(1) When a resident engages in conduct which endangers the health or safety of such resident or others, repeatedly behaves in a manner which substantially interferes with the orderly operation of the shelter or is diagnosed as having a generalized systemic communicable disease or a readily communicable local infection, the social services district must discharge the resident to an appropriate alternate living arrangement, unless such resident's temporary housing assistance is discontinued pursuant to section 352.35 of this Title. Such arrangements are defined for the purposes of this Part as being permanent housing, a hotel/motel, a tier II facility or other similar facility. A resident also may be discharged to another congregate shelter for homeless pregnant women, unless the basis for discharge is that the resident has been diagnosed as having a generalized systemic communicable disease or a readily communicable local infection.

(2) No resident may be discharged involuntarily until the following procedures have been followed:

(i) the resident has been given written notice of the discharge and the reasons for the discharge. Additionally, residents who are to be discharged for endangering others or substantially interfering with the orderly operation of the shelter must be notified that they have the right to request a facility hearing to challenge the discharge and if a hearing is requested, must be advised of the right to remain in the shelter pending the issuance of the decision after the hearing;

(ii) a resident's need for protective services for adults has been evaluated, and an appropriate referral has been made, if necessary; and

(iii) if criminal activity may have occurred, the appropriate law enforcement agency has been contacted.

(3) The district must maintain a written record of all involuntary discharges.

(f) Automatic discharge from congregate shelters for homeless pregnant women. A resident will be deemed to be automatically discharged:

(1) when the resident gives birth to her child;
(2) the pregnancy is terminated; or
(3) when the resident leaves the shelter prior to the completion or termination of her pregnancy.

18 CRR-NY 900.8
18 CRR-NY 900.8
2011 WL 74158337
18 CRR-NY 900.8

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.
Adobe Reader is required to view PDF images.



Westlaw, part of Thomson Reuters
© 2014 West | Privacy | Accessibility



# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

IN THE MATTER OF AN APPLICATION
TO BRING AN ELECTRONIC DEVICE(S)
INTO THE COURTHOUSES OF THE
SOUTHERN DISTRICT OF NEW YORK
FOR USE IN A TRIAL OR PROCEEDING

——————————————————————— x

*[handwritten: pro se litigant] [KNF USM.T]*   *[handwritten: electronic device] [KNF USM.T]*

I hereby authorize the following ~~attorney(s)~~ to bring the ~~General Purpose Computing Device(s)~~ *[KNF USM.T]* ("GPCD") listed below into the Courthouse for use in a trial or proceeding in the action entitled AZKOUR v. HAOUI *[handwritten]* No. ~~11 Civ.~~ 5780 (RJS)(KNF) which is anticipated to begin on 11/26/2013 and conclude on 11/26/2013.

| Attorney | Device(s) |
|---|---|
| 1. HICHAM AZKOUR | VOICE RECORDER |
| 2. | |
| 3. | |

*[handwritten: pro se litigant] [KNF USM.T]*   *(Attach Extra Sheet If Needed)*

The ~~attorney(s)~~ identified in this Order must present a copy of this Order when entering the Courthouse. ~~Their bringing of the equipment into the building constitutes a certification by them that the electronic device(s) lack (a) the capacity to make or record images or sounds or to send or receive wireless transmissions, and (b) one or more infrared ports or, alternatively, that any such capability or ports have been disabled. They shall not use or permit the use of such equipment to make or record images or sounds or to send or receive wireless transmissions.~~ *[KNF USM.T]* They shall comply in all respects with the requirements printed on the reverse side of this page. *[KNF H-E4]* *[KNF USM.T]*

     This order does not authorize any attorney or law firm to bring more than three GPCDs into the Courthouse unless its receipt has been acknowledged below by the Chair of the Court's Technology Committee.

     SO ORDERED.

Dated: 10/31/2013

_____
*[signature: Kevin Nathaniel Fox]*
United States Judge

RECEIPT ACKNOWLEDGED

_____
Chair (or designee), Technology Committee

Revised: August 29, 2013

*(The provisions on page 2 are an integral part of this order.)*

2

## ADDITIONAL PROVISIONS

1.      The term General Purpose Computing Device ("GPCD") as used in this Order is defined as set forth in Local Civil Rule 1.8.

2.      GPCD screens and monitors are limited to one screen or monitor per GPCD and shall not obstruct vision or otherwise interfere with the proceedings.

3.      Printers, scanners and other noise-emitting devices shall not be connected to authorized GPCDs while GPCDs are in a courtroom.

4.      No GPCD shall be connected to the Court's computer network or any device connected thereto.  No GPCD that is connected to a court reporter's device for the purpose of receiving a real-time feed may be networked with any other GPCD or Personal Electronic Device.